# 20-3587-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————

MEREDITH BUSHER, as Co-Personal Representative of the Estate of Eugene L. Busher, ELLEN BUSHER, as Co-Personal Representative of the Estate of Eugene L. Busher, NANCY TUMPOSKY,

*Plaintiffs-Appellants,*

EUGENE L. BUSHER,

*Plaintiff,*

— v. —

DESMOND T. BARRY, JR., THOMAS T. EGAN, JOHN P. HEANUE, WILLIAM M. KELLY, FRANCIS P. BARRON, WINGED FOOT GOLF CLUB, INC.,

*Defendants-Appellees,*

WINGED FOOT HOLDING CORPORATION,

*Nominal Defendant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

SANFORD F. YOUNG
LAW OFFICES OF SANFORD F. YOUNG, P.C.
One World Trade Center, Suite 8500
New York, New York 10007
(212) 227-9755

*Appellate Counsel*

JOHN HALEBIAN
ADAM C. MAYES
LOVELL STEWART HALEBIAN
   JACOBSON LLP
60 East 42nd Street, 40th Floor
New York, New York 10165
(510) 500-5010

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iv

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES PRESENTED...............................................................2

STATEMENT OF THE CASE...............................................................................2

I.    NATURE OF THE CASE...............................................................................2

II.   PROCEEDINGS AND DISPOSITIONS BELOW ...........................................5

     A.   Plaintiffs' original complaint and Defendants' unsuccessful initial
          motion for summary judgment ...............................................................5

     B.   Plaintiffs' amended complaint.................................................................6

     C.   The district court denied Plaintiffs' motion for partial summary
          judgment on liability, and partially granted Defendants' cross-motion
          on statute of limitations grounds ............................................................6

     D.   The district court issued an opinion to "clarify" the effect of its
          summary judgment decision, and denied Plaintiffs' request for motion
          practice on the broad scope of claims the court held had been
          dismissed ...............................................................................................7

     E.   The district court's opinion on the parties' pretrial motions *in limine*
          further clarified the broad scope of claims that the court construed as
          having been dismissed ...........................................................................9

     F.   Plaintiffs voluntarily dismissed their remaining claims ahead of trial
          to bring this appeal .............................................................................10

III.  FACTUAL BACKGROUND ........................................................................11

     A.   WFHC was established as a New York business corporation to protect
          its shareholders' common economic and investment interests in its
          sole asset, the property that it leased to the Club .....................................11

          1.   The original charters and by-laws of WFHC and the Club ..............11

          2.   The original lease between WFHC and the Club .............................12

          3.   The original one share/one member structure created a market for
               WFHC shares ...................................................................................13

i

B.    After the original structure between WFHC and the Club fractured and their interests diverged, the Club manipulated the lease to misappropriate WFHC's financial value for itself .................................... 15

    1.    The Club amended the lease to divert the property's financial value from WFHC to itself ................................................................. 15

    2.    The Club used lease renewal options granted by a Club-controlled WFHC board to perpetuate the Club's leasehold ........... 17

C.    The Club wrongfully acquired and then entrenched its voting control of WFHC ...................................................................................... 19

    1.    The Club bought shares at arbitrarily low prices using coercive transfer restrictions that it knew to be unlawful ............................... 19

    2.    Defendants used misstatements and omissions to convince shareholders that WFHC had no business purpose and its shares no value ...................................................................................... 21

SUMMARY OF THE ARGUMENT .................................................................... 23

ARGUMENT ................................................................................................. 27

I.     STANDARD OF REVIEW .......................................................................... 27

II.    THE DISTRICT COURT ERRED WHEN IT CONSTRUED ITS SUMMARY JUDGMENT DECISION ON THE STATUTE OF LIMITATIONS AS HAVING IMPLICITLY DISMISSED ALL PLAINTIFFS' CLAIMS OTHER THAN THOSE RELATING TO THE LEASE RENEWAL FOR 2050-2071 ............................................................. 28

   A.    The district court never addressed any aspect of Defendants' burden to establish an affirmative statute of limitations defense ............................. 28

   B.    The district court erroneously dismissed numerous claims that arose within the six year statute of limitations .................................................. 30

    1.    Timely claims arose from the Club's exercise in 2013 of the lease renewal option that WFHC had granted to it in 2002 ...................... 30

    2.    The district court improperly dismissed numerous other timely claims relating to the lease ................................................................. 31

    3.    Timely claims arose from Defendants' breaches of fiduciary duty within the limitations period relating to the Club's acquisition of WFHC shares ...................................................................................... 32

C.    The district court dismissed claims not subject to a statute of limitations defense.....................................................................33

D.    The district court erred when it declined to hear Plaintiffs' contention that many post-June 16, 2008 events other than the lease renewal for 2050-2071 gave rise to timely claims........................................35

III.  THE DISTRICT COURT ERRED WHEN IT HELD AS A MATTER OF LAW THAT THE STATUTE OF LIMITATIONS FOR PLAINTIFFS' CLAIMS WAS NOT EQUITABLY TOLLED ...............................................36

A.    The district court erroneously conflated Plaintiffs' breach of fiduciary duty claims with incidental allegations of concealment that were material only to the statute of limitations defense....................................36

B.    The district court erred in finding that Plaintiffs were on inquiry notice of their claims despite Defendants' efforts to conceal WFHC's for-profit purpose....................................................................39

C.    The statute of limitations was tolled because Defendants never openly repudiated their fiduciary obligations to Plaintiffs...................................43

IV.  THE DISTRICT COURT ERRED WHEN IT FAILED TO RULE AS A MATTER OF LAW THAT WFHC WAS A FOR-PROFIT BUSINESS CORPORATION .............................................................................44

A.    The district court erred when it failed to treat WFHC's certificate of incorporation as legally conclusive evidence of its for-profit business purpose....................................................................44

    1.    WFHC's incorporation under the Business Corporations Law, with the express authority to pay dividends on stock, established a for-profit business corporation as a matter of law .........................45

    2.    The purposes stated in WFHC's Certificate conclusively establish its business purpose .........................................................48

    3.    The district court relied upon inapposite authority in its ruling on WFHC's corporate purpose ............................................50

    4.    The district court improperly relied on parol evidence that was extrinsic to WFHC's Certificate that, in any event, does not contradict the Certificate's unambiguous statement of a business purpose .............................................................53

B.    The district court erred when it failed to treat WFHC stock as dispositive of WFHC's status as a for-profit corporation .......................56

CONCLUSION ........................................................................58

iii

# TABLE OF AUTHORITIES

**Cases** **Page**

*Abercrombie v. Andrew Coll*,
  438 F. Supp. 2d 243 (S.D.N.Y. 2006) ................................................37

*Ali v. Fed. Ins. Co.*,
  719 F.3d 83 (2d Cir. 2013) ................................................................1

*All Seasons Resorts, Inc. v. Abrams*,
  68 N.Y.2d 81 (1986).........................................................................57

*Alphonse Hotel Corp. v. Tran.*,
  828 F.3d 146 (2d Cir. 2016) ...........................................................34

*Aronoff v. Albanese*,
  85 A.D.2d 3 (2d Dep't 1982)...........................................................34

*Bano v. Union Carbide Corp.*,
  361 F.3d 696 (2d Cir. 2004) ...........................................................29

*Barton v. 270 St. Nicholas Ave. Hous. Dev. Fund Corp.*,
  84 A.D. 696 (1st Dep't 2011)..........................................................54

*Buckley v. Comm'r*,
  231 F.2d 204 (2d Cir. 1956) ...........................................................48

*Burwell v. Hobby Lobby Stores, Inc.*,
  134 S. Ct. 2751 (2014)......................................................... 50, 52, 53

*Busher v. Barry*,
  2016 WL 1249612 (S.D.N.Y. Mar. 28, 2016)................................6, 33

*Busher v. Barry*,
  2016 WL 2742428 (S.D.N.Y. May 10, 2016)................................6, 33

*Clune v. Barry, et al.*,
  16 Civ. 3210 (NSR)(JCM) (S.D.N.Y.)...............................................39

*Consol. Edison, Inc. v. Ne. Utilities*,
  318 F. Supp. 2d 181 (S.D.N.Y. 2004), *rev'd in part on other grounds*,
  426 F.3d 524 (2d Cir. 2005) ...........................................................58

*Davis v. New York*,
  316 F.3d 93 (2d Cir. 2002) ..............................................................28

iv

*Debs Memorial Radio Fund, Inc. v. Lomenzo*,
  50 Misc. 2d 51 (N.Y. Sup. Ct. 1966) ....................................................47

*Erbe v. Lincoln Rochester Trust Co.*,
  13 A.D.2d 211 (4th Dep't 1961) .........................................................41

*Faison v. Lewis*,
  25 N.Y.3d 220 (2015) ........................................................................34

*Ganzi v. Ganzi*,
  No. 653074/12, 2018 BL 441872 (Sup. Ct. N.Y. Cty. Nov. 15, 2018) ........ 43, 44

*Gen. Stencils, Inc. v. Chiappa*,
  18 N.Y.2d 125 (1966) ........................................................................37

*Golden Pac. Bancorp v. FDIC*,
  273 F.3d 509 (2d Cir. 2001) ...............................................................43

*Hanson Tr. PLC v. ML SCM Acquisition, Inc.*,
  781 F.2d 264 (2d Cir. 1986) ...............................................................32

*Helvering v. Coleman-Gilbert Assocs.*,
  296 U.S. 369 (1935) ................................................................ 48, 55, 56

*In re 650 Fifth Ave. & Related Properties*,
  830 F.3d 66 (2d Cir. 2016) .................................................................36

*In re Am. Agriculturist*,
  264 A.D. 971 (3d Dep't 1942) ................................................. 49, 50, 55

*In re De Peyster*,
  210 N.Y. 216 (1914) ................................................................ *passim*

*In re Integrated Res. Real Estate Ltd. Partnerships Sec. Litig.*,
  815 F. Supp. 620 (S.D.N.Y. 1993) .......................................................40

*In re Rockefeller*,
  177 A.D. 786 (1st Dep't 1917) ............................................................44

*ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*,
  892 F.3d 511 (2d Cir. 2018) ......................................................... 35-36

*Kralik v. 239 E. 79th St. Owners Corp.*,
  5 N.Y.3d 54 (2005) ............................................................................54

*Landreth Timber Co. v. Landreth*,
  471 U.S. 681 (1985) ................................................................ 27, 56, 57

*Mackenzie-Childs Ltd. v. Mackenzie-Childs*,
    477 Fed. Appx. 836 (2d Cir. 2012) ....................................................28

*Menke v. Glass*,
    898 F. Supp. 227 (S.D.N.Y. 1995) .............................................. 42-43

*Mohawk Mills Ass'n v. Miller*,
    260 A.D. 433 (3d Dep't 1940)..................................................... 49, 50

*Penthouse Props. v. 1158 Fifth Ave.*,
    256 A.D. 685 (1st Dep't 1939)..........................................................51

*Pollack v. Warner Bros. Pictures*,
    266 A.D. 118 (1st Dep't 1943)..........................................................38

*Powers Mercantile Corp. v. Feinberg*,
    109 A.D.2d 117 (1st Dep't 1985), *aff'd*, 67 N.Y.2d 981 (1986).................. 38, 39

*Quinn v. Stuart Lakes Club, Inc.*,
    57 N.Y.2d 1003 (1982).....................................................................52

*Quinn v. Stuart Lakes Club, Inc.*,
    64 A.D.2d 556 (1st Dep't 1978)................................................. 50, 51

*Quinn v. Stuart Lakes Club, Inc.*,
    80 A.D.2d 350 (1st Dep't 1981)................................................. 51, 52

*Rensselaer County Agricultural & Horticultural Soc. v. Weatherwax*,
    255 N.Y. 329 (1931)..........................................................................46

*Renz v. Beeman*,
    589 F.2d 735 (2d Cir. 1978) ..............................................................40

*Riverside Syndicate, Inc. v. Munroe*,
    10 N.Y.3d 18 (2008)..........................................................................34

*Robertson v. Seidman & Seidman*,
    609 F.2d 583 (2d Cir. 1979) ..............................................................40

*Rose v. Horan*,
    17-CV-6408 (MKB), 2018 WL 4344954 (E.D.N.Y. Sept. 11, 2018)...............30

*RSL Commc'ns PLC ex rel. Jervis v. Bildirici*,
    04-CV-5217 (KMK), 2006 WL 2689869 (S.D.N.Y. Sept. 14, 2006)...............32

*Scholastic, Inc. v. Harris*,
    259 F.3d 73 (2d Cir. 2001) ...............................................................27

*Shanik v. Empire Power Corp.*,
  58 N.Y.S.2d 176 (Sup. Ct. 1945), *aff'd*, 270 A.D. 925 (1st Dep't 1946),
  *aff'd*, 296 N.Y. 664 (1946) .......................................................................... 48, 53

*Sniado v. Bank Austria AG*,
  378 F.3d 210 (2d Cir. 2004) ...................................................................44

*Sulkow v. Crosstown Apparel Inc.*,
  807 F.2d 33 (2d Cir. 1986) ....................................................................56

*Terry v. Ashcroft*,
  336 F.3d 128 (2d Cir. 2003) ...................................................................28

*Terwilliger v. Terwilliger*,
  206 F.3d 240 (2d Cir. 2000) ...................................................................27

*Thomashefsky v. Edelstein*,
  192 A.D. 368 (1st Dep't 1920)................................................................51

*Trinity Operating Co. v. Corsi*,
  269 A.D. 716 (3d Dep't 1945)........................................................... 49, 55

*Troy v. Lumberman's Clinic*,
  58 P.2d 812 (Wash. 1936) ................................................................ 54-55

*Willensky v. Lederman*,
  13-CV-7026 (KMK), 2015 WL 327843 (S.D.N.Y. Jan. 23, 2015) ....................42


**Statutes & Other Authorities:**

28 U.S.C. § 1332.......................................................................................1

1934 N.Y. Att'y Gen. Rep. & Op. No. 220 ..............................................47

1934 N.Y. Att'y Gen. Rep. & Op. No. 221 ..............................................47

1953 N.Y. Op. Att'y Gen. No. 138 ...........................................................46

Fed. R. Civ. P. 23.1 ...................................................................................1

Fed. R. Civ. P. 56(a)................................................................................28

Fed. R. Civ. P. 41(a)(2).............................................................................1

N.Y. Business Corporation Law § 102(a)................................................48

N.Y. Business Corporation Law § 713 ....................................................31

vii

N.Y. Business Corporation Law § 717 ....................................................32

N.Y. Business Corporation Law § 720 ......................................................5

N.Y. Business Corporation Law § 909(a)...............................................17

General Corporations Law of 1909 § 2 ..................................................45

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this shareholder derivative action by virtue of diversity of citizenship. 28 U.S.C. §1332. The amount in controversy exceeded $75,000, Plaintiffs-Appellants ("Plaintiffs") were citizens of Massachusetts and New Jersey, and Defendants-Appellees ("Defendants") were citizens of New York or of states other than Massachusetts or New Jersey. A119[1] (Am. Cplt. ¶29).

The district court dismissed most of Plaintiffs' alleged claims in its Opinions and Orders dated March 12, 2019 (SPA1-22),[2] October 2, 2019 (SPA23-27), and December 18, 2019 (SPA33-77). Pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure ("FRCP"), Plaintiffs then proposed to voluntarily dismiss their remaining claims ahead of trial, with prejudice, to secure finality and an immediate appeal. *See Ali v. Fed. Ins. Co.,* 719 F.3d 83, 88-90 (2d Cir. 2013) (permitting appeal after voluntary dismissal of remaining claims with prejudice).

Pursuant to FRCP 23.1, the district court approved the proposed voluntary dismissal on October 14, 2020, and thereupon dismissed the remaining claims with prejudice and entered final judgment. SPA78-79, SPA80. Plaintiffs filed a timely notice of appeal that day. A2992-94.

---

[1] References preceded by "A" are to pages in the Joint Appendix.

[2] References preceded by "SPA" are to pages in the Special Appendix.

1

## STATEMENT OF ISSUES PRESENTED

(1)    Was it error to dismiss Plaintiffs' claims on statute of limitations grounds:

    (a)    Did the district court err on one or more grounds when it dismissed most of Plaintiffs' claims *sua sponte*, without notice or a hearing, on the basis that an earlier holding had implicitly made a blanket determination about when the claims accrued?

    (b)    Did the district court err on one or more grounds when it held that Plaintiffs had not established any exception to the statute of limitations defense?

(2)    Did the district court err on one or more grounds when it held that material fact questions precluded summary judgment that the nominal defendant corporation had the business purpose provided in its certificate of incorporation?

## STATEMENT OF THE CASE

## I.    NATURE OF THE CASE

This appeal is from a Judgment of the District Court for the Southern District of New York (Hon. Nelson S. Román, presiding) dismissing this shareholder derivative action brought on behalf of nominal defendant Winged Foot Holding Corporation ("WFHC"), a New York business corporation that owns the 280-acre property operated by the Winged Foot Golf Club (the "Club"), a non-profit membership corporation. Plaintiffs' experts estimated the property has a

market value of approximately $340 million.[3] Plaintiffs commenced the action on June 16, 2014, asserting claims on behalf of WFHC against certain current and former WFHC directors (the "Director Defendants"), as well as the Club which is WFHC's majority (56%) and controlling shareholder.

The Club, in concert with the Director Defendants (who are Club members), contrived to perpetuate a "sweetheart" long-term lease under which the Club and its members enjoyed the exclusive use of WFHC's property for a nominal rent that wasted and misappropriated WFHC's sole asset for the benefit of the Club and its members, and to the detriment of WFHC and its shareholders. Plaintiffs sought damages for the grossly inadequate $30,000 per annum rent that WFHC receives from the Club, pursuant to a 1947 amendment to the original lease that has purportedly been extended until the year 2071.

Members of the New York Athletic Club organized WFHC and the Club in 1921, incorporating WFHC as a business corporation to own the property leased to the non-profit Club. WFHC sold its 600 shares of stock to the Club's original 600 members for prices ranging from $600 to $1,600 each. Each prospective Club member was required to purchase a share as a condition of membership. Thereafter, when member-shareholders left the Club, their shares could be sold to incoming member-shareholders, often at a profit. The founders intended this one

---

[3] *See* docket below, ECF 288-1, at 7 (Corrected Expert Report of Buddie A. Johnson).

share/one member structure to establish an identity of interest between WFHC shareholders and Club members.

In the early years, this one share/one member structure worked as intended and eliminated any conflict of interest between the two entities. Any reduced investment return to WFHC shareholders, for example, would be offset by the shareholders' reduced cost of membership in the Club. The Great Depression and Second World War seriously disrupted this structure, however, as it became more difficult to recruit new members able to afford a WFHC share. In 1934, the Club created a new class of non-shareholding membership that required only the payment of annual dues. By the 1940s, about two thirds of WFHC's 600 shares were held by non-member shareholders who had no allegiance to the Club and potentially posed a threat to the Club's continuation.

In the late 1940s, the Club abandoned aspirations to return to the original one share/one member structure, and instead determined to acquire majority voting control of WFHC and to misappropriate the financial value of its property, contrary to the interests of the majority of WFHC shareholders (who were not Club members). The Club took a series of measures to do so. *First*, it amended the original lease in 1947, terminating the Club's obligation to pay its entire net revenue to WFHC and instead requiring only a nominal annual rental of $30,000. *Second*, it eliminated any requirement for a member to own a share, and instead

4

began a long-term program of purchasing shares for itself. *Third*, it contrived serial extensions of the amended lease beyond the maximum duration (ending in 1987) originally provided.

By their extensive illegal acts, Defendants dismantled the one share/one member structure intended by the founders. Instead, there is one majority shareholder that has positioned itself to commit waste, loot and misappropriate the entire financial value of WFHC for itself and its members. Non-member WFHC shareholders receive nothing.

Plaintiffs alleged derivative claims against Defendants for violation of N.Y. Business Corporation Law §720, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment. In addition to compensatory damages, Plaintiffs' derivative claims sought equitable relief, including the invalidation of the 1947 amendment to the original lease as well as lease extensions, and the removal of restrictions on the transfer of WFHC shares. Plaintiffs also asserted an alternative, direct claim for dissolution of WFHC.

## II.     PROCEEDINGS AND DISPOSITIONS BELOW

### A. Plaintiffs' original complaint and Defendants' unsuccessful initial motion for summary judgment.

Plaintiffs' original complaint (A52-79), filed on June 16, 2014, asserted claims for damages against Defendants within a six-year statute of limitations (*i.e.,* going back to June 16, 2008) for both the wasteful lease, and for the Club's

5

wrongful acquisition of WFHC shares to entrench its control of WFHC.

After extensive document discovery, Defendants moved for summary judgment on their affirmative defenses of laches, acquiescence and estoppel. The district court denied Defendants' motion on March 29, 2016, and denied reconsideration on May 10, 2016. *Busher v. Barry ("Busher I"),* 2016 WL 1249612 (S.D.N.Y. Mar. 28, 2016); *Busher v. Barry ("Busher II"),* 2016 WL 2742428 (S.D.N.Y. May 10, 2016).

### B. Plaintiffs' amended complaint.

After completion of discovery, Plaintiffs filed an amended complaint which reflected extensive additional information. A102-226. Based on allegations that Defendants had fraudulently concealed the wrongful nature of the Club's altered relationship with WFHC, Plaintiffs asserted claims going back to 1987—the year when the wasteful amended lease would have terminated had Defendants not continued to breach their fiduciary duties to WFHC.

### C. The district court denied Plaintiffs' motion for partial summary judgment on liability, and partially granted Defendants' cross-motion on statute of limitations grounds.

Following the amendment of the complaint, Plaintiffs moved for partial summary judgment on Defendants' liability. Defendants cross-moved on all claims, asserting affirmative defenses including the statute of limitations, acquiescence, waiver and ratification. The district court decided the motions on

March 12, 2019. SPA1-22.

The district court denied Plaintiffs' summary judgment motion, holding that Defendants raised a genuine factual question of whether WFHC was founded as a for-profit corporation, or instead was never a for-profit company but was founded solely to support the Club. SPA14-16. The court also denied Defendants' cross-motion for summary judgment so far as it related to acquiescence, waiver and ratification. SPA13-14.

With respect to the statute of limitations defense, however, the district court rejected Plaintiffs' argument that Defendants' alleged concealment equitably estopped them from raising the defense. SPA9-10. The court also found that Defendants' disclosures to WFHC shareholders included "storm warnings", *i.e.,* signs of potential fraud that should have placed Plaintiffs on notice of their claims. SPA10-13. The court therefore held as a matter of law that the six-year statute of limitations period was not tolled, and "Plaintiffs' claims arising from conduct before June 16, 2008 are barred by the statute of limitations." SPA13.

**D. The district court issued an opinion to "clarify" the effect of its summary judgment decision, and denied Plaintiffs' request for motion practice on the broad scope of claims the court held had been dismissed.**

During trial preparation, the parties disagreed about the effect of the district court's summary judgment decision. Plaintiffs read the decision as simply holding that the statute of limitations was not tolled, which in effect reverted Plaintiffs'

7

claims to the six-year period alleged in the original complaint (that was previously sustained in its entirety against Defendants' initial summary judgment motion). Plaintiffs therefore prepared to try all claims relating to the wasteful lease and wrongful share acquisition efforts since June 16, 2008.

Defendants, however, pointed to the district court's statement midway through the opinion that "[t]he Court will analyze the parties' motions solely as they relate to the 2013 lease extension." SPA13. Other than the quoted remark, the opinion contained no discussion of when particular claims accrued, nor did it state that any particular claims were dismissed. Nevertheless, Defendants read the court's decision as having implicitly dismissed all claims as time-barred other than those relating to the latest lease extension, for 2050-2071.

After Defendants submitted a pre-motion letter seeking to file a motion to "enforce" the court's decision, the district court on October 2, 2019 issued an opinion to "clarif[y]… the effect of the Court's [March] Opinion and Order on the claims in this case." SPA24. Bypassing the request for motion practice (and again without identifying or discussing any particular claims), the court endorsed Defendants' reading of its March opinion: "As the Court discussed in its opinion, the only event giving rise to any cause of action within the statutory period is the 2013 renewal of the 1947 lease." *Id.* Accordingly, "the only relevant occurrence remaining in this action is the 2013 lease extension," and "[e]vents preceding that

8

lease extension and outside the statutory period are not actionable." SPA27.

Plaintiffs promptly submitted a pre-motion letter requesting that the district court withdraw or stay its October opinion, and permit motion practice to afford Plaintiffs notice and an opportunity to be heard on the timeliness of claims alleged to arise from other events after June 16, 2008. *See* SPA28-32. The court "adhere[d] to its Opinion" and denied the request. SPA28.

**E. The district court's opinion on the parties' pretrial motions *in limine* further clarified the broad scope of claims that the court construed as having been dismissed.**

The district court's *in limine* rulings on December 18, 2019 (*see* SPA33-77) further clarified the extremely wide scope of claims that the court construed its earlier summary judgment decision to have already dismissed.

The district court made clear that no claims remained that related to any lease period other than 2050-2071. Plaintiffs planned to introduce evidence showing that the Club on July 25, 2013 exercised a lease renewal option for the 2029-2050 lease term. The court excluded the evidence, explaining that "the only relevant occurrence remaining in this action is [the] 2013 lease extension, … [which was] defined in the Court's March 2019 Opinion as the extension that extends the lease from 2050 through October 2071." SPA65 (internal citations and quote marks omitted).

The district court also made clear that all claims relating to the Club's

ongoing share acquisitions had been dismissed. In excluding evidence regarding share acquisition efforts after June 16, 2008, the court stated: "At trial the jury will not be asked to decide whether Defendants engaged in a decades-long scheme to defraud shareholders… Instead the jury will be asked whether Defendants' *entry into the 2013 lease extension* constituted a breach of Defendants' fiduciary duties… [T]he claim… was dismissed nine months ago." SPA66, 69 (emphasis in original).

The district court also dismissed Plaintiffs' claim for dissolution of WFHC, on abstention grounds without prejudice to re-filing in state court.

### F. Plaintiffs voluntarily dismissed their remaining claims ahead of trial to bring this appeal.

By reason of the foregoing orders, the only claims remaining for trial were Plaintiffs' derivative claims relating to the most distant lease period, 2050-2071. Rather than proceeding to trial on those claims alone, Plaintiffs sought permission to voluntarily dismiss their remaining claims with prejudice ahead of trial. This would enable Plaintiffs to take the instant appeal, seeking review of the court's dismissal of all claims relating to the lease between 1987-2050 and to the Club's share acquisitions (as well as review of the court's denial of Plaintiffs' motion for summary judgment on WFHC's purpose). The district court on October 14, 2020 granted final approval to Plaintiffs' application and dismissed their remaining claims with prejudice. SPA78-79. Plaintiffs take this appeal from the resulting

10

judgment. SPA80.

## III. FACTUAL BACKGROUND

### A. WFHC was established as a New York business corporation to protect its shareholders' common economic and investment interests in its sole asset, the property that it leased to the Club.

*1. The original charters and by-laws of WFHC and the Club.*

Members of the New York Athletic Club began organizing a golf club in June 1921. A378-80, A381-85. The organizers incorporated two entities: a business corporation, WFHC, and a membership corporation, the Club. The intention was that WFHC "would have title and control the property and that the same would be leased by the… Club." A386-87.

A certificate of incorporation to establish WFHC was filed on August 15, 1921 (the "Certificate"), stating that it "form[ed] a corporation pursuant to the Business Corporations Law" (the "former BCL"). A389. The Certificate's purposes clause set forth a seven-paragraph list of real estate business powers— detailing at length powers for acquiring, developing, managing, and financing real property interests of all kinds. *See* A389-91.

The Certificate authorized issuance of 600 shares of stock and gave WFHC the power "to guarantee the payment of any dividends upon stocks[.]" A391. WFHC's by-laws did not restrict the transfer of WFHC stock, and provided for proportional voting by shareholders. *See* A401-11.

The Club was then established on August 17, 1921, by a certificate of

11

incorporation that stated it was formed under the statute "relating to Membership Corporations" and "the particular objects for which said Corporation is formed are to provide and maintain for its members a clubhouse and grounds and facilities for the game of Golf." A397. The Club's by-laws made typical provisions for a club (*e.g.*, providing for approval and resignation of members and setting annual dues). A413-26.

WFHC's by-laws did not mention the Club. The Club's by-laws, however, established a membership of 600 and required each member to acquire one of WFHC's 600 shares. A419. This established a one share/one member structure in which WFHC and the Club were composed of a common set of member-shareholders—each of whom had an equal interest in and benefit from both entities. As explained by Plaintiffs' expert, Merritt B. Fox, a professor at Columbia Law School, this meant that if WFHC leased its property to the Club at a submarket rent, the loss to WFHC shareholders was offset by a return that the same persons received as Club members (*e.g.,* through an improved Club, or lower dues than would otherwise have been charged). *See* A1306, A1317.

### 2. *The original lease between WFHC and the Club.*

The original subscriptions to purchase WFHC's 600 shares were priced between $600 and $1,600 per share, and yielded a total of $623,000. A524, A450. WFHC used its capital to purchase 280 acres of land and build two golf courses

12

and a clubhouse. A450. WFHC and the Club then executed a long-term lease indenture on November 1, 1924. A428-42.

The lease required the Club to keep the golf courses and club facilities "in a first class condition" (subject to WFHC inspection); prohibited any improvement that would "substantial[ly] change… their present character" without WFHC approval; and specified that all improvements belonged to WFHC at termination. A431-32, A435. It also provided WFHC with repossession and termination rights, such as the right to declare the Club in default for non-payment of rent, and the right to indemnification by the Club. A432-33, A436-38.

The lease required the Club to pay its entire net income to WFHC as rent. Specifically, the Club was required to place all its dues and gross receipts into a general fund (subject to WFHC inspection). A430-31. After payment of specified expenses (including real estate taxes, insurance and maintenance), the net amount left in the general fund was due as annual rent. A431, A438-39. The Club received an initial lease term of 21 years (ending 1945). A440. The Club had the option to renew on the same terms and conditions for another two 21-year lease terms, provided a new lease was executed and exchanged for the final term (1966-1987). *Id.*

3. *The original one share/one member structure created a market for WFHC shares.*

The organizers envisioned from the beginning that "membership and stock

13

certificates would be transferable." A379. The requirement that each Club member acquire a WFHC share sustained a market for shares between incoming and outgoing members. Soon after the Club commenced operations, original members who resigned from the Club were able to sell their WFHC shares to new members. *See, e.g.,* A476. Share prices were determined by "mutual agreement between buyer and seller." A519. Resigning members sometimes pledged their WFHC shares against outstanding dues owed to the Club. *See* A538-39.

The potential for WFHC shareholders to benefit from share price appreciation was well recognized. The organizers initially told prospective members that "it can be safely assumed that within a year after the course is completed the certificates of stock will be worth at least the minimum value or more of… other clubs." A383. Promoting individual stock subscriptions in 1923, the organizers boasted that they had received (but declined) "several offers… to take over gross lots [of shares] as an investment." A462.

It was well understood that potential share appreciation arose in part from WFHC's property value. At a 1933 annual meeting, the Treasurer remarked, "[p]rimarily, we are meeting here as stockholders of a real estate corporation." A590; *see also* A584 (noting all shareholders "have the same equity in the property"); A599 ("your share of stock represents an equity in this Club House and Grounds of $1052.22"). Discounts to fundamental value were touted to recruit new

14

shareholding members. In a 1936 annual meeting, the President explained that there was "a true book value of $1000 per share" so that members should "advise their friends that this stock is cheap." A610. In 1939, he remarked, "[y]ou have practically 300 acres of ground. Property all around there is selling for $5,000 to $10,000 an acre. And each one owns a half acre of ground. … I would grab that stock." A630. WFHC records document several examples of original shareholders earning profits when they sold their shares. *See* A1393-94 (Expert Report of Jeffrey L. Baliban).

**B.  After the original structure between WFHC and the Club fractured and their interests diverged, the Club manipulated the lease to misappropriate WFHC's financial value for itself.**

1.  *The Club amended the lease to divert the property's financial value from WFHC to itself.*

The Great Depression and the Second World War created serious economic problems for the Club. Because the cost of purchasing a WFHC share became an obstacle to recruiting new, dues-paying Club members, the Club in 1934 created a new category of "yearly members" who were not required to be WFHC shareholders. A640; *see also* A661. The Club studied ways to return to a fully shareholding membership where each of the 600 members would hold one of WFHC's 600 shares. A605-06. But the number of yearly members grew steadily, comprising a majority of Club membership by 1943 and almost two thirds by 1948. *See* A596, A682-83. By the late 1940s, the Club felt endangered by the

15

extent to which WFHC's equity was in the hands of former members or their heirs who had no current allegiance to the Club. *See, e.g.,* A577-78.

In 1947, the Club therefore made what its President characterized as a "drastic change" in the entities' relationship. A702. The original rent provision required the Club to annually pay its entire net income to WFHC as rent. A430-31. The WFHC board (all of whom were also Club governors) amended the lease to substitute a fixed annual payment of $30,000 (plus taxes) as rent. A696-97. Through this amendment, the Club effectively appropriated any financial return on WFHC's property for itself, stripping WFHC shareholders of their equity interest in possible financial returns.

At the same time, the Club explicitly asserted that WFHC's property really belonged to the Club—stating (in the resolution authorizing the 1947 lease amendment) that WFHC was founded to "provid[e] a vehicle by which the legal title to the *property of the said Golf Club* could be held for its benefit… [and] it was always contemplated that such arrangement would be at all times for the benefit of the Golf Club[.]" A692 (emphasis added).

The Club knew this assertion was false. A memo around 1947 noted that the ownership of shares by non-Club members "must be corrected before any statement can be made that the Club owns the property." A577. George Gillespie (a Cravath, Swaine & Moore partner who was the Club's legal adviser and

16

President in the early 1970s before becoming WFHC President for more than thirty years) privately rejected the idea that WFHC was "merely the alter ego or captive of the Club," and admitted that "[t]here is no evidence in our charter or by-laws… that the Corporation was organized exclusively to hold title to property,… and to turn over the entire [net income] to the Golf Club." A719.

The Club obtained legal advice about WFHC in 1961 from a prominent New York law firm (the "Kelley Drye Memo"). The Kelley Drye Memo opined that the 1947 rent amendment "was in all likelihood completely out of line with any normal return to be expected on the value of the properties as of that date." A706. It also warned that "in the case of an ordinary business corporation organized for profit, there is little doubt that such transactions would be set aside at the suit of a stockholder." A706-07.

### 2. The Club used lease renewal options granted by a Club-controlled WFHC board to perpetuate the Club's leasehold.

The Club's original lease gave it the option to renew for up to two additional 21-year terms, ending at the latest in 1987. A440. Agreement of a new lease to extend beyond 1987 would require supermajority approval by WFHC shareholders (because the lease disposed of all WFHC's assets). *See* BCL 909(a); A709. The Kelley Drye Memo therefore recommended buying all non-member shares at a fair value in order to "put the Club in a position where there can be no question as to the propriety of the execution of a new lease[.]" *Id*. Gillespie, however, observed

that doing so would be "prohibitively expensive to the Club." A719-20.

Gillespie contrived the idea of indirectly extending the lease past 1987 by making side agreements for additional 21-year renewal options, allowing "[the] Club to continue leasing [the] property… without [the] lease having to be amended." A2745. With Gillespie as WFHC President, WFHC granted the Club three such 21-year lease renewal options: in 1974 (for 1987-2008), 1984 (for 2008-2029) and 2002 (for 2029-2050). A740-43, A748-51, A760-62. The Club exercised two of these renewal options (but neglected at the time to exercise the 2002 option). A744, A755. Gillespie's contrivance to extend the expired lease amounted to an unacknowledged (and uncompensated) *de facto* sale of the property to the Club.

After Gillespie and his entire board retired in 2008, the Director Defendants were elected to the WFHC board, with Defendant Barry as President.[4] A659; A900. The Director Defendants in 2013 granted the Club another 21-year lease renewal option (for 2050-2071). A1007-09. The Club exercised the option on July 25, 2013, and simultaneously (in the same document) also belatedly exercised its 2002 lease renewal option (for 2029-2050). A1016-18.

All the Director Defendants were Club members (Barry, Egan, and Kelly

---

[4] Defendants Egan and Heanue joined the board in 2011 to replace two of the directors elected in 2008. A1264.

had previously served on the Club's board). A926 at 130:8 (Barron); A935 at 22:6-10, A926 at 30:12-20 (Barry); A951-52 at 105:2-3, 110:15 (Egan); A959 at 41:23-25 (Heanue); A977-78 at 104:13-14, 117:11-20 (Kelly). Gillespie's WFHC board had also consisted entirely of Club members. A733. Beyond a *pro forma* adherence to corporate formalities, there is no evidence that either Gillespie's or Barry's WFHC board ever undertook any investigation or other effort to protect WFHC and its shareholders. The Director Defendants admitted either that WFHC did not benefit from lease renewal, or that they were unconcerned about whether WFHC benefitted. A930 at 245:13-16, A931 at 256:14-24, A933 at 360:7-22 (Barron); A939 at 110:17-25, A945 at 372:1-7 (Barry); A955 at 139:17-140:11 (Egan); A981 at 228:16-229:17, A983 at 233:3-14 (Kelly); A960 at 151:24-152:25, A972 at 333:14 (Heanue). Indeed, the proposal to grant another renewal option in 2013 originated from and was pressed forward by the Director Defendants, who were supposed to be protecting WFHC's interests, not looking out for the Club. *See* A992, A994-95, A998.

## C. The Club wrongfully acquired and then entrenched its voting control of WFHC.

### 1. *The Club bought shares at arbitrarily low prices using coercive transfer restrictions that it knew to be unlawful.*

In 1949, the Club amended its by-laws to eliminate any requirement for Club members to own WFHC stock (ending the market for shares between incoming

19

and resigning members). A784. To secure control of WFHC and perpetuate the lease, the Club instead began buying shares for itself.

Originally, the Club acquired shares only temporarily (to resell to incoming Club members), without recording itself as a shareholder on WFHC's books. In 1945, however, the Club registered a block of shares in its own name for the first time (*see* A493), and a few years later, began a policy "to buy in shares of the Holding Corporation, as opportunity offers, at not exceeding $50 per share." A791. The Club has continued to purchase shares for itself ever since.

The Kelley Drye Memo advised the Club to "consider obtaining an independent appraisal of the value of the stock" to determine its offer price. A709-11. The Club never sought an appraisal, however, and instead offered arbitrarily low "nominal" prices for shares. *See* A265.

To coerce share sales to itself, the Club selectively prohibited share transfers. The Club in 1967 prohibited all transfers other than to itself. A865. Gillespie loosened this policy, allowing transfer of deceased former members' shares to their heirs (to maintain good will and encourage eventual sale to the Club). A883. The Director Defendants in 2009 returned to a more restrictive policy, prohibiting any transfer to a non-member. A1282.

The Club knew the share transfer restrictions were unlawful. Gillespie privately stated that "[n]either our charter nor our By-laws give us the authority to

20

pick and choose" among proposed share transfers. A883-84. Only very low, "nominal" share prices protected WFHC from a successful court challenge:

> [O]bviously, one does not litigate a matter involving a share nominally worth $250…. Someone who [does] may come along one day but, so far, we have been lucky. If such a litigation were brought, my view is that Winged Foot would… lose the case[.]

A886.

The Club owned 63 shares when it adopted its policy of opportunistic share purchases in 1950. A791. In 1983, the Club reached majority ownership of WFHC with 302 shares. A834. It owned 335 shares when the Director Defendants were elected in 2008. A661. Since then, the Director Defendants refused to approve four share transfers proposed by shareholders, and negotiated the Club's purchase of three additional shares. A1284-89, A1296-97.

> 2. *Defendants used misstatements and omissions to convince shareholders that WFHC had no business purpose and its shares no value.*

Defendants misled shareholders about WFHC's original business purpose and relationship to the Club in order to artificially depress the perceived value of the shares and facilitate their share purchases. Because Defendants both concealed and affirmatively denied that WFHC had its own, distinct for-profit interests as lessor of its property that were contrary to the Club's interests as lessee, their communications with shareholders were fundamentally deceptive.

Barry set out Defendants' false position in a 2009 letter to a shareholder

whose share WFHC refused to transfer. A989-91. Among other misleading

statements, Defendants asserted that:

> The purpose of [WFHC] (to hold the land and facilities of the golf club for the sole benefit of the golf club) continues to be fulfilled to this day. … While improvements to the property made by the club may be held by [WFHC], the Corporation does not, and is not intended to, make a profit. Instead, the goal of [WFHC] is, as it always has been, to facilitate the continued operation of Winged Foot Golf Club in perpetuity solely for the benefit of its membership.

A991.

Consistent with the Club's low offer price for shares, WFHC financial

statements and other shareholder communications disclosed the Club's long future

leasehold and the minimal rent WFHC received from the Club. But Defendants

misrepresented WFHC's profitless situation as being intended from the beginning.

Thus, Defendants did not disclose that the nominal rental amount was only the

result of a later lease amendment, nor did they disclose that the fully extended

original lease term had ended in 1987. *See, e.g.,* A906-07, A912-13, A989-91.

The original lease, in addition to a potentially profitable (net income) rent

and a limited lease duration, gave WFHC numerous arms-length rights against the

Club (as discussed above) and was entirely inconsistent with the notion that

WFHC was subordinate to the Club. Defendants took care to withhold the original

lease (the only written lease) from disclosure to shareholders. A2751.

The original lease, Defendants also told shareholders that there was no market for WFHC

22

shares except sale to the Club, and described share purchases by the Club as a "redeeming" or "repurchasing" (even though the Club was neither the issuer of the shares nor had originally owned any). A265, A944 at 298:4-8, A1288, A1296-97. Such language misrepresented Defendants' scheme to coerce sales to the Club at minimal prices as the fulfillment of WFHC's purpose, when in fact WFHC stock was meant to protect the economic interests of WFHC shareholders as its residual claimants.

## SUMMARY OF THE ARGUMENT

Plaintiffs seek the reversal of:

(1)     The district court's ruling that all Plaintiffs' causes of action accrued before the limitations date of June 16, 2008, except causes of action relating to renewal of the lease for 2050-2071;

(2)     The court's ruling that Plaintiffs could not, as a matter of law, establish any exception to the statute of limitations defense which would toll the statute of limitations on their claims; and

(3)     The court's ruling that genuine factual questions prevented summary judgment on the for-profit business purpose of WFHC.

First, the district court erred when it held that all Plaintiffs' claims concerning the lease prior to 2050—as well as all their claims concerning the Club's acquisition of WFHC shares—had accrued before June 16, 2008. Such a

23

ruling was sharply inconsistent with the court's prior holdings when it sustained Plaintiffs' original complaint against Defendants' initial summary judgment motion. The claims alleged in the original complaint did not plead any tolling of the statute of limitations: the entire lease period for 2008-2029 fell *within* the limitations period, the lease agreement for 2029-2050 was only formed in 2013 (when the Club exercised its pertinent renewal option), and all alleged breaches of fiduciary duty by the Director Defendants *necessarily* occurred within the limitations period, as they only took office in June 2008. When the court sustained the original complaint, it specifically acknowledged the central fact questions raised by Plaintiffs' claims, including whether the lease as amended in 1947 unlawfully wasted WFHC's sole asset, and whether the Director Defendants' ongoing share acquisition efforts on behalf of the Club breached their fiduciary duties to WFHC. Indeed, plaintiffs first pleaded tolling only in the amended complaint (for purposes of extending their claims back to 1987, when the final extension provided by the original lease expired).

It was therefore plain error when the district court retrospectively announced (in its October 2019 opinion) that its March 2019 summary judgment decision had somehow effected the blanket dismissal of almost all of Plaintiffs' previously sustained claims on the grounds that they were time-barred. The statute of limitations analysis in its March 2019 summary judgment decision had, in fact,

focused solely on whether Plaintiffs could establish an exception to the defense (based on alleged concealment by Defendants). The decision said nothing about whether Defendants met their burden to establish a statute of limitations defense for any claims: the court had neither made any findings about when claims accrued, nor stated that any claims were dismissed.

By retrospectively misconstruing this decision as a blanket dismissal of claims, the court erroneously dismissed timely claims without any explanation or analysis, and in direct contradiction to its own prior legal and factual rulings. Moreover, this blanket dismissal was not the product of any proper motion or proceeding in which Plaintiffs were given the opportunity to brief and argue these issues. Announced as a mere "clarification" of a prior ruling, the blanket dismissal was in effect a *sua* sponte grant of summary judgment that improperly failed to afford Plaintiffs prior notice or a hearing before dismissing their claims.

Second, with respect to any of Plaintiffs' causes of action that did accrue prior to the limitations period, the district court erred when it held that Defendants' concealment of those causes of action could not, as a matter law, give rise to any equitable tolling of Plaintiffs' claims. The court erroneously held that equitable tolling was unavailable because the concealment alleged by Plaintiffs had the same factual basis as their claims. To the contrary, the similarity was incidental: the gravamen of Plaintiffs' causes of action was breach of fiduciary duty, not

concealment or failure to disclose material facts.

The district court also erred when it held that Defendants' financial disclosures (which merely showed that WFHC had a profitless, long-term lease with the Club) provided "storm warnings" of potential fraud that placed Plaintiffs on notice that they had actionable claims. Contrary to the court's reasoning, Plaintiffs alleged that Defendants concealed WFHC's for-profit purpose, while affirmatively misleading shareholders to believe that WFHC existed solely to serve the Club—making it appear that a wasteful lease with the Club was not wrongful. The court erroneously treated Defendants' false and misleading disclosures as storm warnings.

Apart from equitable estoppel, the open repudiation doctrine also provides a separate basis to toll the statute of limitations on Plaintiffs' claims. It is well established that the statute of limitations does not run against a person protected by a fiduciary relationship until the fiduciary openly repudiates the relationship— which the Director Defendants have not done with respect to WFHC.

Third, the district court erred when it declined to hold that WFHC had a for-profit business purpose as a matter of law, based on its certificate of incorporation which plainly stated a real estate business purpose and guaranteed the payment of dividends upon stock. Mistakenly holding that "courts look to substance over form to determine the purposes of a corporation," SPA15 n. 7, the court failed to identify

26

or apply the correct test under New York law for determining the status of a corporation. *See In re De Peyster*, 210 N.Y. 216, 219–20 (1914) ("In order to determine the status of a corporation and to ascertain the purposes for which it was incorporated, recourse must be had… to its charter and the statute under the authority of which it was framed."). Applying the wrong legal test, the court improperly weighed parol evidence—without any threshold finding that the Certificate was ambiguous—to hold that triable issues of fact as to WFHC's status were created.

Undisputed evidence also established that WFHC stock had all the characteristics of securities as a matter of law. *See Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686 (1985). Because the legal status of WFHC stock as securities bears directly on the for-profit status of WFHC, the district court committed reversible error by failing to take account of the legal status of WFHC stock as securities in determining, incorrectly, that it could not rule as a matter of law concerning WFHC's corporate purpose.

**ARGUMENT**

**I.    STANDARD OF REVIEW**

This Court has stated:

We review *de novo* an order of a district court granting or denying summary judgment. *See, e.g., Scholastic, Inc. v. Harris,* 259 F.3d 73, 81 (2d Cir.2001); *Terwilliger v. Terwilliger,* 206 F.3d 240, 244 (2d Cir.2000) (noting that the same standard of review applies for

27

summary judgment motions and cross-motions). Summary judgment is warranted only upon a showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether there are genuine issues of material fact, "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003) (quotation marks omitted). However, "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002).

*Mackenzie-Childs Ltd. v. Mackenzie-Childs,* 477 Fed.Appx. 836, 839 (2d Cir.

2012).

## II. THE DISTRICT COURT ERRED WHEN IT CONSTRUED ITS SUMMARY JUDGMENT DECISION ON THE STATUTE OF LIMITATIONS AS HAVING IMPLICITLY DISMISSED ALL PLAINTIFFS' CLAIMS OTHER THAN THOSE RELATING TO THE LEASE RENEWAL FOR 2050-2071.

### A. The district court never addressed any aspect of Defendants' burden to establish an affirmative statute of limitations defense.

The district court consistently relied on its March 12, 2019 opinion (the

"March Opinion") as the basis for its later rulings that all of Plaintiffs' claims had

already been dismissed except those relating to the lease for 2050-2071. *See*

SPA24, 26-27 (Oct. 2, 2019 Opinion); SPA65, 69 (Dec. 18, 2019 Opinion). But the

March Opinion is facially erroneous if given such a construction, because it is

bereft of any legal holdings or factual findings to support or even communicate

that Defendants established a defense to any claim.

The burden of establishing an affirmative defense based on the statute of

28

limitations falls on Defendants. *See Bano v. Union Carbide Corp.,* 361 F.3d 696, 710 (2d Cir. 2004) (defendant has the burden of proof on statute of limitations defense, including showing when the cause of action accrued; plaintiff has the burden of showing an exception applies). The March Opinion failed to address any aspect of Defendants' burden. The opinion did not identify what claims were purportedly dismissed; it did not make any findings concerning what events gave rise to the claims; and it failed to state when the claims accrued or when the applicable limitations (purportedly) expired. *See* SPA8-13.

Indeed, the March Opinion did not actually state that any claims had been dismissed. The district court framed the part of the March Opinion that addressed the statute of limitations solely as an examination of whether Plaintiffs had established an exception to the defense. *See* SPA8, SPA13. The only basis for the district court's later assertions that particular claims had been dismissed was a remark, midway through the March Opinion, that "[t]he Court will analyze [the] parties' motions solely as they relate to the 2013 lease extension." SPA13. If the court meant thereby to indicate that all claims unrelated to 2013 events were dismissed, it spoke so ambiguously that Plaintiffs had no reasonable notice that a motion for reconsideration was needed in order to point out the absence of any proper legal or factual basis to reach that conclusion.

29

**B. The district court erroneously dismissed numerous claims that arose within the six year statute of limitations.**

The district court arbitrarily construed all Plaintiffs' claims as having been dismissed except those relating to the lease for 2050-2071. *See* SPA65 ("the only relevant occurrence remaining in this action is [the] 2013 lease extension… that extends the lease from 2050 through October 2071"). In doing so, the court incorrectly dismissed numerous, timely claims that arose from events *after* June 16, 2008.

### 1. *Timely claims arose from the Club's exercise in 2013 of the lease renewal option that WFHC had granted to it in 2002.*

Although WFHC's grant of a lease renewal option for 2029-2050 occurred in 2002, the Club did not exercise this option until 2013—on the same date (and in the same instrument) that it also exercised its option pertaining to the 2050-2071 term. *See* A1018. The district court never acknowledged this undisputed fact, and incorrectly held that claims relating to the 2050-2071 lease term were timely, but claims related to the 2029-2050 lease term were not.

Plaintiffs' unjust enrichment and breach of fiduciary duty claims against the Club as to the 2029-2050 lease terms plainly accrued when the Club exercised its option on July 25, 2013—the same event that gave rise to similar claims pertaining to 2050-2071 that the district court did not dismiss. *See Rose v. Horan*, 17-CV-6408 (MKB), 2018 WL 4344954 (E.D.N.Y. Sept. 11, 2018) (addressing derivative

30

claim for unjust enrichment relating to lease option, and holding that claim accrued upon the exercise and not the grant of the option).

### 2. *The district court improperly dismissed numerous other timely claims relating to the lease.*

The district court erroneously construed numerous claims based on other conduct alleged to have occurred *within* the post-July 16, 2008 limitations period as having been implicitly dismissed by its decision on statute of limitations, including claims that: (i) the Club and the Director Defendants are liable for failing to set aside or avoid a lease that was wasteful and, therefore, void at inception, (ii) the Director Defendants breached their fiduciary duty by failing to set aside WFHC's lease arrangements with the Club as interested director transactions subject to avoidance under BCL § 713, (iii) the Director Defendants breached their fiduciary duties by failing to timely rescind in 2008 the grant of the 2029-2050 option, when a timely claim to rescind could have been brought, and (iv) Defendants committed *ongoing* breaches of their fiduciary duties and waste by enforcing lease obligations known to be interested transactions, and patently unfair to WFHC.  Each of these claims are based on conduct occurring *within* the post-June 16, 2008 limitations period.

Elected to the WFHC board elected in 2008, months before the 2008-2029 lease period began, the Director Defendants failed to inform themselves about WFHC's interests concerning the lease and took no action to protect those

31

interests. Their inaction concerning the lease for 2008-2029 and 2029-2050 breached the fiduciary duty of care and loyalty that they owed to WFHC. *See* BCL § 717; *see also Hanson Tr. PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 274–75 (2d Cir. 1986) ("Directors may be liable to shareholders for failing… to make a reasonable inquiry into material matters."); *RSL Commc'ns PLC ex rel. Jervis v. Bildirici,* 04-CV-5217 (KMK), 2006 WL 2689869, *6 (S.D.N.Y. Sept. 14, 2006) ("Directors may not seek the protection of the business judgment rule on the ground that they made no decisions and took no actions").

### 3. *Timely claims arose from Defendants' breaches of fiduciary duty within the limitations period relating to the Club's acquisition of WFHC shares.*

Defendants also committed numerous breaches of fiduciary duty after June 16, 2008 in connection with the Club's acquisition of WFHC shares. These breaches included efforts to solicit shareholders to sell (A1297), tightening the policy restricting share transfers (A1282), rejecting share transfers proposed by shareholders (A1284-85), and negotiating share purchases for the Club (A1287-88, A1296-97).

The district court nevertheless erroneously construed all claims relating to the Club's share acquisitions as implicitly dismissed (SPA66, SPA69), despite having found in earlier decisions that these claims arose from events in 2009-2010 that raised genuine issues for trial. Denying Defendants' initial motion for summary judgment in 2016, the court stated:

32

> Plaintiff submits evidence sufficient to create a question of material fact as to whether Defendants breached their fiduciary duties and were unjustly enriched by actions in 2009/2010… when the Defendants… tightened WFHC's share transfer restrictions, rejected lawful demands to transfer shares, and provided allegedly misleading information to shareholders to fraudulently induce the sale of their stock to the Club.

*Busher I,* 2016 WL 1249612, at *5. Denying Defendants' request for

reconsideration, the court elaborated:

> Plaintiff has submitted enough evidence to create an issue of material fact as to whether Defendants intentionally misled shareholders and carried out a fraudulent scheme in which Defendants would (1) convince shareholders their shares were not worth much because Winged Foot Holding Corporation was always considered a non-profit in order to (2) justify the transfer restrictions and encourage shareholders to sell shares back to the Club so that (3) the Club could gain control of Winged Foot Holding Corporation and approve its past illegal acts.

*Busher II,* 2016 WL 2742428, at *2. The court's later ruling that these claims were

time-barred, inexplicably, was *directly contrary* to these earlier decisions.

## C. The district court dismissed claims not subject to a statute of limitations defense.

In its October Order, the district court incorrectly ruled that the issue of

whether the 1947 amendment of the original lease was wasteful was no longer in

the case. Such a determination was both beyond the scope of the March Opinion

and inconsistent with the court's earlier 2016 decision in which it held that the

1947 lease amendment was, in fact, alleged to be "wasteful" sufficiently to defeat

Defendants' motion for summary judgment. *Busher I,* 2016 WL 1249612 at 11.

The Second Circuit has held that a lease entered for essentially no

33

consideration, that gave defendants sole access to any revenue from the property, was wasteful and, therefore, void at inception. *Alphonse Hotel Corp. v. Tran.*, 828 F.3d 146, 151 (2d Circ. 2016); *see also Aronoff v. Albanese,* 85 A.D.2d 3, 4 (2d Dept. 1982) ("[I]t is settled law that waste or a gift of corporate assets are void acts and cannot be ratified by a majority of stockholders"). Moreover, the New York Court of Appeals has held that the issue of whether a transaction was void at inception is *not* subject to a statute of limitations defense. *Faison v. Lewis*, 25 N.Y.3d 220, 224 (2015). Accordingly, whether the 1947 lease amendment or any of the recently exercised lease options were void at inception is an issue *necessarily* beyond the scope of the district court's statute of limitations ruling.

The statute of limitations bears only on the period for recoverable damages, not on the validity of the lease. The New York Court of Appeals has explained that, while the issue of whether a lease is wasteful and void at inception is not subject to a statute of limitations defense, the availability of damages depends on the applicable statute of limitations period—here the period beginning June 16, 2008. *See Riverside Syndicate, Inc. v. Munroe*, 10 N.Y.3d 18, 24 (2008). Therefore, as a practical matter, in light of the district court's March 29, 2016 decision, this meant that the issue of whether the 1947 lease amendment, and the subsequent extensions thereof, were wasteful and thus void at inception, remained open and relevant: (i) to Plaintiffs' non-monetary claims for recission of the leases

34

(*i.e.*, a declaration that the 1947 lease amendment and subsequent lease extensions were invalid), and (ii) as a predicate for damages that Plaintiffs sustained *within* the limitations period from Defendants' alleged fiduciary breaches (*e.g.*, their failure to set aside the lease), and the Club's unjust enrichment by continued occupation of WFHC's property under its terms.

**D. The district court erred when it declined to hear Plaintiffs' contention that many post-June 16, 2008 events other than the lease renewal for 2050-2071 gave rise to timely claims.**

The October 2, 2019 opinion in which the district court purported to provide "clarification" (SPA24) of its March Opinion was more accurately an improper, *sua sponte* grant of summary judgment—which dismissed almost all of Plaintiffs' claims, without prior notice that the court would do so or any explanation of its reasons for doing so.[5] (And despite the court having previously found that many of the dismissed claims presented timely questions of material fact that warranted the denial of Defendants' initial summary judgment motion.) The district court therefore erred when it denied Plaintiffs' motion to stay or withdraw the court's "clarification" or permit motion practice, as all parties requested. *See* SPA28.

The Second Circuit has stated that "failure to provide adequate notice is almost always reversible error" when granting summary judgment. *ING Bank N.V.*

---

[5] The district court did not hold oral argument before issuing either its March or October 2019 opinions.

*v. M/V TEMARA, IMO No. 9333929,* 892 F.3d 511, 524 (2d Cir. 2018). "[G]rants

of summary judgment without notice will be tolerated only when the facts before

the district court were fully developed so that the moving party suffered no

procedural prejudice." *In re 650 Fifth Ave. & Related Properties,* 830 F.3d 66, 96

(2d Cir. 2016); *see also ING Bank,* 892 F.3d at 524 ("A notice-free, *sua*

*sponte* entry of summary judgment… is limited only to situations when there is no

indication that the party against whom summary judgment would be entered could

present evidence that would affect the summary judgment determination.").

      The district court should have given Plaintiffs notice and an opportunity to

be heard—*i.e.,* should have permitted motion practice—on the claims that

Plaintiffs alleged were within the six year statute of limitations, because "care

should be taken… to determine that the party against whom summary judgment

is rendered has had a full and fair opportunity to meet the proposition that there is

no genuine issue of material fact to be tried." *Id.* at 97.

## III.    THE DISTRICT COURT ERRED WHEN IT HELD AS A MATTER OF LAW THAT THE STATUTE OF LIMITATIONS FOR PLAINTIFFS' CLAIMS WAS NOT EQUITABLY TOLLED.

### A. The district court erroneously conflated Plaintiffs' breach of fiduciary duty claims with incidental allegations of concealment that were material only to the statute of limitations defense.

      Plaintiffs alleged that Defendants made misrepresentations and omitted

material information in order to mislead shareholders to believe that WFHC's

36

wasteful lease with the Club, rather than wrongfully misappropriating WFHC's financial value, actually fulfilled a purported original purpose of non-profit subservience to the Club. *See* Statement of the Case, *supra* at III.C.2. As a result, Plaintiffs argued that equitable estoppel against Defendants tolled the statute of limitations on Plaintiffs' claims. *See, e.g., Gen. Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 128 (1966) (equitable estoppel "bar[s] the assertion of the affirmative defense of the Statute of Limitations where it is the defendant's affirmative wrongdoing… which produced… delay between the accrual of the cause of action and the institution of the legal proceeding.").

The district court, however, erroneously held that equitable estoppel was unavailable because "Plaintiffs' claims hinge[d] on Defendants' alleged fraudulent and deceptive actions, which are based on the same facts Plaintiffs advance in support of equitable estoppel[.]" SPA9, citing (*inter alia*) *Abercrombie v. Andrew Coll,* 438 F.Supp.2d 243, 265 (S.D.N.Y. 2006) (equitable estoppel does not "apply to fraud actions, because otherwise, the mere assertion of an underlying fraudulent act would always trigger equitable estoppel").

The district court erred when it conflated Plaintiffs' concealment allegations with their underlying claims. For statute of limitations purposes, courts do not treat a claim involving fraudulent concealment as a fraud claim "where [the] allegation of fraud is not essential to the cause of action pleaded except as an answer to an

37

anticipated defense of Statute of Limitations[.]" *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 121 (1st Dept. 1985), *aff'd* 67 N.Y.2d 981 (1986). Plaintiffs' concealment allegations were material only to equitably estop the statute of limitations, not to establish the alleged breaches of fiduciary duty by Defendants.

Plaintiffs' claims relating to the lease clearly were not predicated on concealment. Absent any deceptive behavior, Defendants' self-dealing renewals of the wasteful lease would still give rise to breach of fiduciary duty claims; conversely, if the renewals were not wasteful and self-dealing, Defendants' concealment would not matter. Examining a claim for misappropriation of a corporate opportunity, the First Department held that it was not a fraud claim even though it was committed by fraud, because "without the alleged misappropriation plaintiff would have no claim at all." *Powers Mercantile, id.*; *see also Pollack v. Warner Bros. Pictures,* 266 A.D. 118, 119 (1st Dept. 1943) (claim that defendants wasted corporate assets and concealed doing so, "though framed in fraud, in essence [was] an action for waste and diversion of assets.").

The district court pointed particularly to claims concerning the Club's share acquisitions when it mistakenly found a common basis was "readily apparent" for both the claims and the alleged concealment. *See* SPA9 n. 2 (noting amended complaint alleged a "fraudulent scheme" to obtain voting control by "fraudulently

induc[ing]" shareholders to sell their shares). However, Plaintiffs' claims relating to the Club's share acquisitions had breach of fiduciary duty as their gravamen, not fraud. WFHC sought relief for a different injury than an injury to an individual shareholder: the share acquisitions harmed WFHC because they furthered the Club's self-dealing (by entrenching its control), not because shareholders were defrauded. *See Powers Mercantile*, 109 A.D.2d at 121 (alleged fraud "represent[ed] the means of accomplishing the alleged misappropriation and, as such, [was] only an incident of that wrong."). Indeed, because direct fraud claims are not part of this action, there is a separate class action for claims by former shareholders (including fraud claims among others), *Clune v. Barry et al.,* 16 Civ. 3210 (NSR)(JCM) (S.D.N.Y.). In the instant case, deception was at most only one of many means that Defendants used to accomplish their breach of fiduciary duty to WFHC, along with the open coercion of shareholders (by restricting share transfers and by rejecting proposed transfers other than to the Club) that was also part of Defendants' share acquisition scheme.

**B. The district court erred in finding that Plaintiffs were on inquiry notice of their claims despite Defendants' efforts to conceal WFHC's for-profit purpose.**

Misconstruing Plaintiffs' allegations of concealment, the district court held that tolling was unavailable because Plaintiffs should have been "alerted… that the organizations were not operating at arm's length and potentially were not acting in

39

the best interests of WFHC…. With reasonable diligence, Plaintiffs certainly could have discovered that Defendants were buying up shares of WFHC and that WFHC was not being used to produce profit for investors[.]" SPA12-13.

Tolling by equitable estoppel ends when "facts sufficient to suggest to a person of ordinary intelligence the probability that he has been defrauded" are discoverable with "reasonable diligence." *Renz v. Beeman,* 589 F.2d 735, 752 (2d Cir. 1978) (citations and internal quote marks omitted). "[T]he question of whether a plaintiff exercised reasonable diligence is usually… for the jury to decide[,]" because it:

> depend[s] on inferences drawn from the facts of each particular case—similar to the type of inferences that must be drawn in determining intent and good faith, and when conflicting inferences can be drawn... summary judgment is inappropriate.

*In re Integrated Res. Real Estate Ltd. Partnerships Sec. Litig.,* 815 F.Supp. 620, 638 (S.D.N.Y. 1993) (internal quote marks and brackets omitted) (quoting *Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2d Cir.1979).

Plaintiffs did not allege that Defendants concealed either the Club's control over WFHC, or the profitless long-term lease, but information that suggested WFHC had a for-profit business purpose inconsistent with subordination to the Club. Defendants also affirmatively promoted a contrary, false story that WFHC was always solely intended to serve the Club. Thus, rather than concealing the Club's self-dealing as such, Defendants "led [Plaintiffs] to believe that the act of

self-dealing was proper, lawful and authorized and not one constituting a breach of the fiduciary relationship." *Erbe v. Lincoln Rochester Trust Co.,* 13 A.D.2d 211, 213 (4th Dept. 1961).

The district court erred in treating affirmative misrepresentations by Defendants, and selective disclosures that reinforced their misrepresentations, as "storm warnings" instead of as facts raising a genuine question as to whether a reasonable person would be deceived. As a particularly stark example, the court treated as a storm warning the board minutes concerning the 1947 lease amendment. SPA12. These minutes were the foundational document promulgating the Club's false and misleading story concerning WFHC's purpose—falsely describing WFHC's property as "the property of the… Club" and asserting a non-existent trustee-beneficiary relationship in which WFHC was merely a "vehicle" to hold "legal title… for [the Club's] benefit." A692. The court similarly treated disclosures of the rental amount, lease duration, and the Club's stock control as storm warnings—all selective disclosures that were consistent with Defendants' affirmative misrepresentations. *See* SPA11-12. There was at least a genuine question whether Defendants' disclosures were "so permeated with false representations the [Plaintiffs] were led to believe that the act of self-dealing was… not one constituting a breach of the fiduciary relationship." *Erbe, 13* A.D.2d at 213.

41

The district court's premise for treating Defendants' misleading disclosures as storm warnings was that, "[a]ccording to Plaintiffs, the fact that WFHC was founded with the purpose of generating financial returns for investors is clear from WFHC's certificate of incorporation." SPA11 n. 4. In effect, the court erroneously ruled as a matter of law that a reasonable person would regard the purpose expressed in the Certificate as conclusive (and would therefore take inquiry notice from any inconsistent representations).

The district court's reasoning failed to give any weight to misrepresentations that directly contradicted and explained away the for-profit purpose stated in the Certificate. Discounting such misrepresentations was particularly erroneous because they were made by fiduciaries. Even "concealment without actual misrepresentation may form the basis for invocation of the [equitable estoppel] doctrine if there was a fiduciary relationship which gave [the] defendant an obligation to inform [the] plaintiff of facts underlying the claim." *Willensky v. Lederman,* 13–CV–7026 (KMK), 2015 WL 327843, *10 (S.D.N.Y. Jan. 23, 2015). Moreover, the district court failed to take into account that it had, itself, discounted the Certificate's significance (albeit wrongly, as argued below). Where the court itself has done so, there is certainly a genuine question as to whether a reasonable shareholder would similarly discount the Certificate and therefore remain vulnerable to Defendants' misrepresentations. *See, e.g., Menke v. Glass,* 898

42

F.Supp. 227, 234 and n.7 (S.D.N.Y. 1995) (where courts had previously misread an agreement, "a reasonable fact-finder could find that even if plaintiffs had reviewed [it], it would not have put them on notice" of their claims).

### C. The statute of limitations was tolled because Defendants never openly repudiated their fiduciary obligations to Plaintiffs.

Because Defendants never repudiated their fiduciary duties to WFHC (only the duties' content is contested), the statute of limitations never began to run on Plaintiffs' claims. The Second Circuit has held that:

> Under New York law, the limitations period for claims arising out of a fiduciary relationship does not commence until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated. … The reason for such a tolling rule is that the beneficiary should be entitled to rely upon a fiduciary's skill without the necessity of interrupting a continuous relationship of trust and confidence by instituting suit.

*Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 518-519 (2d Cir. 2001) (internal citations and quote marks omitted).

In a remarkably similar derivative action that involved a decades-long series of below-market rental and license fees between closely-held corporations, the open repudiation doctrine tolled claims for breach of fiduciary duty. *Ganzi v. Ganzi,* No. 653074/2012, 2018 BL 441872, 11 (Sup. Ct. N.Y. Cty. Nov. 15, 2018), *aff'd* 183 A.D.3d 433 (1st Dept. 2020). *Ganzi*, which was decided after the motion below was submitted, applied the doctrine and noted that it "would be antithetical to equity" for the statute of limitations to protect defendants due to their having

43

breached their fiduciary duties "for such a long time."[6] *Id.*

## IV. THE DISTRICT COURT ERRED WHEN IT FAILED TO RULE AS A MATTER OF LAW THAT WFHC WAS A FOR-PROFIT BUSINESS CORPORATION.

### A. The district court erred when it failed to treat WFHC's certificate of incorporation as legally conclusive evidence of its for-profit business purpose.

In holding that "courts look to substance over form to determine the purposes of a corporation," SPA15 n. 7, the district court failed to identify or apply the correct test to determine corporate purpose under New York law. As stated by the New York Court of Appeals:

> In order to determine the status of a corporation and to ascertain the purposes for which it was incorporated, recourse must be had… to its charter and the statute under the authority of which it was framed. … [I]t seems plain that the chartered privileges of a corporation as defined in its certificate of incorporation, which is invariably framed on the language of the corporators, should be the index to its relations to the state, rather than the possibly sporadic and shifting exercise of any one or more of a larger number of the powers delegated to it.

*De Peyster*, 210 N.Y. at 219–20 (internal citations and quote marks omitted); *see also In re Rockefeller*, 177 A.D. 786, 790 (1st Dept. 1917), *aff'd*, 223 N.Y. 563 (1918) ("It is well settled that the character of a corporation must be determined by its charter.").

---

[6] Plaintiffs did not raise the open repudiation doctrine before the district court. Even if *Ganzi* had been decided before the motion below was submitted, however, the doctrine may nonetheless be considered on appeal if necessary to avoid manifest injustice, particularly as its application here "is purely legal and requires no further development of the record." *Sniado v. Bank Austria AG,* 378 F.3d 210, 213 (2d Cir. 2004).

Despite finding that WFHC's Certificate stated that it was formed under New York's former BCL, sets forth for-profit business purposes, and "guarantees the payment of dividends upon stocks," SPA15-16, the district court determined that triable issues of fact as to WFHC's status were created based on "[a]dvertisement materials from 1921," testimony from 1928, and the preamble to the 1947 amendment of the Club's lease, SPA16-17. Applying the correct test, the court should have held as a matter of law that WFHC had a for-profit business purpose.

>   1. *WFHC's incorporation under the Business Corporations Law, with the express authority to pay dividends on stock, established a for-profit business corporation as a matter of law.*

Concluding that the choice of incorporation statute was "not dispositive," SPA15 n. 7, the district court considered "other evidence" without examining the governing statute or the substantial authority indicating that, in 1921, it was legally impermissible to create a business corporation under New York law that was not for profit.

WFHC was formed under Section 2 of New York's General Corporations Law of 1909, which was still in effect in 1921, and which distinguished between a "business corporation," which it includes as a type of "stock corporation," and a "membership corporation," which it includes as a type of "non-stock corporation." Section 3 in turn provided:

45

A "stock corporation" is a corporation having a capital stock divided into shares, and which is authorized by law to distribute to the holders thereof dividends or shares of the surplus profits of the corporation. A corporation is not a stock corporation because of having issued certificates called certificates of stock, but which are in fact merely certificates of membership, and which is not authorized by law to distribute to its members any dividends or share of profits arising from the operation of the corporation.

Precisely as stated in the statute, WFHC's certificate authorized it "to guarantee the payment of any dividends upon stocks … so far as the same may be permitted in the case of corporations organized under the Business Corporations Law of the State of New York." A391.

The district court failed to recognize that the authorization to pay dividends defined the difference between a stock corporation and a membership corporation. *See* 1953 N.Y. Op. Att'y Gen. No. 138 ("By statutory definition a 'stock corporation' is a corporation having shares of a stock and which is authorized by law to distribute dividends to the holders thereof."); *Rensselaer County Agricultural & Horticultural Soc. v Weatherwax*, 255 N.Y. 329, 330-31 (1931) (when a corporation "issues capital stock entitling its shareholders to dividends from the profits of the corporation…[,] the corporation becomes 'subject to the stock corporation law' and not to the provisions of the Membership Corporations Law."). [7]  Indeed, in 1921, the former BCL permitted incorporation only for "any

_____

[7] These sources discuss the Stock Corporation Law instead of the former BCL because

46

lawful business purpose or purposes," and "business purpose" meant a profit purpose. 1934 NY Att'y Gen. Rep. & Op. 220, 221 ("the term 'business purpose,' in its usual sense, denotes the commercial activities of persons engaged in profit making enterprises. … It is a basic rule that corporations which are to be organized for profit may not be incorporated under the Membership Corporations Law.").

*Debs Memorial Radio Fund, Inc. v Lomenzo*, 50 Misc.2d 51 (N.Y. Sup. Ct. 1966) is instructive in this regard. There, the court addressed whether a corporation incorporated under the Stock Corporation Law, that was "organized for profit," could properly be consolidated with a corporation created under provisions of the Membership Corporations Law. In rejecting the petitioners' argument that the stock corporation had "conducted its operation as a *de facto* membership corporation," *id.* at 52, and consolidation therefore was proper, the court held:

> the law seems clearly resolved that to determine the status of a corporation and to ascertain the purposes for which it was incorporated recourse should be had to the statute under which it was formed. (*Matter of De Peyster*, 210 N.Y. 216, 219.). Applying such test would certainly preclude any determination of the posture assumed by the corporation in its operation subsequent to organization as a justification for approval of consolidation.

*Id.*

The district court also ignored that the current version of New York

---

the former BCL (referenced by WFHC's certificate of incorporation in 1921) was largely repealed in 1923 and its provisions moved into the Stock Corporation Law.

corporate law, under which WFHC continues to be incorporated, refers to corporations incorporated under it as being "for profit." BCL 102(a). This current version is the controlling law under which WFHC operates today.

2. *The purposes stated in WFHC's Certificate conclusively establish its business purpose.*

While the district court recognized that the purposes clause in WFHC's Certificate could be read "to mean that WFHC was created to earn profits through real estate," SPA16, it entirely ignored the near-dispositive weight to be accorded the Certificate's statement of purpose.  As the Second Circuit has instructed:

> [T]he charters … here involved clearly show a purpose to engage in business activities. ***This stated purpose is probably conclusive***…. "The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted."

*Buckley v. Comm'r*, 231 F.2d 204, 204 (2d Cir. 1956) (emphasis added) (quoting *Helvering v. Coleman-Gilbert Assocs.*, 296 U.S. 369, 374 (1935) (emphasizing the paramount status to be accorded the terms of an entity's organizing document). Indeed, "[t]he charter is the contract between the parties… and conclusively determines their respective and differing rights in one relation or another." *Shanik v. Empire Power Corp.,* 58 N.Y.S.2d 176, 181 (Sup. Ct. 1945) (citations omitted and emphasis added), *aff'd*, 270 A.D. 925 (1st Dept. 1946), *aff'd*, 296 N.Y. 664 (1946).

The purposes clause of WFHC's Certificate lists its business purposes,

48

which include: "To acquire by purchase …, and to hold, own, manage, improve, develop, sell, lease, exchange, mortgage, or otherwise dispose of or deal in real estate." [cite].  There is no mention of a golf club.

Real estate business powers closely resembling WFHC's have been held to establish a business purpose even for a corporation that solely served a non-profit entity. *See Trinity Operating Co. v. Corsi*, 269 A.D. 716, 717 (3rd Dept. 1945).  In *Trinity Operating Co.*, the corporation was:

> organized… under the Stock Corporation Law, and has power to buy, lease, manage and mortgage any kind of real estate; to erect buildings thereon; to acquire, sell and pledge personal property; to transact a general real estate business, and even to engage in the manufacture and sale of goods; or to carry on any other lawful trade or business useful or incident to the ownership and management of real estate.

*Id.*  However, Trinity's "exercise of these powers is limited to properties owned by the Trinity Church, and [Trinity corporation] acts only as a managing agent for the church[.]" *Id.* Nevertheless, the Third Department held that "the powers thus set forth in its certificate of incorporation clearly stamp it as a business corporation. The charter of a corporation determines its status."  *Id.* (citing *De Peyster*, 210 N.Y. 216, and *Mohawk Mills Ass'n v. Miller*, 260 A.D. 433 (3rd Dept. 1940)).

Similarly, in *In re Am. Agriculturist*, 264 A.D. 971 (3rd Dept. 1942), charter language conclusively demonstrated that a corporation which was wholly owned by a non-profit, charitable entity nevertheless had a for-profit business purpose. Although "[a]ll of the stock of appellant is owned by… a corporation organized for

49

and engaged in educational, scientific and charitable purposes," the subsidiary was nevertheless subject to unemployment insurance tax because "its articles of incorporation do not limit its powers to such purposes. These articles are decisive of the issue." *Id*. (citing *Mohawk Mills,* 260 A.D. 433).

Here, of course, after incorporation, WFHC issued 600 shares of stock that were sold to individuals, not the Club. The terms of WFHC's Certificate reflect a choice by its incorporators to incorporate it as a business corporation and contemplate WHFC generating surplus profits and distributing them to its 600 shareholders. WFHC's Certificate, "framed on the language of the corporators," *De Peyster*, 210 N.Y. at 219–20, should have been decisive on the issue of WFHC's purpose.

3. *The district court relied upon inapposite authority in its ruling on WFHC's corporate purpose.*

When the district court declined to treat WFHC's Certificate as conclusive evidence of its purpose, the court relied on *Quinn v. Stuart Lakes Club, Inc. ("Quinn I"),* 64 A.D.2d 556, 556 (1st Dept. 1978), and *Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2771 (2014)). *See* SPA15 n. 7 (citing cases). Neither case supports the court's decision.

The district court's holding that "courts look to substance over form" (SPA15 n. 7) paraphrased a statement in *Quinn I,* that "in examining to determine which species of organization is here involved, we are to look to substance rather

50

than form." 64 A.D.2d at 556 (citing *Thomashefsky v. Edelstein*, 192 A.D. 368, 370 (1ˢᵗ Dept. 1920), and *Penthouse Props. v 1158 Fifth Ave*., 256 A.D. 685 (1ˢᵗ Dept. 1939)). *Quinn I* was not announcing a rule of construction concerning corporate purpose, however, but referring to the equitable rule that "a court of equity will disregard the corporate form" when "us[ed]… as a cloak to accomplish some fraudulent purpose."[8] *Thomashefsky,* 192 A.D. at 370. That rule of equity is inapposite here as there is no allegation that WFHC's incorporation was, itself, a device to achieve some fraudulent purpose.

To the extent *Quinn I* did seek to construe corporate purpose from something other than the certificate of incorporation, it did so in error and was overruled later in the same proceedings by the Court of Appeals. *Quinn* involved a corporation with the purpose, stated in its certificate of incorporation, of acquiring land and water and promoting rod and gun sports. *Quinn II,* 80 A.D.2d at 351. Decades after incorporation, a bylaw was adopted that cancelled shares upon a shareholder's death or departure from the club—in effect creating a survivorship lottery in which the last club member succeeded to the corporate assets. *Quinn I,* 64 A.D.2d at 556; *cf. Quinn II,* 80 A.D.2d. at 351-354. After trial, the First Department held that the true corporate purpose was the survivorship lottery

_____

[8] The First Department later described its *Quinn I* holding as "equity must look to the realities and not the form." *Quinn v. Stuart Lakes Club, Inc. ("Quinn II"),* 80 A.D.2d 350, 354 (1ˢᵗ Dept. 1981).

(which was illegal—making corporate dissolution necessary). *Quinn II,* 80 A.D.2d. at 354-355.

The Court of Appeals overruled the First Department's corporate purpose determination, instead holding that the certificate of incorporation conclusively established the corporation's purpose—exactly in line with *De Peyster* and its progeny.[9] *Quinn v. Stuart Lakes Club, Inc. ("Quinn III"),* 57 N.Y.2d 1003, 1005 (1982).

The district court also relied on *Burwell v. Hobby Lobby*, in which the United States Supreme Court noted that an Oklahoma business corporation was not strictly bound to "maximize profit," but may "pursu[e]… profit in conformity with the owners' religious [or other] principles." 134 S. Ct. at 2770-71 (crediting the company's "statement of purpose," a non-charter document approved by the firm's board of directors, and a pledge signed by the owners (all members of the same family) as evidence of Hobby Lobby's religiosity where there was no possible shareholder challenge to the assertion of religious purpose). Far from suggesting that business corporations do need not be run as businesses, the Court added the caveat that "a central objective of for-profit corporations is to make money." *Id.* at 2771.

---

[9] The Court of Appeals struck down the bylaw, and left the corporation in existence to continue the purposes stated in its certificate of incorporation. *Id.*

Nothing in *Hobby Lobby* suggests that *De Peyster* and related authority is no longer good law. Indeed, the Court made explicitly clear that, whereas Hobby Lobby was an Oklahoma corporation, "the objectives that may properly be pursued… are governed by the laws of the States in which [the corporations] were incorporated[.]" *Id.*

> 4. *The district court improperly relied on parol evidence that was extrinsic to WFHC's Certificate that, in any event, does not contradict the Certificate's unambiguous statement of a business purpose.*

WFHC's Certificate under the former BCL, which guarantees payment of dividends and unambiguously states a real estate business purpose, expressly contemplates that WFHC shareholders are to be the ultimate recipients of the corporation's residuals. The district court committed plain error in determining that other evidence raised a triable question of whether "WFHC was never a for profit company and… [had the] purpose of supporting the Club." SPA16; *see also* SPA15 n. 7 ("[T]he certificate of incorporation is insufficient to overcome the genuine issue of material fact created by other evidence in the record.").

WFHC's Certificate, "framed on the language of the corporators," *De Peyster*, 210 N.Y. at 220, should have been decisive. The Certificate is "the contract between the parties… [which] conclusively determines their respective and differing rights in one relation or another." *Shanik,* 58 N.Y.S.2d at 181. Without making even a threshold determination of ambiguity, the district court

53

erred in relying on extrinsic evidence to construe WFHC's purpose, and further erred in determining that such evidence indicated a purpose different than that stated in WFHC's Certificate. *See Barton v. 270 St. Nicholas Ave. Hous. Dev. Fund Corp.*, 84 A.D. 696, 696-97 (1st Dept. 2011) (trial court erred in considering extrinsic evidence to interpret certificate of incorporation, since document's language was unambiguous and a "certificate of incorporation is subject to the usual rules of contract interpretation"); *see also Kralik v. 239 E. 79th St. Owners Corp.*, 5 N.Y.3d 54, 59 (2005).

The district court inferred a non-profitmaking purpose from 1921 advertisements for WFHC share subscriptions that conflated share ownership with Club membership, and from a founder's court testimony in 1928 that WFHC was formed to lease its property to the Club. SPA17. This purported evidence of purpose does not state a non-business purpose, or in any way suggest that WFHC shareholders were any less interested in receiving a financial return. It merely reflects the original structure of 600 members and 600 shareholders, initially with a complete identity of interests that ensured WFHC and the Club acted in the best interests of both entities. As long as the one share/one member structure was maintained, shareholders benefited by having each entity serve the interests of the other, which was perfectly consistent with the duty of WFHC's directors to protect the shareholders' expectation of a financial return. *See, e.g., Troy v. Lumberman's*

*Clinic*, 58 P.2d 812, 816 (Wash. 1936) (a right to receive services at below-market prices could qualify as profit: "a saving of expense which would otherwise necessarily be incurred is also a profit to the person benefited"). As discussed, New York courts have repeatedly held that corporations were for-profit businesses because their corporate charters so indicated, despite coordination with non-profit entities as close, or closer than, WFHC's original relationship with the Club. *See, e.g.*, *Trinity Operating Co.*, 269 A.D. at 717; *Am. Agriculturist*, 264 A.D. 971.

With respect to the preamble to the 1947 lease amendment, while the district court was wrong to consider it (particularly given its prior decision that the amendment was an alleged act of waste), the lease amendment, itself, further demonstrated the for-profit nature of WFHC. The original lease term required the Club to pay its entire net income to WFHC as rent. The amendment to permit the Club to retain its net income (less a nominal, flat rental amount) plainly indicated that WFHC would otherwise have had the potential to earn profits from the original lease.[10] Thus, the amendment, itself, does not create a genuine issue of material fact as to WFHC's for-profit purpose.

As the Supreme Court's 1935 decision in *Helvering* makes clear, it was plain

---

[10] The amendment, which was made when two-thirds of the Club members were *not* WFHC stockholders, was characterized by the Club's President as a "drastic change," A702, that was made "in order to enable the Golf Club to conserve and accumulate all of the available cash which it can earn from its operations or obtain as a result thereof." A693.

error for the court to consider such parol evidence, because "[t]he parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." 296 U.S. at 374.

### B. The district court erred when it failed to treat WFHC stock as dispositive of WFHC's status as a for-profit corporation.

In its summary judgment opinion, the district court wholly ignored that WFHC's status as a for-profit corporation would also be established, as a matter of law, if the stock it issued and sold to shareholders were securities, *i.e.*, instruments conferring equity ownership in WFHC. Corporate stock is the "paradigm of a security." *Sulkow v. Crosstown Apparel Inc.*, 807 F.2d 33, 37 (2d Cir. 1986). The test for whether stock is a security examines whether it:

> bears the usual characteristics of stock, *i.e.,* "(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability, (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value."

*Id.* at 36 (quoting *Landreth,* 471 U.S. at 686). WFHC shares, which are denominated "stock," possess each of these "usual characteristics." *Id.* Specifically,

i. WFHC's certificate of incorporation expressly authorized the payment of dividends on its stock. A391-92.

ii. During WFHC's initial decades, shares were bought and sold at privately negotiated prices between incoming and outgoing Club members. *See* Statement of the Case, *supra*, at III.A.3. The Club continues to buy shares at

56

negotiated prices. *E.g.,* A1287.

iii.   During WFHC's initial decades, Club members pledged their shares to the Club against outstanding membership debts. *See* A538-39.

iv.   Shareholders had proportional voting rights under WFHC's Certificate of Incorporation and bylaws, as routinely reflected in annual meetings. *See* A402-411.

v.   Until the Club began to compete with other potential buyers for shares, Club officers often touted shares' capacity to increase in value. *See* Statement of the Case, *supra*, at III.A.3.

The district court failed to address any of these facts in its summary

judgment opinion; and in a later opinion on Defendants' motions *in limine*, stated

that "such evidence is irrelevant to the question of WFHC's corporate purpose

under state law." SPA60. This was clear error. *See All Seasons Resorts, Inc. v.

Abrams*, 68 N.Y.2d 81, 86-87 (1986) (analysis of whether memberships are

"securities" under state statute "comports with the analysis employed by the

[United States] Supreme Court for determining the existence of a security.").[11]

Just as it declined to give due consideration to WFHC's certificate of

incorporation, the district court fundamentally overlooked that WFHC stock

---

[11] The district court also held that "the federal securities laws at issue in *Landreth* were not even in existence at the time WFHC's original shareholders purchased their shares, and for that reason alone could not possibly have informed their expectations." SPA60. The court overlooked that the issue of whether WFHC shares are legally securities bears *directly* on the for-profit nature of WFHC, without regard to the "expectations" of WFHC's original shareholders.

conferred rights to the holders thereof, which bears directly upon the for-profit nature of WFHC as issuer:

> A security itself is essentially a contract between the issuer and the holder that, in the case of certificated stock for example, provides rights through the terms of the certificate and incorporated documents. ... With stock, these rights in the security against the issuer generally include participatory rights in the corporation, such as the right to attend meetings, vote, and inspect corporate records, as well as rights to corporate assets, such as the right to receive dividends.

*Consol. Edison, Inc. v. Ne. Utilities*, 318 F.Supp. 2d 181, 192 (S.D.N.Y. 2004) (citations omitted), *rev'd in part on other grounds*, 426 F.3d 524 (2d Cir. 2005). WFHC shareholders are the ultimate recipients of the corporation's residuals under the terms of WFHC's certificate of incorporation, the incorporation statute, and the stock certificates themselves; and these rights are exercisable *only* as a function of their equity ownership of WFHC stock, not of membership in a Club.

The district court thus committed reversible error by failing to take account of the legal status of WFHC stock as securities in determining, incorrectly, that it could not rule as a matter of law concerning WFHC's corporate purpose.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellants respectfully request that this Court reverse the district court's decision to grant summary judgment to Defendants on their statute of limitations defense, and instead deny summary judgment; reverse the district court's decision to deny summary judgment to

Plaintiffs on WFHC's corporate purpose, and instead grant summary judgment;

and remand to the district court for further proceedings.

Dated: February 8, 2021
     New York, New York   By:    /s/ John Halebian

                                 LOVELL STEWART HALEBIAN
                                  JACOBSON LLP
                                 John Halebian
                                 Adam C. Mayes
                                 Midtown Office
                                 60 East 42nd Street, 40th Floor
                                 New York, NY 10165
                                 Tel: (212) 500-5010
                                 jhalebian@lshllp.com
                                 amayes@lshllp.com

                                 LAW OFFICES OF
                                  SANFORD F. YOUNG, P.C.
                                 *Of-counsel*
                                 Sanford F. Young
                                 One World Trade Center – Suite 8500
                                 New York, New York 10007
                                 Tel: (212) 227-9755
                                 SYoung@SFYLaw.com

                                 *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This document, excluding the parts exempted by Fed. R. App. P. 32(f), contains 13,906 words and complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Local Rule 32.1(a)(4)(A). The document was prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman, and complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6).

Dated: February 8, 2021
      New York, New York    By:   /s/ John Halebian

                                 LOVELL STEWART HALEBIAN
                                  JACOBSON LLP
                                 John Halebian
                                 Adam C. Mayes
                                 Midtown Office
                                 60 East 42nd Street, 40th Floor
                                 New York, NY 10165
                                 Tel: (212) 500-5010
                                 jhalebian@lshllp.com
                                 amayes@lshllp.com

                                 LAW OFFICES OF
                                 SANFORD F. YOUNG, P.C.
                                 *Of-counsel*
                                 Sanford F. Young
                                 One World Trade Center – Suite 8500
                                 New York, New York 10007
                                 Tel: (212) 227-9755
                                 SYoung@SFYLaw.com

                                 *Attorneys for Plaintiffs-Appellants*

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Nelson S.
    Román, dated March 12, 2019, Appealed from.....   SPA-1

Opinion and Order of the Honorable Nelson S.
    Román, dated October 2, 2019, Appealed From ...   SPA-23

Letter Order of the Honorable Nelson S. Román,
    dated October 17, 2019, Appealed From ...............   SPA-28

Opinion and Order of the Honorable Nelson S.
    Román, dated December 18, 2019, Appealed
    From........................................................................   SPA-33

Final Order for Voluntary Dismissal of Claims
    Under Rule 41(a)(2), dated October 14, 2020 .......   SPA-78

Judgment, entered October 14, 2020, Appealed
    From........................................................................   SPA-80

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/12/19
```

------------------------------------------------------------X

MEREDITH and ELLEN BUSHER, *as co-personal* :

*representatives of the Estate of Eugene L. Busher*, :

                           :

                Plaintiff, :

       -against- :

                           :

DESMOND T. BARRY, JR., :

THOMAS F. EGAN, JOHN P. HEANUE, :

WILLIAM M. KELLY, FRANCIS P. BARRON, :

and WINGED FOOT GOLF CLUB, INC., :

                            :

                Defendants, :

                            :

WINGED FOOT HOLDING CORPORATION, :

                            :

             Nominal Defendant. :

------------------------------------------------------------X

14-cv-4322 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

       Plaintiffs Meredith and Ellen Busher, as co-personal representatives of the Estate of

Eugene L. Busher, bring this shareholder derivative action, alleging breach of fiduciary duty,

unjust enrichment, and violation of New York Business Corporation Law § 720 against

Defendants Desmond T. Barry, Jr., Thomas F. Egan, John P. Heanue, William M. Kelly, Francis

P. Barron, Winged Foot Golf Club, Inc. (the "Club"), and, nominally, Winged Foot Holding

Corporation ("WFHC") (collectively, "Defendants"). Before the Court are Plaintiffs' motions to

strike certain affirmative defenses (ECF No. 200) and for partial summary judgment (ECF No.

193) as well as Defendants' cross-motion for summary judgment on their breach of fiduciary

duty claims.  (ECF No. 189.)  For the following reasons, Plaintiffs' motion to strike is

GRANTED in part and DENIED in part, and their motion for summary judgment is DENIED.

Defendants' cross-motion for summary judgment is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Facts

The following facts, drawn from Parties' 56.1 statements[1] and the record, are not in

dispute, unless so noted.

### A.  WFHC and the Club

The Club and WFHC were formed in 1921. (Pls.' 56.1 ¶ 1, ECF No. 204); (Defs.' 56.1 ¶

1, ECF No. 198.)  At that time, the acting chairperson of the founding committee was Charles

"Nibs" Nobles. (Pls.' 56.1 ¶ 2.)  The WFHC certificate of incorporation, filed in 1921, provides

that the "number of shares of stock that may be issued by the Corporation is six hundred (600)

shares without any nominal or par value." (Pls.' 56.1 ¶¶ 6 – 7.)  WFHC's by-laws require that

notice of meetings be mailed to the person listed in its books as a shareholder. (*Id.* ¶ 14.)   The

Club by-laws, adopted in 1921, provide for 600 members. (*Id.* ¶ 11); (Defs.' 56.1 ¶ 11.)  Also in

the Club by-laws, each individual approved for Club membership will, within thirty days after

"identification of his election, become the owner of one fully paid share of the capital stock of

[WFHC]." (Pls.' 56.1 ¶ 15.)  WFHC is a New York corporation, and it holds title to the land on

which the Club sits and leases it to the Club. (*Id.* ¶¶ 5, 19 & 24.)  Parties dispute the reasons for

WFHC's corporate structure, its purpose, and its relationship, if any, to the Club.

WFHC and the Club entered into the original lease in 1924 and it was set to last for

twenty-one years. (*Id.* ¶ 19 & 21.)  Under the terms of the lease, the Club was to invest its

---

[1] Parties have submitted several Rule 56.1 statements relating to the three motions currently pending before the
Court. (*See* ECF Nos. 191, 196, 198, 204 & 217.)  The facts contained here are those that are undisputed between
each of the 56.1 statements or otherwise supported in the record.

earnings in improvements to the land and turn any remaining profits after expenses over to WFHC. (*Id.* ¶ 21); (Gittes Decl. Ex. 12, ECF No. 192.)  In 1947, the lease was amended to cap the Club's annual lease payment at $30,000. (Pls.' 56.1 ¶¶ 48 – 49.)  The level of disclosure of this amendment is disputed. (*Id.*)  The parties entered into twenty-one-year lease extensions under the same terms as the 1947 lease in 1974, 1984, 2002, and, most recently, 2013. (*Id.* ¶¶ 71, 75 & 76); (Defs.' 56.1 ¶ 176); (Gittes Decl. Ex. 125.)  The 2013 lease extension extends the lease from 2050 through October 2071. (Defs.' 56.1 ¶ 177); (Gittes Decl. Ex. 125.)

**B.  Stock Ownership**

At the time of the Club's foundation, purchase of a WFHC share was a condition of Club membership. (*See id.* ¶ 57.)  Upon resignation of a shareholder, the stock had to be surrendered to the Club for resale to a new member. ( Mayes Decl. Ex. 31.)  The stock of WFHC was often discussed both as if it was an investment for shareholders and as if it was part of membership in the Club. (*Id.* Ex. 12.)

During and after the Great Depression of the 1930s, Club membership fell sharply several times, creating financial pressure on the Club. (Pl.'s 56.1, ¶¶ 26, 34 & 35.)  To increase income, as an alternative to full stockholding membership, the Club began to authorize "yearly" membership without any purchase of WFHC stock sometime in the 1930s. (*Id.*)  Throughout the 1940s, the Club bought shares that passed to non-members for nominal amounts. (*Id.* ¶ 61.)  In 1949, the Club eliminated individual stockholding as a requirement for any category of membership. (Defs.' 56.1 ¶ 107.)  In 1950, at the annual meeting, a resolution was adopted authorizing the Club to "buy in shares" of WFHC, "as opportunity offers." (Pls.' 56.1 ¶ 62.)  The Club began prohibiting transfers of WFHC shares between individuals in 1967. (Mayes Decl. Ex. 97, ECF No. 199.)  However, in 1975, the then-Club president, George Gillespie of WFHC,

said that the transfer restrictions were likely prohibited under the WFHC charter and by-laws.

(Mayes Decl. Ex. 2, ECF No. 205.)  The restrictions were relaxed until 2009.  (Defs.' 56.1 ¶

183.)  By 1983, the Club had acquired fifty percent of WFHC shares. (*Id.* ¶ 74.)

## II.    Procedural History

On June 16, 2014, then-Plaintiff Eugene Busher filed a complaint against Defendants.

(ECF No. 1.)  Defendants answered that complaint and then filed a motion for summary

judgment on August 14, 2015 at a time when document discovery was complete but no

depositions had been held.  (ECF Nos. 9, 13 & 39.)  Defendants argued that summary judgment

should be granted in their favor due to the doctrines of laches, acquiescence, and estoppel.  (ECF

No. 39.)  In an opinion issued on March 28, 2016, the Court denied the motion.  (ECF No. 61);

*Busher v. Barry*, No. 14-CV-4322(NSR), 2016 WL 1249612 (S.D.N.Y. Mar. 28, 2016).  The

Court reasoned that summary judgment on the theory of laches was inappropriate because there

were issues of fact as to whether Defendants breached any fiduciary duty to Plaintiff. *Id.* at *5.

Similarly, summary judgment could not be granted under the theories of acquiescence or

estoppel because there were genuine disputes and because it was unclear whether, as required for

the "tainted shares" theory, George Busher participated in the board decisions in dispute. *Id.* at

*6 – 7.

Defendants filed a motion for reconsideration on April 12, 2016 which the Court denied.

(ECF Nos. 63 & 69.)  In September 2016, current Plaintiffs were substituted for Plaintiff Eugene

Busher, who was deceased.  (ECF No. 81.)  On May 23, 2017, Magistrate Judge Judith C.

McCarthy denied Plaintiffs' application to reopen expert discovery.  (ECF No. 153.)  The Court

denied Plaintiffs' objection to Judge McCarthy's denial of the application.  (ECF No. 160.)

Plaintiffs filed an amended complaint ("Amended Complaint," ECF No. 165) on November 7,

4

SPA-5

2017. In Plaintiffs' Amended Complaint, they allege derivative breach of fiduciary duty for waste, neglect, and self-dealing against both the individual Defendants and the Club, a direct unjust enrichment claim against the Club, a derivative aiding and abetting breach of fiduciary duty claim against the Club, and a direct claim for common law dissolution of WFHC against all Defendants. On April 2, 2018, after Defendants answered, Plaintiffs filed a motion for partial summary judgment and a motion to strike certain affirmative defenses. Defendants filed a cross motion for summary judgment.

## LEGAL STANDARDS

### I. Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] . . . affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence [in] support" of such a contention. Fed. R. Civ. P. 56(c)(1)(B). A fact is material if a dispute over that fact could impact the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Id.* (quotations and citations omitted).

If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a motion for summary judgment should fail. *Id.* at 258. Courts must "constru[e] the

5

SPA-6

evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quotations and citations omitted). The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotations and citations omitted). Similarly, "a party cannot create an issue of fact by submitting an affidavit in opposition to summary judgment that contradicts prior deposition testimony." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) (citing *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) (noting that such affidavits "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact"). However, the mere fact that a non-movant's factual allegations in opposition are "self-serving" does not automatically render them insufficient to defeat summary judgment. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998). Instead, summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," where "that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson v.*

6

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, "[t]he inquiry performed is the threshold

inquiry of determining whether there is the need for a trial." *Id.* at 250. If the Court finds that

one party to a case has "no real support for its version of the facts," a motion for summary

judgment should be granted. *Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d

494, 498 (2d Cir. 1962).

"When confronted with cross-motions for summary judgment, the Court analyzes each

motion separately, 'in each case construing the evidence in the light most favorable to the

nonmoving party.' " *Peterson v. Kolodin*, No. 13-CV-793(JSR), 2013 WL 5226114, at \*1

(S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir.

2011)); *see also Morales v. Quintel Entm't, Inc*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach

party's motion must be examined on its own merits, and in each case all reasonable inferences

must be drawn against the party whose motion is under consideration." (citation omitted)). The

Court is not required to resolve the case on summary judgment merely because all parties move

for summary judgment. *Morales*, 249 F.3d at 121.

## II. Standard to Strike Affirmative Defenses

"The court may strike from a pleading an insufficient defense or any redundant,

immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). In order to prevail on

a motion to strike affirmative defenses under Rule 12(f), a plaintiff must satisfy the following

demanding three-part test: "(1) there must be no question of fact that might allow the defense to

succeed; (2) there must be no substantial question of law that might allow the defense to succeed;

and (3) the plaintiff must be prejudiced by the inclusion of the defense." *United States v. E.

River Housing Corp.*, 90 F. Supp. 3d 118, 131 (S.D.N.Y. 2015) (internal quotation marks

omitted) (quoting *Specialty Minerals, Inc. v. Pluess–Staufer AG,* 395 F. Supp. 2d 109, 111

7

(S.D.N.Y. 2005)).  When assessing the sufficiency of affirmative defenses, courts should construe the pleadings liberally, accepting all well-pleaded facts as true and drawing all reasonable inferences in the non-moving party's favor.  *Id.*; *Coach, Inc. v. Kmart Corp.*, 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010).  Turning to prejudice, courts may consider whether the inclusion of a legally insufficient defense would unnecessarily increase the "time, expense, and complexity of a trial." *S.E.C. v. McCaskey,* 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999).

"[C]ourts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir. 1976).  Motions to strike affirmative defenses are generally not favored and are granted infrequently. *Tardif v. City of New York*, 302 F.R.D. 31, 32 (S.D.N.Y. 2014); *Wireless Ink Corp. v. Facebook, Inc.*, 787 F. Supp. 2d 298, 313 (S.D.N.Y. 2011).

## DISCUSSION

### I.   Statute of Limitations

Plaintiffs' derivative claims are subject to a six-year statute of limitations under New York law.  NYCPLR § 213(7).  Similarly, the statutes of limitations for Plaintiffs' direct claims for dissolution and unjust enrichment is six years. *Id.* § 213(1); *Carter v. CIOX Health, LLC*, 260 F. Supp. 3d 277, 289 (W.D.N.Y. 2017); *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 270 (S.D.N.Y. 2008); *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549, 563 (S.D.N.Y. 2001).  However, Plaintiffs argue that the statute of limitations should be tolled due to equitable estoppel and New York's fraud discovery rule.

**A. Equitable Estoppel**

In New York, " '[t]he doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense . . . [and] will apply where [a] plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action' and reasonably relied on the defendant's misrepresentations." *Onibokun v. Chandler*, No. 18-CV-253, 2019 WL 366696, at *1 (2d Cir. Jan. 30, 2019) (quoting *Zumpano v. Quinn*, 6 N.Y.3d 666, 673–74 (2006)). However, equitable estoppel does not apply if the alleged fraud or concealment behind the estoppel claim is the same act at the foundation of the underlying cause of action. *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006). "[T]his limitation on the equitable estoppel doctrine must . . . apply to fraud actions, because otherwise, the mere assertion of an underlying fraudulent act would always trigger equitable estoppel and render the discovery accrual rule for fraud actions superfluous." *Kaufman v. Cohen,* 760 N.Y.S.2d 157, 167 (N.Y. App. Div. 1st Dep't 2003).

Plaintiffs' claims hinge on Defendants' alleged fraudulent and deceptive actions, which are based upon the same facts Plaintiffs advance in support of equitable estoppel, a fact which is readily apparent from a review of Plaintiffs' Amended Complaint and moving papers.[2] *See Laydon v. Mizuho Bank, Ltd.*, No. 12-CV-3419(GBD), 2015 WL 1515487, at *6 (S.D.N.Y. Mar. 31, 2015) (holding that a proposed plaintiff could not toll the statute of limitations under equitable estoppel because the plaintiff relied on the same allegations giving rise to the plaintiff's

---

[2] In Plaintiffs' Amended Complaint, they allege that the Club obtained voting control through a "fraudulent scheme," that Defendants "fraudulently induced" shareholders to sell their shares, and that the "facts underling the breach of fiduciary duty claims that sound in fraud were fraudulently concealed." (Amended Compl. ¶¶ 19, 26(a), & 169.) Plaintiffs allege that "Defendants essentially organized a fraud against WFHC" as one of the alleged breaches of fiduciary duty in their motion for partial summary judgment. (Pls.' Mem. of Law in Supp. of Mot. for Summ. J. pp. 43, 45, ECF No. 194.)

claims to argue that the defendants acted to "conceal their collusion" which prevented the plaintiff from timely filing).

## B. Fraud Discovery Rule

Even if the usual statute of limitations has passed and the doctrine of equitable estoppel is inapplicable, fraud claims may be timely if they are brought within two years of the date of discovery, meaning when Plaintiffs "discovered the fraud, or could with reasonable diligence have discovered it." NYCPLR § 213(8); *Sejin Precision Indus. Co., Ltd. v. Citibank, N.A*, 726 F. App'x 27, 30 (2d Cir. 2018). Whether fraud could have been discovered with reasonable diligence is an objective standard. *Sejin Precision Indus. Co., Ltd.*, 726 F. App'x at 30. "Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Id.* (quoting *Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (N.Y. App. Div. 1st Dep't 2011)) (internal quotation marks omitted). To be on inquiry notice, [3] the plaintiff need not know the actual nature of the alleged fraud, but "need only have known the possibility of fraud." *Bilick v. Eagle Elec. Mfg. Co*., 807 F. Supp. 243, 254 (E.D.N.Y. 1992) (quoting *Bresson v. Thomson McKinnon Sec., Inc.*, 641 F.Supp. 338, 345 (S.D.N.Y. 1986)).

Lawsuits alleging fraud, public reports, and evidence of losses may put a plaintiff on inquiry notice and trigger the statute of limitations. *Id.* In *Baiul v. William Morris Agency, LLC*, the court held that the plaintiff was on inquiry notice that the defendants were not paying her for her work when she stopped receiving payment in 1998 and when she received allegedly

---

[3] "Inquiry notice" is frequently called "storm warnings" when referred to in the securities context. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005).

fraudulent earnings history reports. No. 13-CV-8683(KBF), 2014 WL 1804526, at *6 – 7

(S.D.N.Y. May 6, 2014). Similarly, in *Landow v. Wachovia Sec., LLC*, the plaintiff was not

entitled to the application of the fraud discovery rule because he was on inquiry notice after he

was notified that certain of his assets had been sold and failed to investigate. 966 F. Supp. 2d

106, 130 (E.D.N.Y. 2013). A shareholder's failure to receive financial information or failure to

review information related to investments may also trigger inquiry notice. *See Bilick*, 807 F.

Supp. at 254; *see also Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (cited to

by *Cupersmith v. Piaker & Lyons P.C.*, No. 14-CV-1303(TJM)(DEP), 2016 WL 5394712, at *7

(N.D.N.Y. Sept. 27, 2016). In *Bilick*, the plaintiffs, shareholders, brought a securities fraud

action after the 1986 sale of the plaintiffs' stock back to the company under a stock purchase

agreement. *Bilick*, 807 F. Supp. at 245. The plaintiffs alleged that for fifteen years, the

defendant failed to provide them with financial and other information about the company as

required by the company by-laws. *Id.* at 255. The court held that this was sufficient to put the

plaintiffs on inquiry notice. *Id.*

 Here, there is no genuine dispute that there were storm warnings that would have caused

a reasonable person to investigate. Plaintiffs allege that through fraudulent acts, Defendants

eliminated the market for WFHC's stock, making the stock worthless and defeating the purpose

for which WFHC was created.[4] An essential part of this alleged scheme was the 1947 lease

amendment which changed payments to WFHC from the net profits of the Club to a flat annual

rate of $30,000. It is clear from the face of the document that the amendment changed the rent

terms to $30,000 per year. (Mayes Decl. Ex. 56, ECF No. 199). Minutes from a June 8, 1947

---

[4] According to Plaintiffs, the fact that WFHC was founded with the purpose of generating financial returns for investors is clear from WFHC's certificate of incorporation.

meeting, available to WFHC shareholders, of the Boards for the Club and WFHC record a discussion of the original terms of the lease and the amendment. (Gittes Decl. Ex. 48.) A review of the minutes would have alerted a reasonably diligent shareholder that the Club thought of WFHC as an extension of itself: "[I]t has always been contemplated that [WFHC's holding of the land] would be at all time for the benefit of the Golf Club." (*Id.*) Financial statements for WFHC and the Club over the years have showed that the land's book value has remained approximately the same for decades. (*See, e.g.*, Shaeffer Decl. Exs. 133 – 139, ECF No. 216.) Moreover, the notes to the consolidated financial statements for 1983 expressly state that the Club "now owns more than 50% of the outstanding stock of [WFHC]." (Gittes Decl. Ex. 67.) In fact, it appears that WFHC and the Club filed at least one consolidated financial statement even before the Club gained fifty percent ownership of WFHC. (Gittes Decl. Ex. 77, ECF No. 192.) Each of these facts and incidents would have alerted a shareholder of reasonable diligence that the organizations were not operating at arm's length and potentially were not acting in the best interests of WFHC.

Plaintiffs argue that WFHC failed to mail notices and financial statements to some shareholders, including Plaintiffs, but there is no evidence in the record to suggest that this failure was intentional or an act of concealment. WFHC by-laws provide that shareholders are to receive notice according to their address as they appear in WFHC's books. (Mayes Decl. Ex. 6.) Even if the Club or WFHC intentionally failed to provide WFHC shareholders with these materials, that failure alone would be sufficient to trigger inquiry notice.[5] *Bilick v. Eagle Elec. Mfg. Co., Inc.*, 807 F. Supp. 243, 254 (E.D.N.Y. 1992). Plaintiffs do not allege, nor is there any

---

[5] In their own Amended Complaint, Plaintiffs reference a May 14, 2005 letter about a lawsuit involving the Club, members, and WFHC. This also could have potentially put Plaintiffs on inquiry notice. (Amended Compl. ¶ 299.)

evidence in the record to show, that they attended board meetings or asked to review the

corporate books and records or WFHC's financial statements. *See Busher v. Barry*, No. 14-CV-

4322(NSR), 2016 WL 1249612, at *3 (S.D.N.Y. Mar. 28, 2016). With reasonable diligence,

Plaintiffs certainly could have discovered that Defendants were buying up shares of WFHC and

that WFHC was not being used to produce profit for investors in 1983, if not sooner.

Accordingly, Plaintiffs' claims arising from conduct before June 16, 2008 are barred by

the statute of limitations. The Court will analyze parties' motions solely as they relate to the

2013 lease extension.

**II.     Acquiescence, Ratification, and Waiver**

"[T]he law is clear that a shareholder is estopped from challenging, either individually or

through a derivative action, any corporate policy which he approved or [sic] which the

shareholder had knowledge but to which no objection was put forth." *Martindale v. Gleasman*,

No. 07-CV-6517, 2008 WL 2627457, at *5 (W.D.N.Y. June 27, 2008); *see Pinnacle*

*Consultants, Ltd. v. Leucadia Nat'l Corp.*, 94 N.Y.2d 426, 433 – 34 (2000)) (noting that a

shareholder who votes in favor of an action may be deemed to have acquiesced, but that a

shareholder who abstains from voting does not necessarily need to be estopped from bringing

suit).

Here, however, there is evidence from which a reasonable factfinder could conclude that

Plaintiffs did not acquiesce to or waive their rights to object to the 2013 lease extension of which

they were unaware. Defendants appear to argue that George Busher acquiesced to the 1947 lease

amendment and that therefore his successors in interest, Plaintiffs, are deemed to have

acquiesced to subsequent extensions of the terms in that amendment. While Plaintiffs may have

acquiesced to the 1947 lease amendment due to George Busher's participation or failure to

object, assuming without deciding that he had knowledge of the amendment,[6] Plaintiffs cannot be deemed to have acquiesced to the 2013 lease extension.  (Mayes Decl. Ex. 13 (showing that George Busher became a stockholder in 1928)).

George Busher was no longer living at the time of the 2013 extension, and a reasonable jury could conclude that his successors in interest, Plaintiffs, had no knowledge of the extension when it occurred.  To establish waiver of objections, Defendants must show that Plaintiffs effected "deliberate, informed abandonment of known rights," and to establish that Plaintiffs ratified the corporation's conduct, Defendants must show that Plaintiffs acted "with full knowledge of all material facts relating to the transaction."  *LNC Inv., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 463 (2d Cir. 1999)); *Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394(AJN)(BCM), 2016 WL 4613390, at *15 (S.D.N.Y. Aug. 31, 2016).  There is no evidence in the record that Plaintiffs failed to object to the 2013 lease extension with full knowledge of all material facts.  In fact, Plaintiffs claims and the material facts in dispute surround Defendants' alleged concealment.   A reasonable jury could find that Plaintiffs had no knowledge of the 2013 lease extension.

The Court cannot conclude as a matter of law that Plaintiffs acquiesced or ratified Defendants' conduct or waived their rights.

## III.  Breach of Fiduciary Duty

To sustain a claim of breach of fiduciary duty under New York law, "[Plaintiff] must prove 'the existence of a fiduciary relationship, misconduct by the [Defendants], and damages

---

[6] At the time of the 1947 amendment, George Busher was not a member of the board.  (Pls.' 56.1 ¶ 63, ECF No. 204); (Defs.' 56.1 ¶ 252.) This Court previously found that there were genuine issues of material fact surrounding George Busher's participation and knowledge of Club activities.  *Busher v. Barry*, No. 14-CV-4322(NSR), 2016 WL 1249612, at *7 (S.D.N.Y. Mar. 28, 2016).

14

directly caused by the [Defendants'] misconduct.' " *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (quoting *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008)); *Brown Media Corp. v. K & L Gates, LLP*, 586 B.R. 508, 527 (Bankr. E.D.N.Y. 2018); *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597(NSR)(JCM), 2016 WL 164618, at *2 (S.D.N.Y. Jan. 12, 2016).

Parties do not dispute that Defendants owe a fiduciary duty to WFHC shareholders, but dispute the nature of that duty and WHFC's overall relationship to the Club. Plaintiffs' claims hinge on whether WHFC was created to be a corporation to profit shareholders. If WHFC is a for-profit corporation, Defendants' decision to extend the lease in 2013 without any regard for the market value of the property breached their fiduciary duty to WHFC and its shareholders. However, according to Defendants, from its conception, WHFC has existed solely to support the Club.

The Court can only grant summary judgment if there are no genuine disputes as to material fact. Here, Parties' submissions are replete with genuine disputes of facts that are material to breach of fiduciary duty claims. This is hardly a surprise, considering that the record in this matter spans almost a century.

Plaintiffs present evidence from which a reasonable factfinder could find that the 2013 lease extension was part of an effort to continue to undermine the value of stock of WFHC as a for-profit corporation. The purpose of WFHC as stated in its certificate of incorporation is "[t]o acquire by purchase . . . and to hold, own, manage, improve, develop, sell, lease, exchange, mortgage, or otherwise dispose of or deal in real estate."[7] (Mayes Decl. Ex. 4, ECF No. 199.) A

---

[7] The WFHC certificate of incorporation states WFHC is created under New York Business Corporation's Law, and, according to Plaintiffs that shows that WFHC was founded as a for-profit corporation. However, Defendants correctly point out that this fact is not dispositive, and courts look to substance over form to determine the purposes

15

reasonable jury could understand this to mean that WFHC was created to earn profits through

real estate. The same document also authorizes WFHC to "guarantee the payment of any

dividends upon stocks." (*Id.*) In a June 1975 letter, former President and Board Chairman of

WFHC George Gillespie states that "[t]here is no evidence in our charter or by-laws of the fact

that [WFHC] was organized exclusively to hold title to property . . . and to turn over the

[income], less expenses, to the Golf Club." (Mayes Decl., Ex. 60, ECF No. 199.) Moreover,

multiple Defendants testified that they granted the 2013 lease extension with the low rent for the

Club without concern for WFHC's minority shareholders. (Mayes Decl. Ex. 119 ("Barry Tr.")

Barry Tr. 374:20 – 25; 375:2, 9 – 16; 376:3 – 10); (Mayes Decl. Ex. 121 ("Heanue Tr.") Heanue

Tr. 319:25; 320:2 – 5); (Mayes Decl. Ex. 122 ("Kelly Tr.") Kelly Tr. 41:20 – 23; 266:6 – 15.)

William Kelly, for example, testified that in 2013, as director of the WFHC Board, his role "was

to protect the members" and that WFHC "was a holding company only." (Kelly Tr. 41:20 – 23;

266:6 – 15.) A reasonable factfinder could determine, based on the record, that WFHC's

primary purpose was to earn profit for WFHC's shareholders and that Defendants breached their

fiduciary duty.

However, from the evidence cited to by Defendants, a reasonable jury could conclude the

opposite, that WFHC was never a for profit company and extending the lease to the Club in 2013

was consistent with WFHC's purpose of supporting the Club. Advertisement materials from

1921, when WFHC sought buyers of the 600 available shares, provided prices for shares only as

the price of Club membership and repeatedly referred to WFHC share ownership in terms of

membership. (Schaeffer Decl. Ex. 1, ECF No. 211); (Mayes Decl. Ex. 12.) From these

---

of a corporation. *See Quinn v. Stuart Lakes Club, Inc.*, 64 A.D.2d 556, 556 (N.Y. App. Div. 1st Dep't 1978); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2771 (2014). Regardless, the certificate of incorporation is insufficient to overcome the genuine issue of material fact created by evidence in the record.

SPA-17

materials, a reasonable factfinder could conclude that the primary purpose of WFHC was to finance the Club.  In 1928, Charles Noble, a founder and first president of both the Club and WFHC testified that WFHC was formed to hold title to the Club property and to lease it to the Club.  (Schaeffer Decl. Ex. 27.)  The preamble to the 1947 lease amendment indicates that WFHC was founded "for the purpose of facilitating the conduct of business of [the Club] by providing a vehicle by which the title  to the property of the said Gold Club could be held for its benefit."  (Gittes Decl. Ex. 63, ECF No. 192.)  Moreover, numerous Defendants testified that they understood the purpose of WFHC to be connected to sustaining the Club.  (Kelly Tr. 40:2 – 9); (Mayes Decl. Ex. 118 ("Barron Tr.") Barron Tr. 241:9 – 18); (Mayes Decl. Ex. 120 ("Egan Tr.") Egan Tr. 115:13 – 25; 116:2 – 8; 117:7 – 8.)

There is sufficient evidence to support both Plaintiffs' and Defendants' arguments for the purpose of WFHC and, ultimately, the breach of any fiduciary duties.  It is not for the Court to weigh the evidence and determine what is true.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Only if the Court finds that one party has no real support for its version of the facts can it grant a motion for summary judgment.  *Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir. 1962).  Accordingly, because there is a genuine dispute of material fact, the Court cannot grant summary judgment for Plaintiffs on their fiduciary duty claims.

## IV.    Motion to Strike

Plaintiffs move to strike Defendants' first, third, fourth, fifth, seventeenth, nineteenth, and twenty-seventh affirmative defenses[8] as insufficient; according to Plaintiffs, they are

---

[8] The challenged defenses are as follows: Plaintiffs lack standing to assert the claims alleged in the Amended Complaint; the Court lacks subject matter jurisdiction; Plaintiffs improperly seek to bring derivative claims as direct causes of action; Plaintiffs improperly seek to bring direct claims as derivative causes of action; absence of

conclusory and "ultimately uninformative." ("Answer," ECF No. 166.)  Defendants oppose

Plaintiffs' motion to strike because Plaintiffs fail to argue that any of the challenged defenses are

factually futile, the challenged defenses are not without legal merit, and Plaintiffs fail to identify

prejudice from the inclusion of the challenged defenses.

       A court may strike insufficient affirmative defenses from a pleading. Fed. R. Civ.

P. 12(f).  District courts dispute whether the plausibility standard established by *Twomby* and

*Iqbal* applies to affirmative defenses, and the Second Circuit has yet to address this issue.  *See*

*Scott v. WorldStarHipHop, Inc.*, No. 10-CV-9538(PKC)(RLE), 2012 WL 5835232, at $*2-3$

(S.D.N.Y. Nov. 14, 2012) (citing cases).  Rule 8(a), the subject of *Twombly* and *Iqbal*, governing

the pleading requirement for a claim for relief, requires that a party include statements of the

grounds for jurisdiction, of the claim showing that the pleader is entitled to relief and a demand

for relief. Fed. R. Civ. P. Rule 8(a).  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp.*

*v. Twombly*, 550 U.S. 544 (2007).  However, Rule 8(c), governing pleading of affirmative

defenses, only requires that a party "affirmatively state" a defense.  Fed. R. Civ. P. Rule 8(c).

This is a less stringent pleading standard than that set out by Rule 8(a) and fleshed out by the

Supreme Court.  Therefore, this Court finds, consistent with the interpretation of other district

courts, that the *Twombly* and *Iqbal* plausibly standard does not apply to affirmative defenses.

*See, e.g.*, *Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12-CV-5105(NRB), 2014 WL

3950897, at *3 (S.D.N.Y. Aug. 12, 2014); *Scott*, 2012 WL 5835232, at *3; *Hon Hai Precision*

*Indus. Co., Ltd. v. Wi-LAN, Inc.*, No. 12-CV-7900(SAS), 2013 WL 2322675, at *9 (S.D.N.Y.

May 28, 2013) ("The majority of district courts in this Circuit to consider the issue have held that

---

monetary damages to Plaintiffs caused or contributed to by Defendants; failure to mitigate; Plaintiffs' claims are
barred because equity requires that WFHC's certificate of incorporation be reformed; and Defendants reserve rights
to assert additional defenses.  (Answer  pp. 108 – 11.)

affirmative defenses are not subject to the pleading standard of *Twombly*."); *Cox v. Stone Ridge at Vinings, LLC*, No. 12-CV-2633(AT), 2012 WL 12931994, at *2 (N.D. Ga. Oct. 23, 2012); *Bushbeck v. Chicago Title Ins. Co.*, No. 08-CV-0755(JLR), 2010 WL 11442904, at *2 (W.D. Wash. Aug. 26, 2010).

Here, Plaintiffs do not meet their burden to show the insufficiency of each challenged affirmative defense. In their motion to strike, Plaintiffs present seven subsections each with one or two brief paragraphs, but these paragraphs are conclusory and fail to meet the standards necessary to succeed on a Rule 12(f) motion.

First, Plaintiffs fail to show that there are no questions of fact that would allow the defenses to succeed. The moving party has the burden to demonstrate "to a certainty that [they] would succeed despite any set of facts which could be proved in support of the defense." *Simon v. Mfrs. Hanover Tr. Co.*, 849 F. Supp. 880, 882 (S.D.N.Y. 1994); *see 839 Cliffside Ave. LLC v. Deutsche Bank Nat'l Tr. Co.*, No. 15-CV-4516(SIL), 2016 WL 5372804, at *9 (E.D.N.Y. Sept. 23, 2016). In *Walsh v. City of New York*, a plaintiff alleged that the defendants were negligent and their negligence caused him to be injured. 585 F. Supp. 2d 555, 556 – 57 (S.D.N.Y. 2008). The plaintiff filed a Rule 12(f) motion to strike the affirmative defense of culpable conduct because there were no facts to suggest that the plaintiff was the but-for-cause of the underlying incident. *Id.* at 557. The court denied the plaintiff's motion because the plaintiff failed to establish with certainty that there was no evidence in the record to support the defendant's culpable conduct defense. *Id.* Here, similar to in *Walsh*, Plaintiffs do not show to any degree of certainty that there are no facts in the record on which the defenses can succeed.

Second, while Plaintiffs do occasionally reference questions of law, they fail to show that there are no questions of law on which the defenses can succeed for each of the challenged

defenses. "Motions to strike affirmative defenses under Rule 12(f) for legal insufficiency are generally disfavored and if there are. . . disputed questions of law, the motion should be denied." *Bd. of Managers of Trump Tower v. Palazzolo*, No. 16-CV-9188(KMK), 2018 WL 4682789, at *24 (S.D.N.Y. Sept. 28, 2018). It is Plaintiffs' burden to show that there are no disputed questions of law upon which the challenged defenses would succeed, and Plaintiffs fall short.

Finally, Plaintiffs allege prejudice in that the challenged defenses have deprived them of notice and hindered their ability to prepare for trial. This allegation of prejudice seems thin, and it is insufficient to overcome courts' reluctance to tamper with pleadings and the fact that motions to strike are generally disfavored. *Tardif v. City of New York*, 302 F.R.D. 31, 32 (S.D.N.Y. 2014); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) . Regardless, Plaintiffs' failure to meet the first two elements means that the Court need not consider the third. [9]

Although Plaintiffs failed to establish the elements necessary for a rule 12(f) motion to strike, Plaintiffs' motion to strike has merit in one respect.[10] Plaintiffs also address, separate from the affirmative defenses, Defendants' reservation of rights to "assert additional defenses as

---

[9] Plaintiffs cite to *Schechter v. Comptroller*, 79 F.3d 265 (2d Cir. 1996) and claim that there, the court granted the motion to strike an affirmative defense because the defendants failed to provide the plaintiff with fair notice of the facts forming the affirmative defenses. This misstates the *Schechter* holding. Plaintiffs are correct that the Second Circuit quoted a Wisconsin district court's statement that "[d]efenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy." *Schechter*, 79 F.3d at 270 (quoting *Nat'l Acceptance Co. of Am. v. Regal Prods., Inc.*, 155 F.R.D. 631, 634 (E.D. Wis. 1994) (internal quotation marks omitted). However, first, *Schechter* concerned a Rule 12(c) motion for judgment on the pleadings, not a Rule (12)(f) motion to strike like the one currently before this Court. *Id.* at 270. Second, after the quoted language, the Second Circuit notes that they must draw all reasonable inferences in favor of the nonmovant which, in *Schechter*, was the plaintiff because the defendants had moved for judgment on the pleadings. *Id.* Finally, the court looked to the facts in the record, not just the facts in the affirmative defense, to determine that there were no asserted facts to support the defense.

[10] Regardless of whether Plaintiffs met their burden, Rule 12(f) permits the Court to strike insufficient affirmative defenses *sua sponte*. Fed. R. Civ. P. Rule 12(f)(1).

SPA-21

they become known." (Pls.' Mem. of Law in Supp. of Mot. to Strike Certain Defenses p. 8, ECF No. 201 (citing Answer p. 111.)) The purpose of affirmative defenses is to provide the plaintiff with notice. *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971). Allowing Defendants to reserve the right to plead additional affirmative defenses "as they become known" defeats this purpose. *Calabrese v. CSC Holdings, Inc.*, No. 02-CV-5171(DLI)(JO), 2006 WL 544394, at *6 (E.D.N.Y. Mar. 6, 2006) ("Such assertions do nothing to achieve the purpose of a proper pleading, which is to provide fair notice to opposing parties of the issues in the case."); *see Fisk v. ARS Nat'l Servs., Inc.*, No. 12-CV-0478, 2012 WL 3236569, at *2 (N.D.N.Y. Aug. 7, 2012).

Therefore, the Court strikes Defendants' reservation of rights from the Answer.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment is DENIED. Plaintiffs' motion to strike is GRANTED in part and DENIED in part. Defendants' first, third, fourth, fifth, seventeenth, nineteenth, and twenty-seventh affirmative defenses remain, and their reservation of rights is stricken from the answer. Defendants' cross motion for summary judgment is GRANTED in part and DENIED in part. The Court finds that the statute of limitations bars Plaintiffs' claims arising from conduct from before June 16, 2008 but that there are material issues of fact as to whether Plaintiffs acquiesced to Defendants' actions taken after June 16, 2008. The Parties are directed to appear before this Court on April 4, 2019 at 11:30 AM for a pre-trial conference. The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 189, 193, & 200.

Dated: March 12, 2019                                    SO ORDERED:
      White Plains, New York

                                             NELSON S. ROMÁN
                                      United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MEREDITH and ELLEN BUSHER, *as co-personal*   :
*representatives of the Estate of Eugene L. Busher,*   :
                                                                         :
                         Plaintiffs,                             :                    14-cv-4322 (NSR)
          -against-                                              :
                                                                         :                    OPINION & ORDER
DESMOND T. BARRY, JR.,                             :
THOMAS F. EGAN, JOHN P. HEANUE,           :
WILLIAM M. KELLY, FRANCIS P. BARRON,   :
and WINGED FOOT GOLF CLUB, INC.,           :
                                                                         :
                         Defendants,                           :
                                                                         :
WINGED FOOT HOLDING CORPORATION,      :
                                                                         :
                         Nominal Defendant.              :
-------------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

         Plaintiffs Meredith and Ellen Busher, as co-personal representatives of the Estate of

Eugene L. Busher, bring this derivative action against Defendants Desmond T. Barry, Jr.,

Thomas F. Egan, John P. Heanue, William M. Kelly, Francis P. Barron ("Director Defendants"),

Winged Foot Golf Club, Inc. (the "Club"), and, nominally, Winged Foot Holding Corporation

("WFHC") (collectively, "Defendants"). Plaintiffs allege violations of New York Business

Corporation Law § 720 ("§ 720"), breach of fiduciary duty, aiding and abetting a breach of

fiduciary duty, and unjust enrichment. They seek dissolution of WFHC, monetary damages to be

proved at trial, permanent and mandatory injunctions, and repayment to WFHC of the amounts

by which the Club has been unjustly enriched.

         On March 12, 2019, the Court issued an Opinion and Order disposing of Plaintiffs'

motions to strike certain affirmative defenses, (ECF No. 200), and for partial summary judgment,

(ECF No. 193), and Defendants' cross-motion for summary judgment, (ECF No. 189). In its

Opinion, the Court found that a six-year statute of limitations applies to Plaintiffs' claims.

*Busher v. Barry*, No. 14-CV-4322(NSR), Docket 227, at 8, 13 (S.D.N.Y. Mar. 12, 2019).

Accordingly, only those claims occurring after June 16, 2008, six years before this action was

initiated on June 16, 2014, remain actionable. As the Court discussed in its Opinion, the only

event giving rise to any cause of action within the statutory period is the 2013 renewal of the

1947 lease. *Id.* at 13. The Court also found that there were genuine issues of material fact as to

whether Plaintiffs had knowledge or a reasonable opportunity to object to the lease extension,

and whether Defendants breached their fiduciary duties by participating in the 2013 lease

renewal.

   The Court is in receipt of letters from the parties indicating a disagreement as to the scope

of Plaintiffs' remaining claims after the Court's March 12, 2019, Opinion and Order. (ECF Nos.

239, 241.) Based on the parties' correspondence with the Court, it appears Plaintiffs believe that

certain claims premised on Defendants' conduct prior to June 16, 2008, remain actionable, and

that Plaintiffs may present arguments at trial in this regard. In light of the foregoing, clarification

of the effect of the Court's Opinion and Order on the claims in this case seems to be warranted.

   "Statutes of limitations are not simply technicalities." *Board of Regents v. Tomanio*, 446

U.S. 478, 487 (1980). Rather, "they have long been respected as fundamental to a well-ordered

judicial system." *Id.* If unchecked by a statute of limitations, litigants could reach to the

beginning of time for facts to support a claim. There are situations which warrant tolling of a

statute of limitations, such as the fraud discovery rule or equitable estoppel, but tolling was not

warranted here. *Busher v. Barry*, No. 14-CV-4322(NSR), Docket 227, at 9 – 12 (S.D.N.Y. Mar.

12, 2019).

2

SPA-25

Although Plaintiff's Amended Complaint, (ECF No. 165), presents facts occurring outside of the statute of limitations, the Court, in its March 12, 2019, Opinion, has determined that any claims arising from events preceding June 16, 2008, are barred. The Court will not permit the parties to relitigate that issue. Some of Plaintiffs' allegations are as distant as a century ago, surrounding the formation of the Club and WFHC in 1921. Since that time, televisions gained a place of prominence in America's living rooms, Neil Armstrong walked on the moon, and cellphones became a part of everyday life. More relevantly, laws have changed, multiple generations of the Board of WFHC have risen to their positions and stepped down, and the shares in WFHC currently held by Plaintiffs passed through several different owners. To allow the parties to litigate matters occurring outside of the statute of limitations, even those less remote than the formation of WFHC and the Club or the effectuation of the lease as amended in 1947, would require the Court to decipher law as it evolved over decades and determine how that law relates to current law and the 2013 lease extension. A jury would be presented with an even more arduous task. Jurors would have to somehow determine the weight to be applied to scattershot and sometimes difficult-to-verify facts spanning from 1921 through the 2010s. The result is the sort of temporal rigamarole that is precisely what statutes of limitations are intended to prevent. *See Kohn v. Royall, Koegel & Wells*, 496 F.2d 1094, 1096 (2d Cir. 1974) (noting that the policy behind statutes of limitations is to "bar stale claims").

The Court is aware that instances outside of the statutory period were discussed in its March 12, 2019, Opinion. However, the Court considered pre-statutory occurrences only to determine whether the relevant statute of limitations should be tolled. *Busher v. Barry*, No. 14-CV-4322(NSR), Docket 227, at 9–13 (S.D.N.Y. Mar. 12, 2019). The remaining references to events before June 16, 2008, were only discussed for purposes of deciding the motions for

3

summary judgment and not dispositive to the motions. The Court's denial of summary judgment as to Defendants' acquiescence, ratification, and waiver defenses was focused on the 2013 lease extension; the Court held that "a reasonable jury could conclude that . . . Plaintiffs . . . had no knowledge of the [2013] lease extension when it occurred." *Id.* at 14. Similarly, in denying summary judgment on Plaintiff's fiduciary duty claims, the Court held that there was a genuine dispute about the purpose of WFHC *at the time of the 2013 lease extension* and whether the 2013 lease extension was part of an illegal effort to undermine the value of WFHC stock. *Id.* at 15–17. The Court considered testimony that the 2013 lease extension was granted "without concern for WFHC's minority shareholders" and other testimony implying that the 2013 lease extension was granted with the understanding that "the purpose of WFHC [was] connected to sustaining the Club." *See id.* at 16–17.

Based on the Court's March 12, 2019, Opinion and Order and the discussion above, the primary issue of fact for trial will be identifying WFHC's corporate purpose at the time of the lease extension in 2013. If a jury determines that WFHC was indeed a for-profit business at the time of the 2013 lease extension, the following issues of fact remain: (1) whether Plaintiffs failed to object to the 2013 lease extension in such a way that they can be deemed to have acquiesced, ratified, or waived their right to object to the 2013 lease extension; (2) whether Director Defendants caused the loss or waste of WFHC's assets due to neglect of, failure to perform, or another violation of their duties in connection with their entering into the 2013 lease extension; (3) whether Defendants breached their fiduciary duties to WFHC's shareholders in connection with their entering into the 2013 lease extension and whether the Club aided and abetted that breach; and (4) whether the Club was enriched at the expense of WFHC by gaining the benefit of terms of the lease extension in 2013. Whether to grant Plaintiffs' request for dissolution of

4

WFHC and whether Plaintiffs are entitled to have the 2013 lease renewal rescinded under §

720(a)(2) are questions of law.

      Accordingly, as trial approaches, the Court reminds the parties that their pretrial

submissions must comply with the Court's March 12, 2019, Opinion and Order.  In that regard,

the only relevant occurrence remaining in this action is the 2013 lease extension.  Events

preceding that lease extension and outside of the statutory period are not actionable.  Therefore,

Parties should not rely on or attempt to prove such events in their pretrial submissions or at trial.

      The Clerk of the Court is respectfully directed to terminate the letter motion at ECF No.

239.


Dated: October ⅟, 2019           SO ORDERED:
       White Plains, New York

                            NELSON S. ROMÁN
                         United States District Judge

Case 20-3587, Document 56, 02/08/2021, 3032290, Page99 of 151

SPA-28

Case 7:14-cv-04322-NSR-JCM   Document 256   Filed 10/17/19   Page 1 of 5
Case 7:14-cv-04322-NSR-JCM   Document 247   Filed 10/11/19   Page 1 of 5

LOVELL STEWART HALEBIAN JACOBSON LLP

ATTORNEYS AT LAW
500 FIFTH AVENUE, SUITE 2440
NEW YORK, NEW YORK 10110

TELEPHONE (212) 608-1900
www.lshllp.com

MIDTOWN EAST OFFICE
420 LEXINGTON AVENUE, SUITE 2440
NEW YORK, NEW YORK 10170

TELEPHONE (212) 500-5010
FACSIMILE (212) 208-6806

JOHN HALEBIAN
E-MAIL jhalebian@lshllp.com

*Plaintiffs' application is denied. The Court adheres to its Opinion, dated Oct. 2, 2019 (ECF No. 244). Clerk of the Court requested to terminate the motion (ECF # 247).*

*Dated: Oct. 17, 2019*

**SO ORDERED:**

October 11, 2019

HON. NELSON S. ROMÁN
UNITED STATES DISTRICT JUDGE

**BY ECF**
The Honorable Nelson S. Román
The Hon. Charles L. Brieant, Jr. Federal Bldg. and U.S. Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

*Busher v. Barry, Jr., et al.*, 14 Civ. 4322

Dear Judge Román:

Plaintiffs submit this letter to address the Court's October 2, 2019 Opinion and Order (ECF No. 244) (the "October Order"), in which the Court issued dispositive rulings on critical issues and claims that were beyond the scope of its March 12, 2019 Opinion and Order (ECF No. 227) (the "SOL Decision") despite the Court's stated intention to merely clarify the SOL Decision. As explained below, it is unlikely that the Court intended to resolve issues—by what is, in effect, summary judgment—that were *never* briefed for the Court during the SOL Decision motion practice or otherwise, and thereby deprive Plaintiffs of notice and an opportunity to be heard. Plaintiffs thus respectfully request that the Court withdraw or stay the October Order and direct Defendants to proceed with a fully briefed motion, so that Plaintiffs may have an opportunity to be heard before the Court considers or addresses any summary resolution of issues or claims which have yet to be briefed by the parties or heard by the Court.

It is beyond cavil that a court may not grant summary judgment on a ground not specified in a motion, or grant summary judgment *sua sponte* until the court provides the parties "notice" of its intention to do so and grants the parties "a reasonable time" to respond to the proposed summary judgment before acting. Fed. R. Civ. P. 56(f). As the Second Circuit recently noted, "[a] district court's failure to provide adequate notice is almost always reversible error ...." *ING Bank N.V. v. M/V Temara*, 892 F.3d 511, 524 (2d Cir. 2018). The Second Circuit has emphasized that great care must be taken by district courts to be certain that the party against whom summary judgment is entered has had a full and fair opportunity to meet the proposition at issue and that summary disposition is warranted as a matter of law because no material issues of fact are in dispute. *Schwan-Stabilo Cosmetics v. Pacific Link Internat'l Corp.*, 401 F.3d 28 (2d Cir. 2005). Here, in its nominal "clarification" of its SOL Decision, the Court issued dispositive rulings on issues and claims that were not the subjects of Defendants' cross motion, and were not addressed, either directly or indirectly, in the Court's SOL Decision.

Case 20-3587, Document 56, 02/08/2021, 3032290, Page100 of 151

SPA-29

Case 7:14-cv-04322-NSR-JCM   Document 256   Filed 10/17/19   Page 2 of 5
Case 7:14-cv-04322-NSR-JCM   Document 247   Filed 10/11/19   Page 2 of 5

LOVELL STEWART HALEBIAN JACOBSON LLP

Honorable Nelson S. Román
October 11, 2019
Page 2

There are three issues that the Court decided in its October Order as to which Plaintiffs lacked notice or an opportunity to be heard.[1]

— *First,* the Court essentially ruled that the issue of whether the 1947 amendment of the original lease was wasteful was no longer in the case. Such a determination was beyond the scope of the SOL Decision and inconsistent with the Court's 2016 decision in which the Court held that the 1947 lease amendment was, in fact, alleged to be "wasteful" sufficiently to *defeat* summary judgment. *See* Op. & Order, ECF No. 61 (March 29, 2016), 11 ("MSJ Decision").

The Second Circuit held that a wasteful lease entered for essentially no consideration, that gave defendants sole access to any revenue from the property—all of which happened here—was *void at inception. See Alphonse Hotel Corp. v. Tran,* 828 F.3d 146, 151 (2d Cir. 2016).[2] The New York Court of Appeals has held that the issue of whether a transaction was void at inception is *not subject to a statute of limitations defense. Faison v. Lewis,* 25 N.Y. 3d 220, 224 (2015). Accordingly, whether the 1947 lease amendment or any subsequent lease options are void at inception is an issue *necessarily* beyond the scope of the Court's ruling in the SOL Decision, that "claims arising from conduct before June 16, 2008 are barred by the statute of limitations." SOL Decision, at 13.[3]

Neither the Court's SOL Decision nor the October Order addressed the issue of whether the lease agreements beginning with the 1947 lease amendment were void at inception as wasteful. *Thus, the Court's October Order barring that issue from trial because it was beyond the statute of limitations was a sua sponte ruling as to an issue not subject to the statute of limitations as a matter of law, and that had not been disposed of in any of the Court's prior decisions.*[4]

---

[1] Defendants' September 23, 2019 pre-motion letter to the Court (ECF No. 239) was expressly "[p]ursuant to Section 3.A of Your Honor's Individual Practices" to "request a pre-motion conference" to "enforce" the SOL Decision. In response, Plaintiffs opposed Defendants' request to file their "proposed motion." (ECF No. 241). The Court then issued the October Order in which it "terminate[d] the letter motion," notwithstanding that the proposed motion had not been filed and Plaintiffs had not been given an opportunity to file an opposition to a yet-to-be-filed motion. Before filing their pre-motion letter, Defendants' counsel advised us that they were considering requesting leave from the Court to file a "supplemental motion for summary judgment." By the time they wrote their pre-motion letter, they had decided to request "enforcement" instead.

[2] In addition, New York Business Corporation Law ("BCL") Section 713 specifically recognizes that "a self-dealing transaction ... not shown to be 'fair and reasonable' to a corporation is *void.*" *Sardanis v. Sumitomo Corp.,* 723 N.Y.S.2d 466, 469 (1ˢᵗ Dep't 2001) (emphasis added); BCL § 713 (interested transactions may be "void").

[3] In the event the lease were declared void, Plaintiffs cited the New York Court of Appeals decision in *Riverside Syndicate, Inc. v. Munroe,* 10 N.Y. 3d 18, 24 (2008), to explain that such a ruling would not disturb the Court's ruling in the SOL Decision because the damages, if any, would now be limited to the time period within the statute of limitation—here *post-June 16, 2008.*

[4] Because, as noted, the Court previously held that Plaintiffs had properly alleged that the 1947 lease amendment was "wasteful," MSJ Decision at 11, it plainly follows that if the amendment was wasteful and void *ab initio,* any extensions thereof are also void.

Case 20-3587, Document 56, 02/08/2021, 3032290, Page101 of 151

SPA-30

Case 7:14-cv-04322-NSR-JCM   Document 256   Filed 10/17/19   Page 3 of 5
Case 7:14-cv-04322-NSR-JCM   Document 247   Filed 10/11/19   Page 3 of 5

LOVELL STEWART HALEBIAN JACOBSON LLP
Honorable Nelson S. Román
October 11, 2019
Page 3

   — ***Second***, the Court's October Order effectively eliminated numerous issues for trial concerning wrongful conduct alleged to have occurred ***within*** the post-June 16, 2008 limitations period. Yet, the SOL Decision did not address, much less resolve, what particular wrongs took place within the limitations period.[5] *See* SOL Decision, at 11-13. This is perhaps most starkly apparent in the Court's ruling in the October Order that only the 2013 lease extension (concerning the 2050-2071 lease term) remains at issue, despite the fact that Plaintiffs' unjust enrichment claim as to the 2029-2050 lease term also plainly accrued in 2013, when the Club exercised the option on July 25, 2013—the same date (within the limitations period) that the Club exercised its option as to the 2050-2071 lease term. *See, e.g., Oranuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 500 (S.D.N.Y. 2005); *Rose v. Horan*, No. 17-CV-6408, 2018 WL 4344954 (E.D.N.Y. Sept. 11, 2018) (addressing derivative claim for unjust enrichment relating to lease option, and holding that claim accrued upon the exercise and not the grant of the option). Under the plain language of the Court's SOL Decision, the 2029-2050 lease term resulting from an option exercised by the Club ***within the limitations period*** should remain in the case.[6]

   — ***Third***, the Court's October Order also excludes *all evidence* concerning "events preceding [the 2013] lease extension and outside of the statutory period." October Order at 5 ("the Parties should not rely on or attempt to prove such events in their pretrial submissions or at trial"). This direction summarily precludes all evidence prior to the limitation period. Yet the Court, itself, had previously recognized that such evidence would be significant both to Plaintiffs' claims and Defendants' defenses.[7]

   Because these matters had not been addressed in the Court's SOL Decision, Plaintiffs opposed Defendants' proposed "motion to enforce" by pointing out that "[w]hat Defendants really

---

[5]  Such analysis was not required by—or set forth in—the Court's SOL Decision. Defendants' cross motion was a sweeping motion to dismiss all claims because Defendants alleged their conduct was open and transparent during an alleged 70-year course of conduct. The motion sought rulings on whether the course of conduct was open or concealed (and whether Plaintiffs' predecessors-in-interest had acquiesced), but did not address, or seek any rulings on, which claims had accrued at any particular time.

[6]  Other alleged conduct giving rise to liability *within the limitations period* that was also extinguished by the October Order includes whether, *from the start of the limitations period:* (i) the Club and the Director Defendants may be liable for failing to set aside or avoid a lease that was void at inception, (ii) the Director Defendants may be liable for breach of fiduciary duty for failing to set aside WFHC's lease arrangements with the Club as interested director transactions subject to avoidance under BCL § 713, (iii) whether the Director Defendants may be liable for failing to timely rescind in 2008 the grant of the 2029-2050 option, when a timely claim to rescind could have been brought, and (iv) both the Director Defendants and the Club as fiduciaries could seek to enforce lease obligations known to be interested transactions, and patently unfair to WFHC, without further breaching their fiduciary duties.

[7]  For example, when the Court earlier denied Defendants' motion for summary judgment, it relied in part on evidence drawn from meeting minutes in the 1930s and 1940s, stating that:

     Plaintiff provides circumstantial evidence that the shares were discussed as an investment at the annual meetings and boards of directors often discussed the value of the shares relative to assets and liabilities of WFHC. ... Such actions are inconsistent with a nonprofit, and therefore an issue of material fact as to the corporate purpose of WFHC exists.

MSJ Decision at 12 (citation omitted).

Case 20-3587, Document 56, 02/08/2021, 3032290, Page102 of 151

SPA-31

Case 7:14-cv-04322-NSR-JCM   Document 256   Filed 10/17/19   Page 4 of 5
Case 7:14-cv-04322-NSR-JCM   Document 247   Filed 10/11/19   Page 4 of 5

# LOVELL STEWART HALEBIAN JACOBSON LLP

Honorable Nelson S. Román
October 11, 2019
Page 4

seek is a third—and both untimely and meritless—round of summary judgment motion practice." Letter (ECF 241) at 1.  As noted, Defendants originally advised us that they were considering requesting leave to file a supplemental motion for summary judgment.

If the Court was willing to render as "enforcement" or "clarification" a dispositive decision that plainly went beyond the scope of its SOL Decision, it should have required Defendants to brief a motion for that relief appropriately and afforded Plaintiffs an opportunity to be heard.  The Court instead issued a dispositive ruling *sua sponte* in response to a request for a pre-motion conference, and ruled on the basis of pre-motion letters as to matters that were never addressed by the parties in their briefing, and had not been addressed in the SOL Decision that the Court purported to clarify.[8]

The Federal Rules state that a court may grant summary judgment only "[a]fter giving notice and a reasonable time to respond" and "after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f).  The Supreme Court has emphasized that prior notice is a prerequisite to a grant of summary judgment, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548 (1986); and, as noted, the Second Circuit has cautioned that "[a] district court's failure to provide adequate notice is almost always reversible error," *ING Bank*, 892 F.3d at 524 (citing *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000)).  *Accord In re 650 Fifth Ave. and Related Props.*, 830 F.3d 66, 96-97 (2d Cir. 2016); *Schwan-Stabilo Cosmetics GmbH & Co.*, 401 F.3d at 33; *Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162, 167–68 (2d Cir. 1991).  In this regard, the Second Circuit has specifically instructed that, "in addition to providing notice, a district court is also required to 'identify[ ] for the parties material facts that may not be genuinely in dispute' before entering summary judgment *sua sponte*." *ING Bank*, 892 F.3d at 524 (quoting Fed. R. Civ. P. 56(f)(3)).  None of these procedures were followed here.

The October Order deprived Plaintiffs of a full and fair opportunity to present argument or evidence on any of the new matters resolved *sua sponte* by the Order.  The Court effectively granted summary judgment as to Plaintiffs' claims based on the very lease amendment that the Court itself, in its earlier 2016 decision, noted had been sufficiently alleged to be "wasteful." MSJ Decision at 11.

---

[8]   There are some instances where courts have approved decisions based on pre-motion letters, but those circumstances are nothing like what the Court did here, and did not involve decisions on dispositive issues. They involve either discovery disputes or situations where notice of the issue being decided was explicitly given and addressed and where the pre-motion letters themselves provided a voluminous record adequate for appellate review.  *See KJ Roberts & Co. v. MDC Partners, Inc.*, 605 F. App'x 6, 8 (2d Cir. 2015) (considering proposed motion for sanctions, "the court deemed eleven letters submitted by the parties on sanctions and two related oral arguments to constitute a duly filed motion, which it then denied on the merits"); *NMD Interactive, Inc. v. Chertok*, No. 11-CV-6011, 2017 WL 993069, at *3 (S.D.N.Y. Mar. 13, 2017) (considering proposed motion to vacate settlement, indicating moving party's submission of a reply letter, and the court's review of "nearly 500 pages" of documents relating to the motion), *aff'd sub nom. StreetEasy, Inc. v. Chertok*, 730 F. App'x 4 (2d Cir. 2018); *cf. Griffin v. Sheeran*, 767 F. Appx. 129, 132 (2d Cir. 2019) (stating that "the District Court ... acted outside the scope of its powers under the Federal Rules when it converted [proposed intervenor] SAS's letter request for a conference into a motion and denied that motion without allowing SAS to respond to Defendants' opposition.").

The differences between these decisions and the instant one are dramatic.  Here, the Court decided dispositive issues that had not been addressed in the SOL Decision, as to which Plaintiffs had no opportunity to be heard, and did so based on two three-page letters following which the Court dismissed much of Plaintiffs' case, including matters on which the Court previously *denied* summary judgment.

SPA-32

LOVELL STEWART HALEBIAN JACOBSON LLP

Honorable Nelson S. Román
October 11, 2019
Page 5

The Court also summarily disposed of Plaintiffs' claims based on conduct occurring **within** the post June 16, 2008 limitations period.  But the issues of whether the "wasteful" amended lease and subsequent options were void *ab initio*, and what acts within the limitations period would give rise to liability, have never been briefed by the parties.[9]

Because Defendants sought leave merely to make a motion to enforce the SOL Decision—which did not address these matters—Plaintiffs had no notice that this Court would effectively grant summary judgment in the process of "clarifying" its earlier SOL Decision.  Because Defendants' cross-motion had sought summary judgment solely on statute of limitations and acquiescence grounds, and the Court expressly limited its ruling to a determination of the applicable limitations period, the Court did not provide Plaintiffs an opportunity to respond before deciding these issues against them in the October Order.

Accordingly, Plaintiffs ask that the Court withdraw or stay the October Order and permit Plaintiffs to be heard in response to a properly filed motion.

Respectfully submitted,

/s/ John Halebian

John Halebian

cc   Maeve L. O'Connor, Counsel to Defendants (by ECF)
S. Gale Dick, Counsel to Nominal Defendant (by ECF)

---

[9]   And evidentiary matters were scheduled to be addressed by motions *in limine* after the parties' proposed pretrial order was filed. Pretrial Sched. Order, ECF No. 236 (July 11, 2019).

**SPA-33**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: __12-18-19__

MEREDITH BUSHER and ELLEN BUSHER as
Co-Personal Representatives of the Estate of
Eugene L. Busher, and NANCY TUMPOSKY,

         Plaintiffs,

   -against-

DESMOND T. BARRY, JR., THOMAS T. EGAN,
JOHN P. HEANUE, WILLIAM M. KELLY,
FRANCIS P. BARRON, and WINGED FOOT
GOLF CLUB, INC.,

         Defendants,

WINGED FOOT HOLDING CORPORATION,

         Nominal Defendant.

14-cv-4322 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

   Plaintiffs Meredith and Ellen Busher, as co-personal representatives of the Estate of Eugene L. Busher, and Plaintiff Nancy Tumposky (collectively, "Plaintiffs"), bring this derivative action against Defendants Desmond T. Barry, Jr., Thomas F. Egan, John P. Heanue, William M. Kelly, Francis P. Barron ("Director Defendants"), Winged Foot Golf Club, Inc. (the "Club," and together with Director Defendants, "Defendants"), and, nominally, Winged Foot Holding Corporation ("WFHC"). Plaintiffs allege violations of New York Business Corporation Law § 720, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and unjust enrichment.[1] They seek dissolution of WFHC, monetary damages to be proved at trial, permanent

---

[1] In its Opinion and Order issued on March 12, 2019, the Court found that Plaintiffs' claims are limited to those occurring after June 16, 2008, six years before this action was initiated. *See Busher v. Barry*, No. 14-cv-4322 (NSR), Docket 227 (S.D.N.Y. March 12, 2019). Accordingly, the only event giving rise to any cause of action in this case is a lease renewal entered into by the Club and WFHC in 2013. *See id.*; *Busher v. Barry*, No. 14-cv-4322 (NSR), Docket 244 (S.D.N.Y. Oct. 2, 2019).

SPA-34

and mandatory injunctions, and repayment to WFHC of the amounts by which the Club has been unjustly enriched.

Trial is scheduled to begin on January 7, 2020. In anticipation, both Plaintiffs and Defendants have filed numerous pre-trial motions *in limine*. (*See* ECF Nos. 273, 275 & 280 (Plaintiffs); ECF Nos. 264, 265, 268, 278 & 286 (Defendants).) This Opinion and Order addresses those motions that pertain to the issue of Defendants' liability, (ECF Nos. 273, 275 & 280 (Plaintiffs); ECF Nos. 264, 268 & 278 (Defendants)), and so much of Defendants' motion *in limine* to preclude evidence of damages as concerns their jurisdictional challenge to Plaintiffs' claim for dissolution, (ECF No. 286).[2] For the following reasons, those motions are GRANTED in part, DENIED in part, and RESERVED in part.

## BACKGROUND

The Court assumes familiarity with the facts and allegations in this case, as well as the procedural background of this case. *See, e.g.*, *Busher v. Barry*, No. 14-cv-4322 (NSR), 2016 WL 1249612, Docket 61 (S.D.N.Y. March 28, 2016) (addressing Defendants' first motion for summary judgment); *Busher v. Barry*, No. 14-cv-4322 (NSR), Docket 227 (S.D.N.Y. March 12, 2019) (addressing Plaintiffs' motion to strike certain affirmative defenses and for partial summary judgment, and Defendants' cross-motion for partial summary judgment). Additional factual information relevant to the parties' motions *in limine* is addressed in the applicable section of the Court's discussion.

Many of the parties' motions *in limine* implicate the scope of the issues remaining for trial after the Court's most recent opinions and orders. Accordingly, a brief summary of the Court's

---

[2] The Court reserves decision on the remainder of Defendants' motion *in limine* to preclude evidence of damages, (ECF No. 286), and Defendants' motion *in limine* to preclude evidence of damages based on the theoretical development of the property at issue in this case, (ECF No. 265).

recent jurisprudence is warranted. On March 12, 2019, the Court issued an Opinion and Order (the "March 2019 Opinion") disposing of Plaintiffs' motions to strike certain affirmative defenses, (ECF No. 200), and for partial summary judgment, (ECF No. 193), and Defendants' cross-motion for summary judgment, (ECF No. 189). In its March 2019 Opinion, the Court found that a six-year statute of limitations applies to Plaintiffs' claims, such that only those claims occurring after June 16, 2008, six years before this action was initiated on June 16, 2014, remain actionable. *Busher*, Docket 227, at 8, 13. Accordingly, the only event giving rise to any cause of action within the statutory period in this case is the 2013 renewal of the 1947 lease between WFHC and the Club (the "2013 lease" or "2013 lease renewal"). *Id.* at 13.

On October 2, 2019, the Court issued another Opinion and Order (the "October 2019 Opinion") responding to letters from the parties that indicated a disagreement as to the scope of Plaintiffs' remaining claims after the March 2019 Opinion. *See Busher v. Barry*, No. 14-cv-4322 (NSR), Docket 244, at 5 (S.D.N.Y. Oct. 2, 2019). The Court clarified the effect of the March 2019 Opinion, confirming that any claims arising from events preceding June 16, 2008, are time-barred and stating that the parties would not be allowed to relitigate that issue. *Id.* at 2–3. The Court also clearly defined the remaining issues for trial:

> Based on the Court's March 12, 2019, Opinion and Order and the discussion above, the primary issue of fact for trial will be identifying WFHC's corporate purpose at the time of the lease extension in 2013. If a jury determines that WFHC was indeed a for-profit business at the time of the 2013 lease extension, the following issues of fact remain: (1) whether Plaintiffs failed to object to the 2013 lease extension in such a way that they can be deemed to have acquiesced, ratified, or waived their right to object to the 2013 lease extension; (2) whether Director Defendants caused the loss or waste of WFHC's assets due to neglect of, failure to perform, or another violation of their duties in connection with their entering into the 2013 lease extension; (3) whether Defendants breached their fiduciary duties to WFHC's shareholders in connection with their entering into the 2013 lease extension and whether the Club aided and abetted that breach; and (4) whether the Club was enriched at the expense of WFHC by gaining the benefit of terms of the lease extension in 2013. Whether to grant Plaintiffs' request for dissolution of WFHC

3

and whether Plaintiffs are entitled to have the 2013 lease renewal rescinded under § 720(a)(2) are questions of law.

*Id.* at 4–5.  The Court warned the parties that their pretrial submissions were to be limited in accordance with the foregoing, and reminded them that "[e]vents preceding [the 2013] lease extension and outside of the statutory period are not actionable.  Therefore, Parties should not rely on or attempt to prove such events in their pretrial submissions or at trial."  *Id.* at 5.

Following the issuance of the October 2019 Opinion, Plaintiffs submitted a letter to the Court asking the Court to withdraw or stay the October 2019 Opinion and permit the Defendants to file yet another motion for summary judgment.  (ECF No. 247.)  The Court denied Plaintiffs' application and adhered to the October 2019 Opinion.  (ECF No. 256.)

The Court now turns to the parties' motions *in limine*.

## LEGAL STANDARDS

### I.    Motions *in Limine*

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*."  *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984)).  An *in limine* motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).  "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial."  *United States v. Perez*, No. 09–CR–1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

4

SPA-37

The Federal Rules of Evidence provide that only relevant evidence is admissible.  Fed. R. Evid. 402.  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." Fed. R. Evid. 401(a) – (b).  Relevant evidence may still be excluded by the Court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Though the "standard of relevance established by the Federal Rules of Evidence is not high," *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985), the Court has "broad discretion to balance probative value against possible prejudice" under Rule 403.  *United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008).

## II.     Expert Testimony

The testimony of an expert, at trial, must be reliable and relevant. The standards governing the admissibility of expert testimony are set forth in Fed. R. Evid. 702 ("Rule 702"), which provides that "[a] witness...qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if...the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

The standards have been further clarified by the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S. Ct. 2786 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999). In *Daubert*, the Supreme Court defined the role of the district court as that of a gatekeeper charged with the task of deciding whether an expert's scientific testimony satisfies Rule 702's general requirements of reliability and relevance.

*Daubert,* 509 U.S. at 597. Originally intended to screen out "junk science," *Daubert* has been extended to both technical and other specialized expert evidence. *See Kumho*, 526 U.S. 137.

In addition to screening whether or not a proposed individual qualifies as an expert as contemplated by Rule 702, the court must assess whether the purported expert's testimony is relevant and reliable to be admissible at trial. In assessing the reliability of potential expert testimony, the court must, "...make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* Hence, the court must focus on the purported expert's principles and methodology, not on the expert's conclusions. Ultimately, admissibility is a question of law that rests within the discretion of the district court. *United States v. Feliciano,* 223 F.3d 102, 120 (2d Cir. 2000).

Notably, in December 2000, Rule 702 was amended to reflect the court's gatekeeping task. With regards to assessing expert testimony for admissibility, Rule 702 now instructs district courts to ensure that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Further, the proponent of the evidence must establish its admissibility by a preponderance of the proof. *See Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

## DISCUSSION

Plaintiffs and Defendants have each filed five motions *in limine* to preclude certain testimonial or documentary evidence and/or to confirm the admissibility of certain evidence. Eight of those motions pertain to the issue of liability. In Plaintiffs' motions *in limine*, Plaintiffs seek (1) to confirm the admissibility of evidence concerning the purpose of WFHC that pre-dates June

16, 2008, (Pls.' Mot. *In Limine* No. 1 ("Pls. Mot. 1") (ECF No. 273)); (2) to preclude the admission

of hearsay statements made in the June 8, 1947 minutes of the Club's board (the "6/8/47 board

minutes," or "6/8/47 minutes"), and any witness testimony or subsequent documents that repeat

the contested assertions of the 6/8/47 board minutes, (Pls.' Mots. *In Limine* Nos. 2–3 ("Pls. Mots.

2–3") (ECF No. 275)); and (3) to confirm the admissibility of statements made by nonparty George

Gillespie in a June 10, 1975, letter to Joseph DioGuardi and a March 14, 1975, letter to Walter

Kolb, as admissions against interest, (Pls.' Mots. *In Limine* Nos. 4–5 ("Pls. Mots. 4–5") (ECF No.

280)).

       In Defendants' motions *in limine* addressing evidence of liability, Defendants seek (1) to

preclude the admission of evidence and testimony regarding WFHC's classification under federal

income tax law, including certain anticipated expert testimony (Defs.' Mot. *In Limine* to Exclude

Evid. and Test. on WFHC's Classification Under Fed. Tax Law ("Defs. Mot. 1") (ECF No. 264));

(2) to preclude the admission of certain evidence and arguments related to WFHC's corporate

purpose, including certain anticipated expert testimony, (Defs.' Mot. *In Limine* to Exclude Evid.

Inconsistent with N.Y. Law and Court's Prior Decisions on the Question of Corp. Purpose ("Defs.

Mot. 2") (ECF No. 268)); and (3) to preclude the admission of certain evidence and testimony

related to liability as irrelevant, (Defs.' Mot. *In Limine* to Exclude Irrelevant Evid. ("Defs. Mot.

3") (ECF No. 278)).  Defendants have also filed motions *in limine* addressing evidence of damages,

seeking (1) to preclude the admission of evidence of monetary damages, (Defs.' Mot. *In Limine* to

Exclude Evid. Related to Speculative Damages and Unreliable Op. Test. ("Defs. Mot. 4") (ECF

No. 286)); and (2) to preclude the admission of testimony and evidence of damages based on the

theoretical development of the property owned by WFHC and leased to the Club, including certain

anticipated expert testimony (Defs.' Mot. *In Limine* to Exclude Test. and Evid. of Damages Based

on Theoretical Development of Winged Foot Property ("Defs. Mot. 5") (ECF No. 265)).  The
Court addresses so much of the first of these damages motions as concerns Defendants'
jurisdictional challenge to Plaintiffs' dissolution claim herein.  Decision on the remainder of that
motion, and on Defendants' second damages motion, is reserved.

I.    **Plaintiffs' Motions *in Limine***

A.    **Plaintiffs' First Motion to Confirm Admissibility of Relevant Evidence Preceding June
      16, 2008**

      Plaintiffs' first motion *in limine* seeks confirmation that evidence which is otherwise
relevant to WFHC's corporate purpose may be admissible at trial even if the evidence pre-dates
June 16, 2008.  (*See* Pls.' Mem. in Supp. of Pls. Mot. 1 ("Pls. Mem. 1") (ECF No. 274).)
Defendants do not oppose Plaintiffs' motion.  (*See* ECF No. 292.)

      As the Court determined in the March 2019 Opinion, a six-year statute of limitations
applies to Plaintiffs' claims.  *See Busher v. Barry*, Docket 227, at 8, 13.  While it recently became
necessary for the Court to remind the parties that events outside the statute of limitations period
are not actionable, *see Busher v. Barry*, Docket 244, at 5, the Court has never indicated that all
evidence preceding June 16, 2008, would be categorically excluded at trial.  Indeed, the Court has
explicitly recognized that "the primary issue of fact for trial will be identifying WFHC's corporate
purpose at the time of the lease extension in 2013."  *Id.* at 4.  Thus, it should be clear to all parties
that evidence properly introduced at trial and relevant to WFHC's corporate purpose at the time of
the lease extension in 2013[3] may be admissible even if such evidence pre-dates the statute of

---

[3] The parties indicate in their submissions that all agree the question of corporate purpose is determined by the
reasonable expectation of the original shareholders of WFHC.  (*See, e.g.*, Defs.' Mem. in Supp. of Defs. Mot. 2
("Defs. Mem. 2") (ECF No. 281) at 3 ("Both parties agree that the corporate purpose of [] WFHC is determined by
the expectations of the original shareholders who provided capital to the corporation…")); Pls.' Mem. Opp. Defs.
Mot. 2 ("Pls. Opp. 2") (ECF No. 306) at 15 (describing testimony relevant to corporate purpose as evidence "of the
reasonable expectations of the original shareholders that [WFHC] was established as a for-profit").)  Thus, it is all
but guaranteed that the parties will need to present evidence from the earliest years of WFHC's existence at trial.

limitations period.  Plaintiffs' motion is granted to the extent that relevant evidence properly introduced at trial will not be precluded solely because it pre-dates June 16, 2008.

**B.  Plaintiffs' Second and Third Motions to Preclude Certain Statements in or Based on the 6/8/47 Board Minutes**

In their second and third motions *in limine*, Plaintiffs argue that the Court should preclude a set of statements in the 6/8/47 board minutes purporting to explain why the Club approved an amendment to the lease agreement between WFHC and the Club, as well as any witness testimony or later documents that repeat the same assertions.  (*See* Pls.' Mem. in Supp. of Pls. Mots. 2–3 ("Pls. Mem. 2–3") (ECF No. 284).)   Plaintiffs aver that the statements at issue constitute inadmissible hearsay, and that any repetition of the assertions made in those statements is likely to be derivative of the inadmissible statements themselves.  (*Id.* at 7–13.) Defendants oppose Plaintiffs' motions, stating that the statements contained in the 6/8/47 board minutes are clearly admissible under the hearsay exceptions for business records and ancient documents, and that there is no legal basis for Plaintiffs' proposed categorical exclusion of any assertions repeating those statements.  (*See* Defs.' Mem. in Opp. to Pls. Mots. 2–3 ("Defs. Opp. 2–3") (ECF No. 294).)

For the reasons that follow, Plaintiffs' second and third motions *in limine* are denied.

**1.  The 6/8/47 Board Minutes**

The history of the lease between WFHC and the Club at the center of this action dates back nearly a century.  The original lease agreement, executed in 1924, provided that the Club would pay its entire income to WFHC, as rent, net of certain specified expenses.  (Decl. of Adam C. Mayes in Support of Pls. Mots. 2–3 ("Mayes Decl. 2–3") (ECF No. 279) Ex. 1 at 11015–16.)  On July 21, 1947, the Club and WFHC entered into an agreement replacing the foregoing provision with a new provision requiring the Club to pay only a net fixed annual rental to WFHC of $30,000.00 per year (the "1947 Lease Amendment").  (*Id.* Ex. 2 at 11801.)  On June 8, 1947,

shortly before the execution of the 1947 Lease Amendment, the board of the Club, which also acted as the board of WFHC, met to discuss the lease.  (*See* Pls. Mem. 2–3 Ex. A ("6/8/47 Minutes").)  The board minutes recording the meeting memorialize the board's adoption of a resolution authorizing the 1947 Lease Amendment.  (*Id.* at 5809.)  The resolution is preceded by nine paragraphs of recitals (the "recitals" or "6/8/47 recitals") in which the board set out its explanation and justification for the 1947 Lease Amendment.  (*Id.* at 5808–09.)

The recitals include statements referring to the purpose of the original lease agreement and relationship between WFHC and the Club.  For example, the first recital reflects in pertinent part that,

> . . . at the time of the formation of [the Club], title to the property of the said [Club] was taken in the name of [WFHC] for the purpose of facilitating the conduct of business of [the Club] by providing a vehicle by which the legal title to the property of the said [Club] could be held for its benefit by [WFHC] . . ."

(*Id.* at 5808.)  Other recitals reiterate the assertion that WFHC was formed with the purpose of benefitting the Club, adding, *inter alia*, that "since the incorporation of [WFHC] the said corporation has transacted no other business by [sic] that of holding title to the property of the [Club] . . ." (*Id.*)  The 6/8/47 minutes recite that "after full and careful consideration," the recitals and resolution amending the original lease agreement were "unanimously adopted by the Board of Governors of [the Club] and by the Board of Directors of [WFHC], at this joint meeting at which a quorum of each Board was present and of which due notice had been given."  (*Id.*)

**2.  Admissibility of the 6/8/47 Board Minutes and Related Statements**

Plaintiffs contend that the recitals contain hearsay statements related to the corporate purpose of WFHC.  Under Federal Rules of Evidence 801 and 802, hearsay is not admissible if offered to prove the truth of the matter asserted in the statement.  However, there are a number of

exceptions to this proposition.  As relevant here, business records, even if hearsay, are admissible

if the following elements are met:

> (A) the record was made at or near the time by— or from information transmitted
> by— someone with knowledge; (B) the record was kept in the course of a
> regularly conducted activity of a business, organization, occupation, or calling,
> whether or not for profit; (C) making the record was a regular practice of that
> activity; (D) all these conditions are shown by the testimony of the custodian or
> another qualified witness . . . ; and (E) the opponent does not show that the source
> of information or the method or circumstances of preparation indicate a lack of
> trustworthiness.

Fed. R. Evid. 803(6) ("Rule 803(6)").  The definition of a business record under the Federal Rules

of Evidence includes "a memorandum, report, or data compilation" involving a business activity.

*Id.* 101(b)(4).  "Rule 803(6) favors the admission of evidence rather than its exclusion if it has any

probative value at all."  *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (internal

quotation marks omitted).  "'[T]he principal precondition to admission of documents as business

records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of

trustworthiness to be considered reliable.'"  *Elsevier B.V. v. UnitedHealth Grp., Inc.*, 784 F. Supp.

2d 286, 292 (S.D.N.Y. 2011) (quoting *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d

627, 632–33 (2d Cir. 1994)).

Plaintiffs contend that the recitals are not properly admissible under Rule 803(6) for a

variety of reasons.  While most of Plaintiffs' concerns are unfounded, it is true that the recitals

would not be admissible for the truth of events that took place decades in the past, rather than "at

or near the time" at which the minutes were recorded.  However, the 6/8/47 recitals were not made

as historical documentation of WFHC's founding but as statements that describe the 1947 WFHC

board's understanding of WFHC's purpose.  Plaintiffs have not demonstrated that the recitals in

the 6/8/47 board minutes could never be admissible to demonstrate this understanding, which was

the basis of its rationale for adopting the 1947 Lease Amendment, under Rule 803(6), provided

Defendants lay the proper foundation for their admission at trial through the testimony of a custodian or qualified witness. The recitals were recorded in the 6/8/47 board minutes at the time of the board's meeting, and contain statements adopted by the board members present at that meeting. The statements are reflective of those board members' unanimous understanding of the corporate purpose of WFHC, which they viewed as a substantial consideration in adopting the 1947 Lease Amendment.[4]

The 6/8/47 board minutes appear to have been maintained as a regular part of WFHC's activities. They are included in one of several bound volumes of WFHC's board minutes, which are maintained in chronological order within WFHC's corporate records. (*See* Pls. Mem. 2–3 at 8; Defs. Opp. 2–3 at 6; Decl. of Aasiya F. M. Glover in Supp. of Defs. Opp. 2–3 ("Glover Decl. 2–3") (ECF No. 295) Ex. 22.) While Plaintiffs complain that the minutes are unsigned, they identify no requirement in applicable caselaw or elsewhere mandating that board minutes be signed or otherwise "adopted" in subsequent documents in order to be admissible under Rule 803(6). Rather, as the court has noted, the appropriate prerequisite for admission under Rule 803(6) is that the minutes have "sufficient indicia of trustworthiness to be considered reliable." *Saks Intern., Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987) (citing cases); *see Elsevier B.V.*, 784 F. Supp. 2d at 292. The Court finds that the 6/8/47 minutes, maintained as they were within WFHC's corporate records, alongside numerous other board meeting minute records, several of which were unsigned, (*see* Glover Decl. 2–3 Ex. 22), meet this standard. Plaintiffs' argument to the contrary, based on their assertion that the recitals were "highly unusual statements," (Pls. Reply

---

[4] Contrary to Plaintiffs' assertions, since the recitals do not rely on any outside source for their understanding of WFHC's corporate purpose, this is not a case in which the Court must review multiple layers of hearsay, and the cases cited by Plaintiffs in this regard are inapplicable. *See Rodriguez v. Modern Handling Equip. of NJ, Inc.*, 604 F. Supp. 2d 612, 622 (S.D.N.Y. 2009) (investigator's report which relied on statements from non-parties interviewed by investigator was inadmissible because investigator did not have personal knowledge of the information contained in his report); *Agriculture Ins. Co., Inc. v. Ace Hardware Corp.*, 214 F. Supp. 2d 413, 416 (S.D.N.Y. 2002) (accident report that relied on statements of other eyewitnesses to accident was inadmissible hearsay).

Mem. in Support of Pls. Mots. 2–3 ("Pls. Reply 2–3") (ECF No. 312) at 6), is unpersuasive. Plaintiffs do not provide any evidence or caselaw in support of their proposition that board minute recitals referencing a corporation's purpose are irregular.  Indeed, it appears that such recitals would only raise red flags if Plaintiffs' theory of corporate purpose were accepted.  But as the Court has reiterated time and again, that is a question for the jury.

Furthermore, Plaintiffs have not demonstrated that the source or circumstances of preparation of the recitals in the 6/8/47 board minutes bear any indicia of untrustworthiness. Plaintiffs' proposed theory that the board members present at the 6/8/47 board meeting were "specifically motivated" to fabricate the recitals "in order to falsify and conceal" WFHC and the Club's "conflicting interests in relation to the proposed rent change," (Pls. Mem. 2–3 at 9), which the Court takes no position on, is an argument that will be put before the jury at trial.  It is not a basis for excluding a document that does not, on its face, appear to have been created disingenuously or in anticipation of litigation commenced nearly seventy years later.

To be sure, admitting the 6/8/47 board minutes in their entirety will not restrict the parties from offering other evidence related to the statements in the minutes, or from suggesting that facts recited in some of the minutes are not truthful and accurate.  *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-CV-6201 DLC, 2015 WL 1137572, at *2 (S.D.N.Y. Mar. 13, 2015). For example, both Plaintiffs and Defendants make much of whether John Kadel, an original shareholder of WFHC who was present at the 6/8/47 board meeting, possessed accurate knowledge of the corporate purpose of WFHC at the time of its formation.  Whether or not Kadel was motivated to adopt the assertions in the 6/8/47 board minute recitals based on his proactive role in the formation of WFHC and its corporate governance for the first 25 years of its existence goes to the weight that a finder of fact should afford the assertions, rather than the admissibility of the

13

assertions as a business record. Similarly, Plaintiffs' observation that the other board members present at the meeting may have lacked personal knowledge sufficient to speak to the corporate purpose of WFHC because they were not shareholders at the time of WFHC's founding may indicate that the recitals are unreliable. However, the recitals themselves, authored by the board members present at the 6/8/47 board meeting and memorialized in the 6/8/47 board minutes maintained in the ordinary course of WFHC's business activities, would be admissible if properly introduced pursuant to Rule 803(6).

As a secondary argument, Plaintiffs contend that the 6/8/47 recitals should be excluded under Federal Rule of Evidence 403. Plaintiffs aver that the recitals' "minimal (at best) probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, and ultimately misleading the jury." (Pls. Mots. 2–3 at 10.) The Court disagrees. The 6/8/47 board minute recitals are admissible under Rule 803(6) and directly bear on a central issue in this case: the corporate purpose of WFHC. Moreover, Plaintiffs' arguments that the recitals are contradicted by other terms of the original lease between WFHC and the Club, or are not supported by the founding documents, are properly addressed to the probative value that should be afforded to the recitals, not whether they should be admitted. The existence of contradictory evidence creating an issue of fact does not mean that the evidence should be excluded as confusing or misleading to the jury, whose very role is to weigh contradictory evidence and make determinations as to its relative value.

Thus, Plaintiffs have not demonstrated that the 6/8/47 recitals would not be admissible under Rule 803(6) to show the 1947 board members' understanding of corporate purpose, provided Defendants lay the proper foundation for their admission at trial. Since the Court determines that the 6/8/47 board minutes could be admissible under the business records exception to the hearsay

rule, it does not reach the issue of whether the minutes are separately admissible as an ancient document pursuant to Federal Rule of Evidence 803(16).

In addition, the Court cannot conclude that unspecified "later hearsay statements equivalent to or based upon" the recitals in the 6/8/47 board minutes are inadmissible. Plaintiffs provide no authority or rule of evidence for their assertion that any such evidence, defined extremely broadly as "witness testimony (e.g., by the Director Defendants) or later documents," should be excluded because it is "likely to be derivative of the [6/8/47 recitals]," (Pls. Mem. 2–3 at 12). For the Court to make a pre-trial determination as to whether certain evidence should be excluded, the party making the application must sufficiently specify what that evidence is, so that the Court can assess whether it is "clearly inadmissible on all potential grounds." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675–76 (S.D.N.Y. 2013) (quotation marks omitted) (quoting *Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01-cv-3796, 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005)); *see Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 408 (S.D.N.Y. 2003) (citing *Rmed Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94-cv-5587, 2002 WL 31780188, at *1 (S.D.N.Y. Dec. 11, 2002)). Plaintiffs recognize this same principle in their opposition to Defendants' motions *in limine*. (*See* Pls.' Opp. to Defs.' Mot. 2 ("Pls. Opp. 2") (ECF No. 306) at 17–20.) A categorical prohibition on any evidence supporting the theory of corporate purpose included in the 6/8/47 recitals, while undoubtedly a boon to Plaintiffs' case, is unwarranted on the minimal facts before the Court. Of course, Plaintiffs may raise appropriate objections to testimony or evidence based on the applicable rules of evidence at trial.

In light of the foregoing, Plaintiffs' second and third motions *in limine* are denied.

**C. Plaintiffs' Fourth and Fifth Motions to Admit Party Admissions Against Interest Made by George J. Gillespie III**

In their fourth and fifth motions *in limine*, Plaintiffs seek a preemptive determination from the Court that two letters written by George J. Gillespie III in 1975 are admissible as admissions against interest by the Club pursuant to Federal Rules of Evidence 801(d)(2)(B) and 801(d)(2)(D). (Pls.' Mem. Supp. Mots. *In Limine* 4–5 ("Pls. Mem. 4–5") (ECF No. 282).)  Defendants oppose the motions, contending that each of the letters is irrelevant to the remaining issues in this case, and that each is inadmissible as an opposing party statement since Plaintiffs do not demonstrate either that the Club adopted any of Mr. Gillespie's statements or that Mr. Gillespie was the Club's agent.  (Defs.' Mem. Opp. Pls. Mots. 4–5 ("Defs. Opp. 4–5") (ECF No. 296).)  For the reasons that follow, Plaintiffs' motions are denied.

**1.  The DioGuardi and Kolb Letters**

George Gillespie served as a member of the Club's Board of Governors and as its legal advisor in the early 1970s.  (*See* Decl. of Adam C. Mayes in Support of Pls. Mots. 4–5 ("Mayes Decl. 4–5") (ECF No. 283) Exs. 1 (memorandum prepared by Mr. Gillespie for members of Club's Board of Governors on November 11, 1970) & 2 at 4489 (report to Club's membership at annual meeting dated January 7, 1973, referencing Mr. Gillespie as Chairman of Club's special Legal Committee).)  Mr. Gillespie was elected President of the Club on January 7, 1973.  (*See id.* Ex. 3 at 4484 (referencing Mr. Gillespie as Club President).)  On January 13, 1974, Mr. Gillespie stepped down as Club President and became WFHC President, a position he held until his retirement from WFHC's board on June 8, 2008.  (*See id.* Exs. 4 & 5; Defs. Opp. 4–5 at 2.)  Mr. Gillespie died in 2017.  (Defs. Opp. 4–5 at 2 n.2.)

In 1975, while Mr. Gillespie was serving as WFHC President, he wrote two letters in response to Club member Joseph DioGuardi (the "DioGuardi Letter"), and WFHC shareholder

16

and Club board member Walter Kolb (the "Kolb Letter," and together with the DioGuardi Letter, the "1975 Letters"), respectively.  The DioGuardi Letter, dated June 10, 1975, reflects Mr. Gillespie's response to Mr. DioGuardi's proposals to reduce WFHC's tax liability.  (*See* Pls. Mem. 4–5 Ex. A.)  In the DioGuardi Letter, Mr. Gillespie notes the "difficult, and quite complicated, problems involved in the relationships of [WFHC and the Club]" and states that he has plans to meet with an attorney from the law firm Kelley Drye Newhall and Maginnes to discuss certain questions relating to the future relationship between the two entities.  (*Id.*)  He then proceeds to address Mr. DioGuardi's proposals that WFHC renegotiate its lease with the Club, apply for tax-exempt status under the Internal Revenue Code ("IRC"), or merge with the Club.  (*Id.*)  Of note, Mr. Gillespie expresses his disagreement with Mr. DioGuardi's suggestion that the Internal Revenue Service ("IRS") might consider WFHC to be the "alter ego or captive" or the Club "in view of the fact that the [Club] itself and its current members own less than one-half of [WFHC] stock."  (*Id.*)  He further expresses his "doubt that [an IRC] Section 501(c) exemption will be available to [WFHC].  There is no evidence in [WFHC]'s charter or by-laws of the fact that [WFHC] was organized exclusively to hold title to property, to collect the income therefrom, and to turn over the entire amount, less expenses, to the [] Club."  (*Id.*)  The DioGuardi Letter also contains Mr. Gillespie's opinion that a merger between WFHC and the Club was unlikely because the Club would not "wish to consider conferring dissenter's rights on outside stockholders," and his understanding that the Club would make a concerted effort to acquire a majority of WFHC's shares in the coming year.  (*Id.*)

The Kolb Letter, dated March 14, 1975, addresses itself to Walter Kolb's correspondence regarding the transfer of WFHC shares.  (Pls. Mem. 4–5 Ex. B.)  Mr. Gillespie notes that WFHC's policy and practice at the time was, at least initially, to disapprove and refuse to record transfers

of shares to persons other than a close relative of a stockholder. (*Id.*)  However, Mr. Gillespie

opines that "as a legal matter, [he does] not think the Board of Directors of [WFHC] may properly

withhold approval of any transfer of a share if the transfer papers are in good order.  Neither

[WFHC's] charter nor [its] By-laws give [the Board of Directors] the authority to pick and choose."

(*Id.*)  Mr. Gillespie also discusses specific instances where transfer restrictions were enforced

against WFHC shareholders, stating his view that WFHC had been lucky not to face litigation with

respect to such restrictions because it would likely lose the case.  (*Id.*)  He observes that in every

case where a proposed transferee had disagreed with WFHC's actions and hired counsel to

represent their interests in court, the proposed transferee simply gave up "because, obviously, one

does not litigate a matter involving a share nominally worth $250."  (*Id.*)

## 2. Admissibility of the 1975 Letters

In their opposition to Plaintiffs' motions, Defendants argue before reaching the issue of

whether the 1975 Letters constitute party admissions that the 1975 Letters should be excluded on

other evidentiary grounds.  Specifically, Defendants aver that the 1975 Letters should be excluded

in their entirety as irrelevant pursuant to Federal Rule of Evidence 402.  They also aver that, even

if relevant, the 1975 Letters are likely to waste the Court's time, mislead the jury, and unfairly

prejudice Defendants, and should be excluded on those grounds pursuant to Federal Rule of

Evidence 403.

As the Court has outlined in recent dispositions, *see infra* pp. 2–4, evidence offered by a

party to this action will be relevant only if it bears upon one of the limited issues remaining for

trial.  Plaintiffs argue that the 1975 Letters meet this standard because they are pertinent to the

question of whether WFHC was created to be a corporation to profit shareholders or whether, from

its inception, WFHC has existed solely to support the Club.  Plaintiffs rely on the Court's prior

rulings on motions for summary judgment as purported evidence of the Court's agreement that

Mr. Gillespie's statements in the 1975 Letters have a "high degree of relevance" to this issue. (Pls.

Reply Mem. in Support of Pls. Mots. 4–5 ("Pls. Reply 4–5") (ECF No. 314) at 1.)

To the extent Plaintiffs invoke the Court's 2016 ruling on Defendants' first motion for

summary judgment, *Busher*, 2016 WL 1249612, the Court notes that the March 2019 Opinion

further limited the issues in this case and is the applicable guide to the scope of the matters that

may be properly addressed at trial. In that regard, the March 2019 Opinion cited the 1975 Letters

in a section entitled "Background" and referred more generally to Plaintiffs' allegations of

misconduct regarding transfer restrictions in addressing Plaintiffs' tolling arguments. *Busher*,

Docket 227, at 3–4, 10–13. It further referenced one of Mr. Gillespie's statements in the DioGuardi

Letter as potential evidence that WFHC was not formed for the exclusive benefit of the Club. *Id.*

at 16. Contrary to Plaintiffs' assertions, however, the Court has not explicitly considered whether

the 1975 Letters are properly admissible pursuant to Federal Rule of Evidence 402.

The information contained in the 1975 Letters is of dubious relevance to the issues

remaining for trial. The Kolb Letter discusses restrictions placed by WFHC on the transfer of

WFHC shares and includes Mr. Gillespie's opinion that such restrictions were in violation of

WFHC's charter and by-laws and therefore illegal. All the purported transfers took place well

before June 16, 2008, and were not connected to WFHC's 2013 extension of its lease with the

Club. Instead, Plaintiffs maintain that the Kolb Letter is admissible because "evidence concerning

the nature and value of [WFHC]'s shares [is] probative of [WFHC]'s purpose." (Pls. Reply 4–5

at 2.) To be sure, evidence that shares were initially discussed as an investment and that at annual

meetings the value of shares were often considered relative to the assets and liabilities of WFHC

may suggest that WFHC was a for-profit corporation, just as evidence that shares were sold at the

price of Club membership could suggest the opposite. However, no such connection is obvious between WFHC's corporate purpose and the transfer restrictions imposed on individual shares in the 1970s, as discussed in the Kolb Letter. Plaintiffs may not shoehorn a time-barred cause of action arising from the purportedly illegal practices of WFHC with respect to share transfers into this derivative suit by simply claiming that any evidence pertaining to "the nature" of WFHC shares is relevant to whether WFHC was formed to generate profits for its shareholders. *See infra* pp. 28–29, 40–41.

Mr. Gillespie's statements in the DioGuardi Letter with respect to transfer restrictions are irrelevant for the same reasons. Further, his statements regarding the Club's intention to make a concerted effort to buy WFHC shares so that it could become a majority shareholder are similarly lacking in relevance to the question of WFHC's original corporate purpose. If they bear any connection to the 2013 lease extension at all, it is based on the argument that the Club's scheme to become a majority shareholder in the 1970s ultimately facilitated its approval of lease renewals in later years. However, whether any wrongdoing took place in connection with the Club's buying of shares many years outside of the applicable statute of limitations period is not a question that may be put before the jury. The manner in which the Club gained its status as majority shareholder is not relevant to the question of whether Defendants breached their fiduciary duties or caused the loss or waste of WFHC's assets when they entered into the 2013 lease extension. Nor do the restrictions Defendants imposed on share transfers otherwise bear on any of Plaintiffs' remaining claims. *See infra* pp. 34–37.

The vast majority of Mr. Gillespie's statements regarding WFHC's tax classification under Section 501(c) of the IRC are also plainly irrelevant to WFHC's corporate purpose under state law. *See infra* 22–25. The only statement that warrants further scrutiny pertains to Mr. Gillespie's

assessment of WFHC's governing documents.  In explaining why he believes WFHC is ineligible for a federal tax exemption, Mr. Gillespie opines that there is no evidence in the WFHC charter or by-laws of the fact that WFHC was organized exclusively to hold title to the Winged Foot property and to turn over income to the Club.  While this statement, in isolation, appears to implicate Defendants' theory of WFHC's purpose, its placement within a discussion of WFHC's classification under federal tax law shows that it is concerned with whether WFHC meets the requirements for an exemption under the IRC.  As the Court explains in further detail below, the fact that there is overlap between the parties' theories of corporate purpose under state law and federal taxation law does not mean that federal taxation law is relevant to any issue in this case.

In any event, even if Mr. Gillespie's isolated opinion statement were relevant, it constitutes hearsay, and Plaintiffs have not shown that it fits into any exception to the prohibition on hearsay that would make it admissible.  Federal Rules of Evidence 801(d)(2)(B) and (d)(2)(D) permit the introduction of a hearsay statement offered against an opposing party if the statement is one the party manifested that it adopted or believed to be true, or was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.  Fed. R. Evid. 801(d)(2)(B), (d)(2)(D).  As to the first of these exceptions, a party seeking to offer a statement as an adoptive admission may show adoption or acquiescence in any appropriate manner.  *See Penguin Books, U.S.A. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 258 (S.D.N.Y. 2003) (citing Fed. R. Evid. 801(d)(2)(B), advisory comm. notes).  Here, the fact that Mr. Gillespie, who was not an officer of the Club when he wrote the DioGuardi Letter, copied the Club on his response to Mr. DioGuardi, (*see* Pls. Reply 4–5 at 7), does not suffice to demonstrate that the Club adopted any of Mr. Gillespie's statements or believed them to be true.  Likewise, Plaintiffs do not show that the Club's failure to respond or to pursue any action related to the

taxation matters discussed in the DioGuardi Letter is conduct in compliance with Mr. Gillespie's statement. *See Penguin Books, U.S.A.*, 262 F. Supp. 2d at 259 ("In the case of written statements, such as letters or other documents, mere non-response is generally considered insufficient [to show adoption by silence].").

Nor do Plaintiffs demonstrate that Mr. Gillespie was acting as the Club's agent at the time he wrote the DioGuardi Letter. No evidence has been produced to show that, although Mr. Gillespie did not have any position with the Club when he wrote the DioGuardi Letter, Mr. Gillespie was nonetheless under the Club's control and was doing its bidding when he discussed WFHC's tax status. Indeed, it is unclear why Mr. Gillespie would need authority from the Club to discuss a matter that was specific to WFHC, even if the Club had an interest in that matter.

Accordingly, Plaintiffs have demonstrated neither that the 1975 Letters are relevant to an issue in this case, nor that Mr. Gillespie's opinion statement about WFHC's governing documents in the DioGuardi Letter would be admissible under Federal Rules of Evidence 801(d)(2)(B) or (d)(2)(D) even if it were relevant. Plaintiffs' motions *in limine* four and five are therefore denied.

## II.   Defendants' Motions *in Limine*

### A. Defendants' Motion to Preclude Evidence Regarding WFHC's Classification under Federal Income Tax Law

In their first motion *in limine*, Defendants seek to preclude the introduction of evidence related to WFHC's classification under federal income tax law. (Defs.' Mem. in Support of Defs. Mot. 1 ("Defs. Mem. 1") (ECF No. 262).) Specifically, Defendants implore the Court to exclude the testimony of Plaintiffs' retained tax law expert, Jeffrey A. Galant, and the testimony of fact witness Joseph J. DioGuardi as to discussions in the 1970s about tax-related proposals that were considered but never implemented by WFHC. Defendants argue that such testimony is irrelevant, unreliable, and prejudicial, and should be excluded pursuant to Federal Rules of Evidence 104,

402, 403, and 702.  Plaintiffs oppose the motion, averring that the fact that WFHC did not or could

not apply for an exemption under the IRC is probative of its corporate purpose.  (Pls.' Mem. Opp.

Defs. Mot. 1 ("Pls. Opp. 1") (ECF No. 301).)  For the following reasons, Defendants' motion is

granted.

Defendants contend that WFHC's classification under federal tax law lacks relevance to

any issue remaining in this trial, including the question of WFHC's original corporate purpose.  As

Defendants correctly note, the question of corporate purpose is a state law question.  *See Burwell*

*v. Hobby Lobby Stores, Inc.*, 573, U.S. 682, 713 (2014).  While there may be some overlap between

the definition of a non-profit entity under state law and the definition of a tax-exempt entity under

the IRC, the two concepts are legally distinct.  As the United States Internal Revenue Service

("IRS") explains on its website,

> Nonprofit status is a state law concept.  Nonprofit status may make an organization
> eligible for certain benefits, such as state sales, property and income tax
> exemptions.  Although most federal tax-exempt organizations are nonprofit
> organizations, organizing as a nonprofit organization at the state level does not
> automatically grant the organization exemption from federal income tax.  To
> qualify as exempt from federal income tax, an organization must meet requirements
> set forth in the Internal Revenue Code.

INTERNAL REVENUE SERVICE, APPLYING FOR TAX EXEMPTION FAQ #1, https://www.irs.gov/

charities-non-profits/frequently-asked-questions-about-applying-for-tax-exemption  (last  visited

Dec. 17, 2019).  In other words, the fact that an organization's corporate purpose, as determined

by state law, is something other than the maximization of shareholder profit does not by itself

indicate that such organization is likely to receive a federal tax exemption.  Rather, the only criteria

relevant to the determination of federal tax status is that which is explicitly set forth by the IRC.

Similarly, an organization's tax-exempt status under the IRC may not be conflated with its

corporate purpose.  Doing so would wrongly suggest that an issue exclusively governed by federal

law is relevant to a state law determination. *See Foreman v. United States*, 232 F. Supp. 134, 136 (S.D. Fl. 1964) (holding that a corporation's federal tax status is determined exclusively by federal tax law, because "it would introduce an anarchic element in federal taxation if we determined the nature of associations by State criteria rather than the special criteria sanctioned by the tax law"); *In re Reed*, 127 B.R. 244, 247 (Bankr. D. Haw. 1991) (in determining whether the IRS could levy upon certain property, holding that "[s]tate law may define the nature of the taxpayer's interest in the property, but the consequences flowing from that definition under state law are of no concern to the operation of federal tax law").

Thus, to argue to a jury that WFHC's status under federal tax law is probative of its purpose under state law would be misleading, at best. This issue is compounded by the fact that Plaintiffs' proposed tax expert, Mr. Galant, adopts the term "for-profit business corporation" in lieu of "nonexempt" or "taxable" corporation to describe a corporation subject to federal income taxation in his Expert Report dated December 23, 2016. (*See* Defs. Mem. 1 Ex. 1.) While Mr. Galant's usage of that term is not meant to convey an opinion as to WFHC's status under state corporate law, its effect on jurors who are being asked to determine that very question in the context of profits is likely to be confusing and prejudicial.

In addition, Mr. Galant testified at his deposition that the IRC implicitly "assumes a business corporation is in business and has a for-profit motive" when a business corporation files its tax return on a U.S. Corporation Income Tax Return Form. (*Id.* Ex. 2 at 63–64.) There is no such presumption as to for-profit status, however, under New York state law, which looks to substance over form to determine corporate purpose. *See Busher*, Docket 227 at 15–16 n.7. This testimony, too, is likely to confuse the jury and lacks any relevance to the question they must decide.

Mr. Galant is also expected to testify as to the potential application of Section 482 of the IRC to WFHC's income. (*See* Defs. Mem. 1 Ex. 1 at 10–12.)  Again, Plaintiffs fail to explain how WFHC's theoretical tax liability, even as it arises from the amount of rent it charges to the Club, is relevant to corporate purpose or to the 2013 lease extension, which is the only occurrence left in this action from which a claim arises.  Nor do they show how it may be relevant to any of Defendants' affirmative defenses.

In sum, Mr. Galant's testimony as to WFHC's classification under federal tax law is not relevant to any issue remaining in this case and is subject to exclusion on that ground.  The testimony of Mr. DioGuardi with respect to tax proposals considered, but not implemented, by WFHC in the 1970s warrants the same treatment.  Whether WFHC applied for, or could apply for, exemptions from federal taxation over the course of its nearly one-hundred-year existence does not make it more or less likely that WFHC's original shareholders believed they were contributing capital to an organization whose purpose was to create profits for shareholders.  Accordingly, Defendants' motion to preclude irrelevant evidence and testimony related to the classification of WFHC under federal tax law, including such testimony as is anticipated from Mr. Galant and Mr. DioGuardi, is granted.

**B.  Defendants' Motion to Exclude Certain Evidence Related to Corporate Purpose**

Defendants next move to preclude Plaintiffs from introducing evidence related to WFHC's corporate purpose that is irrelevant to the expectations of WFHC's original shareholders, and to exclude certain evidence or arguments anticipated from Plaintiffs that are inconsistent with the Court's prior holdings on the issue of corporate purpose.  (Defs.' Mem. in Support of Defs. Mot. 2 ("Defs. Mem. 2") (ECF No. 269).)  Relatedly, Defendants seek to exclude certain testimony from Plaintiffs' experts, Professor Merritt Fox and Jeffrey Baliban, related to WFHC's corporate

SPA-58

purpose. (*Id.*) Plaintiffs oppose the motion, stating, *inter alia*, that much of Defendants' motion is inappropriately broad in the scope of evidence it seeks to preclude, and that their experts should be permitted to testify. (Pls.' Mem. Opp. Defs. Mot. 2 ("Pls. Mem. 2") (ECF No. 306).) Defendants' motion is granted in part and denied in part.

### 1. Relevant Evidence of Corporate Purpose

Defendants seek a ruling from the Court restricting evidence that will be considered relevant to the question of corporate purpose to "evidence that reflects, either directly or as recounted in documents concerning Winged Foot's general history, the words, actions, or inaction of WFHC's earliest shareholders." (Defs. Mem. 2 at 3.) Defendants cite to no specific evidence that they believe will violate their proposed principal, and that alone warrants denial of this portion of their motion. *See Weiss*, 293 F. Supp. 2d at 408 (defendants' motion "lack[ed] sufficient specificity with respect to the evidence to be excluded" where "[n]o particular documents or testimony ha[d] been identified"). "In the absence of context the court cannot categorically conclude that [] evidence is not related to matters raised by the present dispute nor can it weigh its probity." *TVT Records v. Island Def Jam Music Group*, 250 F. Supp. 2d 341, 345 (S.D.N.Y. 2003) (denying motion for an order precluding evidence of collateral legal disputes between plaintiff and defendant).

Moreover, Defendants' proposed preclusion of all evidence that "reflect[s] the actions or opinions of those who did not contribute to the corporation," (Defs. Mem. 2 at 4), is unduly broad. The Court cannot, for example, determine that evidence of how officers of WFHC viewed WFHC's purpose after its founding, or how/whether WFHC interacted with businesses other than the Club is irrelevant to whether WFHC was formed as a for-profit corporation. Indeed,

Defendants' proposed limitation would call into question even evidence of corporate purpose that they argue elsewhere is admissible, such as the 6/8/47 recitals.

Accordingly, the portion of Defendants' motion seeking to limit evidence of corporate purpose is denied, without prejudice to Defendants' raising specific evidentiary objections at trial.

### 2. Preclusion of Certain Legal Arguments as to Corporate Purpose

*i.   Argument that Form of Incorporation is Dispositive of Purpose*

Defendants ask the Court to preclude Plaintiffs from offering any testimony or argument that WFHC's form of incorporation is dispositive of its purpose. Such testimony or argument would contradict this Court's express ruling that the "certificate of incorporation is insufficient to overcome the genuine issues of material fact created by evidence in the record" with regard to corporate purpose. *Busher*, Docket 227 at 15–16 n.7. The Court notes that Plaintiffs' opposition indicates that they are aware of this ruling and do not intend to challenge it at trial. (Pls. Opp. 2 at 14.)

As all parties are aware, it is the Court, and not counsel or expert attorney witnesses, that instructs the jury on the law to be applied in reaching their verdict. To the extent any party or witness purports to define the legal parameters within which the jury must exercise its fact-finding function, such party or witness usurps the role of the Court. *See Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) ("Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury."); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[A]lthough [] expert[s] may opine on an issue of fact within the jury's province, [they] may not give testimony stating ultimate legal conclusions based on those facts."). Either party may make an appropriate objection if instances of this nature arise during trial. Since Plaintiffs do not contest that introducing evidence or

testimony that WFHC's corporate form is dispositive to the question of corporate purpose would violate the foregoing principles, however, the portion of Defendants' motion seeking to exclude such evidence or testimony is preliminarily denied as moot.

    ii.   *Arguments Related to Status of WFHC Shares Under Federal Securities Law*

Defendants also ask the Court to preclude the introduction of evidence or testimony that the Supreme Court's decision in *Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985), supports their theory of WFHC's corporate purpose. *Landreth* addresses, *inter alia*, the determination of whether an instrument is a security within the meaning of the 1934 Securities Exchange Act, 15 U.S.C.A. § 78a et seq., and the 1933 Securities Act, 15 U.S.C.A. § 77a et seq. *Landreth*, 471 U.S. at 683. Plaintiffs aver that whether WFHC shares are "securities" with investment value under federal securities laws bears on the question of whether WFHC's original shareholders purchased their shares with an expectation of receiving a financial return. (Pls. Opp. 2 at 20.)

As a preliminary matter, the Court reminds the parties, again, that expert witnesses may not opine on the law to be applied by the jurors during their deliberations. To the extent that Plaintiffs seek to introduce only factual evidence as to the classification of WFHC shares for purposes of the federal securities laws, such evidence is irrelevant to the question of WFHC's corporate purpose under state law. To be sure, the federal securities laws at issue in *Landreth* were not even in existence at the time WFHC's original shareholders purchased their shares, and for that reason alone could not possibly have informed their expectations. Plaintiffs essentially ask that they be allowed to litigate and put before a jury a matter of federal securities law that has no bearing on any issue remaining in this case and would amount to nothing more than a distraction from the core legal questions for trial. The Court declines to grant such permission. The portion

of Defendants' motion seeking to exclude evidence or testimony as to the classification of WFHC

shares under federal securities law is granted.

### 3. Admissibility of Expert Testimony of Merritt Fox

Defendants challenge certain portions of the expert testimony of Plaintiffs' proposed

corporate law expert, Professor Merritt Fox, on two separate grounds, neither of which has merit.

First Defendants seek to preclude Professor Fox from testifying that it is "fair to assume" that the

members of the New York Athletic Club who incorporated WFHC and the Club were

"sophisticated business and professional people of their time." (Defs. Mem. 2 at 8 (quoting Decl.

of Laura Samuels in Support of Defs. Mot. 2 ("Samuels Decl.") (ECF No. 270) Ex. 2 at 8.)

Defendants contend that this assumption is completely unsupported and is thus unreliable and

inadmissible pursuant to Federal Rules of Evidence 702 and 403. (*Id.* at 9.) The Court disagrees.

Professor Fox is permitted to offer his opinion that, based on membership in an affluent club, the

price paid for original shares, and the decision to choose different modes of incorporation for

WFHC and the Club, (*see* Pls. Opp. 2 at 16), the original incorporators of WFHC were

sophisticated businesspeople. Of course, Defendants may challenge the bases underlying

Professor Fox's assumptions on cross-examination.

Defendants also argue that Professor Fox should be "precluded from testifying that []

WFHC was required to change how it fulfilled its corporate purpose once one or more shareholders

were no longer [] Club members." (Defs. Mem. at 6.) However, Defendants misstate Professor

Fox's proposed testimony. Professor Fox has not opined that WFHC was legally required to

change its corporate purpose. Rather, Professor Fox's opinion is that WFHC was formed as a for-

profit business corporation, and that although it could further its corporate purpose in its early

years without dealing with the Club at arms-length, since WFHC membership and Club

membership were identical, it could no longer maximize returns to all of its shareholders when the requirement of share ownership as a condition of Club membership was eliminated without altering its relationship with the Club.  (*See* Samuels Decl. Ex. 1 at 5–7.)  Professor Fox's testimony is relevant to WFHC's corporate purpose and the scope of WFHC's fiduciary duties towards its shareholders, which Plaintiffs contend were breached through the 2013 lease extension. His opinion that WFHC was created to provide a return to shareholders directly supports Plaintiffs' theory of corporate purpose.  His explanation that, at its inception, WFHC was fulfilling this purpose even though it was engaged in non-arms-length transactions with the Club, but that WFHC could not no longer fulfill this purpose through the same course of conduct after membership in the Club and WFHC shareholder status diverged suggests that Director Defendants acted in violation of their fiduciary duties by entering a sweetheart lease with the Club in 2013.

For the foregoing reasons, the portion of Defendants' motion seeking to preclude the testimony of Professor Fox is denied.

### 4. Admissibility of Expert Testimony of Jeffrey Baliban

Defendants seek to preclude the expert testimony of Jeffrey Baliban to the extent it references a legal memorandum from 1961 prepared by the law firm Kelley Drye Newhall and Maginnes (the "Kelley Drye memo").  (Defs. Mem. 2 at 12–14.)  Plaintiffs assert in their opposition that they "will not ask Mr. Baliban any questions about the Kelley Drye memo, and will not seek to elicit any testimony from Mr. Baliban concerning the contents of that memo." (Pls. Opp. 2 at 5.)  Since both parties agree that such testimony will not be solicited, Defendants' motion to preclude Mr. Baliban's testimony to the extent it concerns the Kelley Drye memo is denied without prejudice as moot.

**C. Defendants' Motion to Exclude Certain Evidence Related to Liability**

Defendants' next motion seeks to exclude several categories of evidence as irrelevant to the issues remaining in this action.  Specifically, Defendants seek to exclude (1) evidence related to time-barred leases; (2) evidence relevant to Defendants' alleged fraud or misrepresentations in communications or transactions with shareholders, including in WFHC's financial statements, and to the allegedly illegal share transfer restrictions enforced by Defendants; (3) evidence regarding WFHC's activities with respect to lost shareholders for whom it has no contact information; and (4) evidence related to Defendants' liability insurance.  (Defs.' Mem. in Support of Defs. Mot. 3 ("Defs. Mem. 3") (ECF No. 281).)  Defendants also move to exclude testimony from Plaintiffs' proposed witnesses whose testimony is unrelated to corporate purpose or the 2013 lease.  (*Id.*) Plaintiffs oppose the motion, stating that much of Defendants' motion is impermissibly broad, and disputing that the evidence highlighted by Defendants is irrelevant to Defendants' liability.  (Pls.' Mem. Opp. Defs. Mot. 3 ("Pls. Opp. 3") (ECF No. 307).)  For the following reasons, Defendants' motion is granted in part, denied in part, and reserved in part.

**1.  Evidence Related to Leases Preceding the 2013 Lease Extension**

As Defendants correctly observe, and as set forth in greater detail above, "by order dated March 12, 2019, this Court ruled that the only claims left for trial concern the appropriateness of one contract: the 2013 lease extension [] between [WFHC] and the [Club]."  (Defs. Mem. 3 at 1.) Relatedly, the Court explained that Plaintiffs' claims arising from the 2013 lease extension depend on the threshold question of WFHC's corporate purpose. *See Busher*, Docket 227 at 15.  Thus, the March 2019 Opinion clearly limited the issues remaining in this action.  Nonetheless, Plaintiffs have resisted tailoring their case for trial in accordance with the Court's order, necessitating further clarification from the Court that "the only relevant occurrence remaining in this action is the 2013

lease extension." *Busher*, Docket 244 at 5.  Notwithstanding this clarification, Plaintiffs continue

to argue that they should be permitted to litigate the validity of the 1947 Lease Amendment at trial

next month.  (*See* Pls. Opp. 3 at 3–4; Joint Final Trial Report (ECF No. 257) at 6 ("Plaintiffs allege

that the 1947 amendment of the original lease, and Defendants' extension of the amended lease in

2013, constituted acts of corporate waste . . . and are therefore void.").)

  The validity of the 1947 Lease Amendment is not an issue that may be properly litigated

in this case.  The Court has now repeated numerous times that "[e]vents preceding [the 2013] lease

extension and outside of the statutory period are not actionable," and has reminded the parties that

they "should not rely on or attempt to prove such events in their pretrial submissions or at trial."

*Busher*, Docket 244 at 5.  That Plaintiffs have now decided to cloak their time-barred claim arising

from the 1947 Lease Amendment in the new legal theory that all extensions of the 1947 Lease

Amendment, including the 2013 lease extension, are void *ab initio*, (Pls. Opp. 3 at 4), does not

alter the Court's conclusion.  Indeed, Plaintiff first introduced their new legal theory two months

ago in their October 2019 letter asking the Court to withdraw or stay the October 2019 Opinion,

and the Court nonetheless denied that request and adhered to its decision.  (*See* ECF No. 256.)  The

Court notes, in addition, that allowing Plaintiffs to introduce a new legal theory that revives a time-

barred claim nine months after issuing its decision disposing of that claim, and less than one month

before the start of trial, would be highly prejudicial to Defendants.

  Accordingly, the Court adheres to its prior decisions and declines to endorse Plaintiffs'

creation of brand-new legal theories, which Plaintiffs have not pursued in the approximately five

years since they commenced this action, on the eve of trial, in order to avoid the effect of the

Court's rulings.  *See Farouki v. Petra Int'l Banking Corp.*, No. 08-cv-2137, 2013 WL 12309520,

*2 (D.C. Cir. June 12, 2013) (application to amend pleading is properly denied "when a party—

SPA-65

without explanation for the delay—springs new facts and legal theories on the eve of trial"); *Sanai v. Sanai*, No. C02-2165Z, 2005 WL 1172437, at *1–*2 (W.D. Wash. May 18, 2005) (plaintiffs not permitted to adopt a new legal theory to allow previously dismissed claims to continue on the eve of trial, after the close of discovery, and after the dispositive motions deadline); *see also Beck v. Met. Prop. And Casualty Ins. Co.*, No. 3:13-cv-00879, 2016 WL 4978411, *1 (D. Or. Sept. 16, 2016) (considering defendant's decision "to advance for the first time on the eve of trial a completely new and significant legal theory, and to do so through the awkward procedural mechanism of an evidentiary motion" in calculating attorneys' fees plaintiff was entitled to). The portion of Defendants' motion seeking to exclude evidence or testimony related to the 1947 Lease Amendment is granted to the extent that Plaintiffs may not attempt to prove the validity of the 1947 Lease Amendment at trial. Insofar as Plaintiffs argue that general information regarding the 1947 Lease Amendment may be relevant for purposes of providing background to the 2013 lease extension, the Court reserves decision on whether general evidence or testimony related to the 1947 Lease Amendment is relevant and admissible under the circumstances that present themselves at trial.[5]

As to Plaintiffs' contention that they may introduce evidence in connection with the Club's exercise of a lease extension option granted by WFHC in 2002, the Court has stated numerous times that "the only relevant occurrence remaining in this action is 2013 lease extension," *Busher*, Docket 244 at 5, defined in the Court's March 2019 Opinion as the extension that "extends the lease from 2050 through October 2071," *Busher*, Docket 227 at 3. Accordingly, the portion of Defendants' motion seeking to preclude the introduction of evidence related to the 2002 lease extension and the Club's exercise of an option granted in that lease extension is denied.

---

[5] The Court suspects, however, that far less information regarding the 1947 Lease Amendment is necessary for background purposes than Plaintiffs contemplate.

### 2. Evidence Related to Defendants' Alleged Fraud and Misrepresentations in Communications or Transactions with Shareholders

Defendants argue that evidence relating to Defendants' alleged fraudulent statements and misrepresentations to current and former non-original shareholders other than Plaintiffs, and to the enforcement of transfer restrictions printed on WFHC shares, is irrelevant to the claims remaining in this action and improper in a derivative lawsuit. (Defs. Mem. 3 at 4–8.) Defendants observe that much of the evidence Plaintiffs seek to introduce in this regard pre-dates the statutory limitations period and has no bearing on WFHC's original corporate purpose or whether Defendants' entering the 2013 lease extension breached their fiduciary duties to shareholders. (*Id.*) Defendants also note that Plaintiffs have not produced any evidence that any purported fraud or misrepresentation to an individual shareholder caused damages to WFHC, as required to state a derivative claim. (*Id.* at 6.)

Plaintiffs counter that the challenged evidence is relevant to Plaintiffs' claims because it shows that the 2013 lease extension was part of a "common course of conduct in which the Director Defendants acted as agents of the Club while maintaining the pretense of serving as fiduciaries of [WFHC] and its shareholders." (Pls. Opp. 3 at 9.) Plaintiffs assert that Defendants' "scheme to control" WFHC is also relevant to WFHC's corporate purpose and to the nature of relief that may be appropriate should Plaintiffs prevail on the issue of liability. (*Id.* at 10–11.)

Plaintiffs' alleged "scheme to control" appears to be another attempt to backdoor in significant amounts of evidence related to claims that the Court has dismissed as time-barred. However, the fact that Plaintiffs invoke the same theory, i.e., that Defendants acted to enrich the Club, to explain different species of Defendants' conduct does not make all conduct which could conceivably fit under that theory relevant to Plaintiffs' claims. At trial, the jury will not be asked to decide whether Defendants engaged in a decades-long scheme to defraud shareholders of

WFHC for the benefit of the Club. That is not a claim in this case. Instead, the jury will be asked whether Defendants' *entry into the 2013 lease extension* constituted a breach of Defendants' fiduciary duties, the scope of which will be determined by WFHC's corporate purpose. That Plaintiffs can prove prior bad acts of Defendants related to their representations to shareholders, many of which took place prior to June 16, 2008, does not aid resolution of that question. Nor does Director Defendants' purported facilitation of the Club's purchase of WFHC shares bear upon WFHC's original corporate purpose. On the contrary, such evidence would only serve to confuse the jury as to the issues it is to consider. It would also substantially prejudice Defendants and would imply that jurors may properly consider evidence of Defendants' past wrongdoing in deciding whether they breached their fiduciary duties in 2013. *See New Am. Mktg. FSI LLC v. MGA Entm't, Inc.*, 187 F. Supp. 3d 476, 480 (S.D.N.Y. 2016) (defendant's proposed evidence of fraud or defenses sounding in fraud, where fraud-based counterclaims had previously been dismissed, was precluded as both irrelevant and substantially prejudicial to plaintiff); *see also* Fed. R. Evid. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *United States v. Lyles*, 593 F.2d 182, 195 (2d Cir. 1979) ("The greater the danger of prejudice, the more justification must be shown for the introduction of challenged evidence.") (citation omitted).

Plaintiffs' argument that evidence of Defendants' past fraudulent behavior is relevant to the issue of the remedy Plaintiffs are entitled to is similarly without merit. Plaintiffs argue it is logical to assume that if the 2013 lease were rescinded, "the Club would simply use its entrenched control over [WFHC] . . . to find other ways to continue looting [WFHC]'s assets," as evidenced by "the Club's scheme to control [WFHC]." (Pls. Opp. 3 at 10.) Therefore, argue Plaintiffs,

monetary damages or the dissolution and sale of WFHC are more appropriate remedies than rescission. (*Id.*) Plaintiffs' line of reasoning rests upon the unsupported premise that Defendants will continue to violate their fiduciary duties in unspecified ways unless the Court orders a remedy that will provide monetary compensation to Plaintiffs. The Court is unpersuaded by this theory.

Plaintiffs' argument that their proposed evidence of a scheme to control WFHC is relevant to corporate purpose is also unavailing. As the Court has stated, while certain evidence related to WFHC shares does bear upon whether WFHC's purpose was to enrich its shareholders, not every fact or theory related to the shares does so. Defendants' alleged practice, beginning in the 1970s, of restricting the transfer of WFHC shares and attempting to consolidate the Club's majority shareholder status in part through such restrictions does not make it more likely than not that WFHC was formed to enrich its shareholders.

Finally, Plaintiffs argue that their proposed evidence supports their derivative claims because Defendants' fraudulent shareholder communications and share transfer restrictions constitute acts of "looting" WFHC by entrenching the Club's control of WFHC. (Pls. Opp. 3 at 7–8.) Plaintiffs raise these claims in the Joint Final Trial Report only in the context of their alternative claim for dissolution, and not in the context of their derivative claims.[6] (*See* Joint Final Trial Report at 5.) Previously, Plaintiffs invoked evidence related to shareholder communications and transfers to demonstrate that Defendants looted WFHC by pursuing a scheme "to purchase and accumulate shares from non-member shareholders in order to consolidate the Club's majority control over WFHC and thereby remove potential obstacles" to purportedly unfair leases. (Pls.' Mem. in Support of Mot. for Partial Summ. J. (ECF No.194) at 47.) However, WFHC gained

---

[6] Plaintiffs raise these claims, which are separate from and unrelated to the 2013 lease, in spite of their initial assertion that "In light of the Court's rulings, all claims for relief stated in Plaintiffs' amended complaint remain to be tried to the extent the claims relate to Defendants' extension in 2013 of the lease between [WFHC] and [the Club]." (Joint Final Trial Report at 3.)

majority shareholder status by 1983. *See Busher*, Docket 227 at 4. It appears that Plaintiffs have now amended their theory of liability to suggest that Defendants' scheme to advance the Club's control over WFHC harmed WFHC in some manner unrelated to the lease extensions or to the Club's power as majority shareholder. Plaintiffs have not disclosed what that harm entailed, or how they expect to prove any damages to WFHC arising from Defendants' post-2008 actions in this regard. In other words, Plaintiffs appear to have introduced a new legal theory without evidentiary support, on the eve of trial, in order to revive a claim that was dismissed by the Court nine months ago. However, Plaintiffs' proposed evidence does not show any harm to WFHC and thus does not support a derivative claim. Plaintiffs' allegations with respect to the fraudulent actions of Defendants are more properly the subject of the direct action commenced against Defendants in 2016. *See Clune v. Barry*, No. 7:16-cv-4441, Am. Compl., Docket 62.

In sum, the Court is unpersuaded that any evidence related to Defendants' alleged "scheme to control" is relevant to the issues of corporate purpose and the 2013 lease extension. Furthermore, even if such evidence carried any probative value, that value is substantially outweighed by the prejudice it would inflict on Defendants. Accordingly, the portion of Defendants' motion to preclude evidence related to Defendants' alleged fraud or misrepresentations to shareholders, or restricted transactions involving WFHC shares, is granted.

**3. Evidence Related to Lost Shareholder Contact Information**

Defendants next argue that Plaintiffs should be precluded from presenting evidence regarding WFHC's alleged failure to proactively seek out updated contact information for certain shareholders. (Defs. Mot. 3 at 8–9.) Plaintiffs contend that such evidence is relevant to the "scheme to control" discussed above, to assess appropriate remedies should Plaintiffs prevail at trial, and to explain why Defendants extended the 1947 Lease Amendment using option

instruments rather than formally replacing or amending the original lease.  (Pls. Opp. 3 at 11–12.)
As to the first of these rationales, the Court has considered and rejected Plaintiffs' argument that
evidence is *per se* relevant if it is indicative of Defendants' attempts to consolidate the Club's
control over WFHC.  Similarly, Plaintiffs' assertion that whether Defendants actively sought out
contact information for "lost" shareholders is relevant to whether rescission is an appropriate
remedy is without merit for reasons the Court has already discussed.  Finally, the rationale behind
the instrument used by WFHC to extend its lease with the Club is not relevant to any issue in this
case.  The Court can discern no basis for the entry of Plaintiffs' proposed evidence at trial.
Accordingly, the portion of Defendants' motion seeking to preclude Plaintiffs from introducing
evidence regarding WFHC's failure to contact shareholders who have not updated their contact
information is granted.

### 4.  Defendants' Liability Insurance

Federal Rule of Evidence 411 ("Rule 411") precludes parties from offering evidence that
a person was or was not insured against liability to prove whether the person acted negligently or
otherwise wrongfully.  Fed. R. Evid. 411.  However, "Rule 411 is not a bar to the introduction of
evidence regarding liability insurance in all cases."  *Weiss*, 293 F. Supp. 2d at 413.  A court may
admit such evidence for another purpose, "such as proving a witness's bias or prejudice or proving
agency, ownership, or control."  Fed. R. Evid. 411.

Defendants seek to preclude Plaintiffs from introducing any evidence regarding
Defendants' liability insurance arrangements.  (Defs. Mem. 3 at 10–11.)  Plaintiffs agree that they
will not seek to offer most of the evidence of Defendants' liability insurance identified in
Defendants' moving papers.  (Pls. Opp. 3 at 12–13.)  However, Plaintiffs contend that they should
be permitted to offer evidence at trial relating to an indemnification agreement between WFHC

and the Club, dated October 15, 2013 (the "Indemnification Agreement"), as evidence of Defendants' culpability.   (*Id.*)   While this is not a permissible purpose for which to offer indemnification evidence pursuant to Rule 411, Plaintiffs state that because the Indemnification Agreement was executed after WFHC entered the 2013 lease extension, they are entitled to an exception from the rule.   Specifically, Plaintiffs aver that "[a]n indemnification agreement, obtained *after* wrongdoing, is admissible as evidence of consciousness of wrongdoing."  (*Id.* at 12.)

Plaintiffs cite a single Texas District Court case for this proposition.  *See DSC Communications Corp. v. Next Level Communications*, 929 F. Supp. 239 (E.D. Tex. 1996).  That case involved indemnity agreements under which a buyer of a corporation agreed to indemnify the corporation's former employees for any liabilities incurred in a trade secret misappropriation action that had been recently commenced by their former employer.  *Id.* at 241–42.  The Texas District Court determined for various reasons, including that the agreements were isolated business arrangements and did not insure against future risk, that the indemnification agreements did not constitute liability insurance under Rule 411, and were not inadmissible pursuant to that rule.  *Id.* at 242–45.  It did not determine that any indemnification agreement "obtained *after* wrongdoing" is "admissible as evidence of consciousness of wrongdoing."   Plaintiffs, resting on their mischaracterization of the Texas District Court's holding, make no attempt to analogize the Indemnification Agreement with the facts of the case they cite.

Since Plaintiffs have presented no basis for the admission of the Indemnification Agreement pursuant to Rule 411, and the Court does not find that references to the Indemnification Agreement would serve any probative purpose as to the issues remaining for trial, the portion of

39

Defendants' motion seeking to preclude evidence related to the Indemnification Agreement is granted.

### 5. Inadmissible Witness Testimony

Defendants ask the Court to exclude testimony from several of Plaintiffs' proposed witnesses who, according to Defendants, are only expected to testify on topics unrelated to corporate purpose or the 2013 lease extension. First, Defendants state that the testimony of Plaintiffs' proposed expert, Craig Jacobson, should be excluded as irrelevant and prejudicial because it relates solely to the historical value of a WFHC share, dating back to 1923, and whether the prices paid for a WFHC share over its history were reasonable. (Defs. Mem. 3 at 11–12.) Specifically, Mr. Jacobson will testify that he calculated an indicative, present-day price for a WFHC share based on the valuation of WFHC's property performed by Plaintiffs' expert Eric Haims, and indexed this present-day price to economic indices such as the Dow Jones Industrial Average, the S&P 500, and the Consumer Price Index in order to calculate similar indicative prices for WFHC shares in past years. (*See* Pls. Opp. 3 at 14; Defs. Mem. 3 Ex. 14.) Based on his comparison of the indicative prices to the actual, transactional prices historically paid for WFHC shares, Mr. Jacobson will testify that while in the 1920s and 1930s, the actual transactional prices for WFHC shares closely correlated with the indicative prices, from the year 1945 onwards, the indicative prices exceeded the transactional share prices by varying but consistently large amounts. (*Id.*) Further, Mr. Jacobson will testify that prior to 1945, price movements of WFHC shares correlated with the movement of the indices, but that after that year, transactional prices moved arbitrarily in relation to the market-reflective indicative prices, displaying no apparent linkage with underlying value. (*Id.*) Mr. Jacobson intends to opine that (1) since 1945, "the prices paid for WFHC stock were not reasonable and were significantly lower than the indicated value of the

stock," and (2) "in recent decades, the prices paid for WFHC stock were frequently even more dramatically lower than the indicated value of the stock." (Defs. Mem. 3 Ex. 14 (ECF No. 285).)

Defendants argue that these facts are irrelevant to WFHC's corporate purpose, liability, or Plaintiffs' damages. Plaintiffs disagree, contending that Mr. Jacobson's testimony is relevant to WFHC's corporate purpose insofar as it tends to support Plaintiffs' theory that WFHC shares were originally equity securities intended "to provide a prospective return related to the value of [WFHC]'s assets." (Pl. Opp. 14.) While certain aspects of WFHC stock, particularly around the time of WFHC's founding, might be relevant to whether WFHC's original shareholders expected WFHC to produce a profit for them, the Court can discern no reason why the reasonableness of the transactional prices of WFHC shares throughout its nearly one-hundred-year-long history would have any bearing on that question, regardless of whether such prices tracked hypothetical indicative prices. Since it appears that Mr. Jacobson's testimony will be limited to that issue, the Court concludes that it should be precluded as irrelevant.

As to Defendants' arguments that an additional twelve fact witnesses should be precluded as irrelevant, (Defs. Mem. 3 at 13–15), the Court does not have enough information about their expected testimony to conclude that their testimony would have no conceivable relevance to any issue in this case. Accordingly, the Court declines to categorically preclude Plaintiffs from calling these witnesses. However, the Court cautions that the testimony of these witnesses is required to conform with the Court's rulings to date. The portion of Defendants' motion seeking to preclude certain fact witnesses is preliminarily denied, without prejudice to Defendants' re-raising their objections during trial.

SPA-74

**D.  Defendants' Application for Dismissal of Plaintiffs' Dissolution Claim**

Since the issue of damages will be tried separately from and subsequently to the issue of liability in this matter, the Court reserves decision on the majority of the issues raised in Defendants' two motions *in limine* concerning evidence of damages.  However, one issue raised by Defendants warrants the Court's present consideration.  Specifically, Defendants argue that Plaintiffs' cause of action seeking judicial dissolution of WFHC must be dismissed because the Court lacks subject matter jurisdiction to hear such a claim.  (Defs. Mem. in Support of Defs.' Mot. 4 ("Defs. Mem. 4") (ECF No. 287) at 11.)  Plaintiffs oppose dismissal of their dissolution claim, asserting that it is not jurisdictionally barred, that Defendants have waived their right to seek the Court's abstention, and that, in any event, the Court should decline to exercise abstention. (Pls.' Mem. Opp. Defs. Mot. 4 ("Pls. Opp. 4") (ECF No. 308) at 13–15.)

Whether the Court has subject matter jurisdiction over a claim to dissolve a corporation is a question that has not been resolved by the Second Circuit.  *See Friedman v. Revenue Mgmt. cf N.Y., Inc.*, 38 F.3d 668, 671 (2d Cir. 1994) (discussing competing authority with respect to whether or not federal courts have subject matter jurisdiction over dissolution claims and concluding that "we need not authoritatively resolve [that issue] at this time").  In any event, however, "federal courts may decline to exercise their jurisdiction, in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (internal quotation marks omitted).  One such class of exceptional circumstances was recognized by the Supreme Court in *Buford v. Sun Oil Co.*, 319 U.S. 315, 332–34 (1943).  Pursuant to the *Buford* abstention doctrine,

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the

> result in the case at bar; or (2) where the exercise of federal review of the question
> in a case and in similar cases would be disruptive of state efforts to establish a
> coherent policy with respect to a matter of substantial public concern.

*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)

(internal quotation marks omitted).

The Second Circuit has "identified three factors to consider in connection with the

determination of whether federal court review would work a disruption of a state's purpose to

establish a coherent public policy on a matter involving substantial concern to the public," which

are as follows: "1) the degree of specificity of the state regulatory scheme; (2) the need to give one

or another debatable construction to a state statute; and (3) whether the subject matter of the

litigation is traditionally one of state concern." *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639,

650 (2d Cir. 2009) (quoting *Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir. 1998)) (internal

quotation marks omitted).   In general, *Burford* abstention is appropriate when a federal court

determines that "the strong interest in having certain classes of cases, and certain federal rights,

adjudicated in federal court" outweighs "the State's interests in maintaining uniformity in the

treatment of an essentially local problem." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. at 728.

A claim for judicial dissolution implicates *Burford*, "given the comprehensive regulation

of corporate governance and existence by New York." *Friedman*, 38 F.3d at 671.   The Second

Circuit has explicitly recognized that "New York has a strong interest in the creation and

dissolution of its corporations." *Id.*  Furthermore, the Second Circuit, in reviewing a district court's

decision to abstain from exercising jurisdiction over a dissolution claim for abuse of discretion,

has noted that in such cases, abstention "would avoid needless interference with New York's

regulatory scheme governing its corporations." *Id.*   In accordance with that rationale, district

courts within this Circuit have routinely, and almost uniformly, elected to exercise *Burford*

abstention over claims for the dissolution of a corporation formed under state law.  *See, e.g.*, *Mecca v. Lennon*, No. 16-cv-1414, 2017 WL 1410790, at *5 (E.D.N.Y. Apr. 18, 2017); *Scjitz Am. Capital Corp. v. Keystone Equip. Fin. Corp.*, 88 F. Supp. 3d 59, 62 (D. Conn. 2015); *Kermansah v. Kermansah*, 580 F. Supp. 2d 247, 271 (S.D.N.Y. 2008); *Feiwus v. Genpar, Inc.*, 43 F. Supp. 2d 289, 296–98 (E.D.N.Y. 1999); *see also Friedman*, 38 F.3d at 671 (noting that "every federal court that has addressed the issue of dissolving state corporations has either abstained or noted that abstention would be appropriate, assuming that jurisdiction existed").

Here, it is unnecessary for the Court to reach the merits of Defendants' jurisdictional challenge because even assuming that the Court does possess jurisdiction to dissolve WFHC, the Court finds it proper to abstain from exercising that power.  WFHC, a corporation formed under the laws of the state of New York, is a creature of the state, and its dissolution necessarily implicates New York's comprehensive system of corporate governance.  The fact that Plaintiffs say they are pursuing a claim for dissolution under common law, rather than a state statute, (*see* Pls. Opp. 4 at 15), does nothing to alter this fact, or New York's "strong interest in the creation and dissolution of its corporations."  *Friedman*, 38 F.3d at 671.  Moreover, the Court is unpersuaded by Plaintiffs' argument that Defendants have waived the right to seek the Court's abstention.  (*See* Pls. Opp. 4 at 13–14.)  While the Court does not endorse Defendants' delay in raising this issue, Plaintiffs have demonstrated neither that waiver of *Burford* abstention is a recognized concept in this Circuit, nor that they would be prejudiced by the Court's exercise of abstention at this phase in the proceedings.  Indeed, Plaintiffs admit that "[i]f the Court abstained

from exercising jurisdiction over the dissolution claim, Plaintiffs would be able to re-file the cause of action in New York Supreme Court, Westchester County." (Pls. Opp. 4 at 14 n.18.)

For the foregoing reasons, the Court finds abstention appropriate as to Plaintiffs' dissolution claim, without ruling on the issue of subject matter jurisdiction. The portion of Defendants' motion *in limine* seeking dismissal of that claim is granted. The Court reserves decision on the remainder of the motion.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motions *in limine*, (ECF Nos. 273, 275, & 280), are GRANTED in part and DENIED in part. Defendants' motions *in limine* concerning evidence bearing on the question of liability, (ECF Nos. 264, 268, & 278), are GRANTED in part, DENIED in part, and RESERVED in part. Defendants' motion *in limine* which seeks, in relevant part, dismissal of Plaintiffs' dissolution claim, (ECF No. 286), is granted to the extent that such claim is dismissed without prejudice to Plaintiffs' asserting the claim in a state court action, and the Court otherwise reserves decision on all other aspects of the motion. The Court likewise reserves decision on Defendants' motion *in limine* seeking to preclude evidence of the theoretical development of the Winged Foot property, (ECF No. 265).

The Clerk of the Court is directed to terminate the motions at ECF Nos. 273, 275, 280, 264, 268, & 278.

Dated:   December 18 , 2019                    SO ORDERED:
         White Plains, New York

                                               _____
                                               NELSON S. ROMÁN
                                               United States District Judge

45

SPA-78

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/14/2020

---

MEREDITH BUSHER and ELLEN BUSHER as Co-Personal Representatives of the Estate of EUGENE L. BUSHER, and NANCY TUMPOSKY,

        Plaintiffs,

        v.

DESMOND T. BARRY, JR., THOMAS T. EGAN, JOHN P. HEANUE, WILLIAM M. KELLY, FRANCIS P. BARRON, and WINGED FOOT GOLF CLUB, INC.,

        Defendants.

WINGED FOOT HOLDING CORPORATION,

        Nominal Defendant.

---

14 Civ. 4322 (NSR) (JCM)

~~[PROPOSED]~~ FINAL ORDER
FOR VOLUNTARY
DISMISSAL OF CLAIMS
UNDER RULE 41(a)(2)

---

    WHEREAS, Plaintiffs' derivative claims on behalf of the Winged Foot Holding Corporation ("Holding Corp.") were partially dismissed by the Court's order dated March 12, 2019 (dkt. 227), as clarified by the Court's orders dated October 2 (dkt. 244) and December 18, 2019 (dkt. 329);

    WHEREAS, Plaintiffs' claim for equitable dissolution of Holding Corp. was dismissed on abstention grounds, without prejudice to Plaintiffs' asserting the claim in a state court action, by the Court's order dated December 18, 2019 (dkt. 329);

    WHEREAS, Plaintiffs sought permission pursuant to Rule 41(a)(2) to voluntarily dismiss their remaining derivative claims, relating to the lease between Holding Corp. and Winged Foot Golf Club for the period 2050-2071 (the "Remaining Claims"), with prejudice, in order to expeditiously appeal the Court's prior dismissal of Plaintiffs' other derivative claims;

    WHEREAS, the Court on January 2, 2020 (dkt. 337) preliminarily approved Plaintiffs' proposed voluntary dismissal of the Remaining Claims with prejudice, subject to notice being provided to Holding Corp. shareholders pursuant to Rule 23.1 of the Federal Rules of Civil Procedure;

    WHEREAS, the Court on January 28, 2020 (dkt. 344) approved a plan for notice to shareholders, pursuant to which a final approval hearing was scheduled for April 17, 2020, and Plaintiffs' counsel mailed written notice to shareholders advising them, *inter*

*alia*, of their right to appear at the hearing and to object to the proposed voluntary dismissal of claims; and

WHEREAS, because of the public health emergency regarding the COVID-19 virus, the originally scheduled final approval hearing was adjourned and rescheduled three times (*see* dkt. 346, 348, 355), with further notice being mailed to shareholders by Plaintiffs' counsel each time;

The matter having come on for hearing before the Court on October 8, 2020, with no shareholder objections having been made, and the Court having considered the papers and proceedings filed herein and the arguments made at the final approval hearing, and finding there to be good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

1.      The distribution of notice to Holding Corp. shareholders pursuant to Rule 23.1, as provided for in the plan approved by the Court, constituted the best notice practicable under the circumstances, and met the requirements of due process under the United States Constitution and applicable state and federal law, and accordingly, based on the papers and proceedings in connection with the final approval hearing held on October 8, 2020, the Court finds that the actual notice to Holding Corp. shareholders was adequate.

2.      The Court finds that no substantial prejudice to Defendants has been shown from Plaintiffs' proposed voluntary dismissal of the Remaining Claims with prejudice.

3.      Final approval of Plaintiffs' proposed voluntary dismissal of the Remaining Claims with prejudice is granted, and accordingly, the Remaining Claims are dismissed with prejudice.

4.      Final judgment shall be entered in this matter.

SO ORDERED.

_____
Nelson S. Román, U.S.D.J.

DATED: October 14, 2020
White Plains, NY

SPA-80

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MEREDITH BUSHER and ELLEN BUSHER as Co-Personal Representatives of the Estate of EUGENE L. BUSHER, and NANCY TUMPOSKY, | |
| Plaintiffs, | |
| v. | 14 Civ. 4322 (NSR) (JCM) |
| DESMOND T. BARRY, JR., THOMAS T. EGAN, JOHN P. HEANUE, WILLIAM M. KELLY, FRANCIS P. BARRON, and WINGED FOOT GOLF CLUB, INC., | [PROPOSED] JUDGMENT |
| Defendants. | |
| WINGED FOOT HOLDING CORPORATION, | |
| Nominal Defendant. | |

Pursuant to the accompanying Final Order for Voluntary Dismissal of Claims Under Rule 41(a)(2),

IT IS HEREBY ORDERED that:

Final judgment in this matter is entered.

SO ORDERED.

_____
Nelson S. Román, U.S.D.J.

DATED: October 14, 2020
White Plains, NY


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/14/2020